PETITION FOR WRIT OF HABEAS CORPUS 2008 OCT -7  AM II: 45
UNDER 28 U.S.C. 2254

Prisoner's name:        **KENNETH HARTLEY**
Prisoner's number:      DOC No. 318987
Place of Confinement:   **UNION CORRECTIONAL INSTITUTION**
                        **Raiford, Florida**

MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE FLORIDA

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**KENNETH HARTLEY,**

        Petitioner,

v.                                  CASE NO. 3:08-cv-962J-34

**WALTER A. MCNEIL, JR.,**
        **Secretary, Florida**
        **Department of Corrections,**

        Respondent,

**and**

**BILL MCCOLLUM, JR.,**
        **Attorney General,**

        Additional Respondent.
_____/

## PETITION

1.  **Name and location of court which entered the judgment
    of conviction under attack and state court case
    number(s):**

    Duval County Circuit Court of the Fourth Judicial
    Circuit, Case No. 91-8144 CF.

2.  **Date of judgments and convictions:**

    Found Guilty by jury on August 27, 1993; Recommendation
    of death by jury on September 9, 1993; Sentenced by

judge on December 9, 1993.

**3.    Length of sentence:**

Sentence of death.

**4.    Sentencing judge:**

Judge Hudson Olliff.

**5.    Nature of offense or offenses for which you were convicted:**

First-degree murder.

**6.    What was your plea?**

Not guilty plea.

**7.    Type of trial:**

Jury trial.

**8.    Did you testify at trial?**

No.

**9.    Did you appeal from the judgment of the conviction?**

Yes.

**10.   If you did appeal, answer the following:**

A)   Name of court:  Supreme Court of Florida.

B)   Result: convictions and sentence of death affirmed.

C)   Date of result: 9/19/96, Hartley v. State, 686 So.2d 1316 (Fla. 1996), rehearing denied 1/31/97. Mandate issued 3/3/97.

**If you filed a second appeal or filed a petition for certiorari in the Florida Supreme Court or the United**

2

**Supreme Court, give details:**

Applied for certiorari in the United States Supreme Court on 4/30/97, case No. 96-8870, cert denied at Hartley v. Florida, 522 U.S. 825 on 10/6/97.

11. **Did you file any post conviction motions under either Florida Rule of Criminal Procedure 3.800 or 3.850 with the state trial court or any other post conviction motions or petitions for writ of habeas corpus with the state trial court or state appellate court to this judgment and conviction?**

Yes.

12. **(a)   Grounds relied upon in the petition:**

1.   One year time limitation on filing 3.851 Motion violated Mr. Hartley's due process and equal protection rights and denies him effective assistance of counsel and access to state and federal courts and habeas corpus.

a.   Raised in Mr. Hartley's Amended Rule 3.851 motion filed on or about 2/2/02 as Claim I.

2.   Finding existence of HAC aggravating circumstance violated Eighth Amendment and federal case law.

a.   Raised in Mr. Hartley's Amended Rule 3.851 motion filed on or about 2/2/02 as Claim II.

3.   Florida's capital sentencing scheme is vague and overly broad as the jury does not receive sufficient narrowing instructions.

a.   Raised in Mr. Hartley's Amended Rule 3.851 motion filed on or about 2/2/02 as Claim III.

4.   Mr. Hartley is innocent of first-degree murder and was denied adversarial testing.

3

      a.    Raised in Mr. Hartley's Amended 3.851 motion filed on or about 2/2/02 as Claim IV.

5.    Newly discovered evidence establishes that Mr. Hartley's capital conviction and sentence are constitutionally unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

      a.    Raised in Mr. Hartley's Amended 3.851 motion filed on or about 2/2/02 as Claim V.

6.    Mr. Hartley is innocent of the death penalty.

      a.    Raised in Mr. Hartley's Amended Rule 3.851 motion filed on or about 2/2/2 as Claim VII.

7.    The prosecutor's impermissibly suggesting to the jury that the law required that it recommend a sentence of death denied Mr. Hartley his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

      a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim VIII.

8.    The prohibition against Mr. Hartley's counsel interviewing jurors violates the Sixth, Eighth and Fourteenth Amendments.

      a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim IX.

9.    The trial court violated Mr. Hartley's rights by instructing the jury that "no one has the right to violate the rules we all share."

      a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or

4

about 2/2/02 as Claim X.

10. Penalty phase counsel's failure to present witnesses was ineffective.

    a.  Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XII.

    b.  Mr. Hartley appealed the denial of his claim to the Florida Supreme Court in Claim I of his Initial Brief filed on or about November 28, 2006.

11. The admission of a jailhouse statement Mr. Hartley allegedly made to his cellmate violated Mr. Hartley's rights.

    a.  This claim was raised in Mr. Hartley's Amended 3.851 Motion filed on or about 2/2/02 as Claim XII.

12. Florida's capital sentencing statute is unconstitutional as the imposition of the death penalty is arbitrary and capricious and violates the constitutional guarantees of the due process and is cruel and unusual punishment.

    a.  Mr. Hartley raised this claim in his Amended Rule 3.851 Motion filed on or about 2/2/02 as Claim XIII.

13. No reliable transcript of Mr. Hartley's trial exists making reliable appellate review impossible.  This is a violation of Mr. Hartley's Sixth, Eighth and Fourteenth Amendment rights.

    a.  Mr. Hartley raised this claim in his Amended Rule 3.851 Motion filed on or about 2/2/02 as Claim XV.

14. The trial court permitted the State to introduce gruesome and shocking photographs

in violation of Mr. Hartley's Fifth, Sixth, Eighth and Fourteenth Amendments.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XV.

15.  Defense counsel was ineffective in the guilt phase by failing to adequately question potential jurors regarding their views of the death penalty, failing to ensure an impartial jury, failing to discover and remove biased jurors and failing to properly preserve this issue for appeal.  This violated Mr. Hartley's Sixth, Eighth and Fourteenth Amendment rights.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 Motion filed on or about 2/2/02 as Claim XVI.

16.  The trial court erroneously instructed Mr. Hartley's jury on the standard by which they must judge expert testimony.  The jury made decisions of law that were within the province of the court.  The jury's guilt verdict and death recommendation are constitutionally unreliable in violation of the Sixth, Eighth and Fourteenth Amendments.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XVII.

17.  The sentencing court's refusal to find and weigh mitigating circumstances as set out in the record violates Mr. Hartley's Eighth Amendment rights.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XVIII.

18.  The introduction of nonstatutory aggravating factors so perverted the sentencing phase of

Mr. Hartley's trial that it resulted in the arbitrary and capricious imposition of the death penalty, in violation of the Eighth and Fourteenth Amendments.

    a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XVIV.

19.    Mr. Hartley's sentencing jurors were repeatedly misinformed and misled by instructions and arguments, which unconstitutionally and inaccurately diluted their sense of responsibility for sentencing, contrary to the Eighth and Fourteenth Amendments. Defense counsel's failure to object and adequately litigation this issue was ineffective assistance of counsel.

    a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XXI (A).

20.    Mr. Hartley was denied effective assistance of counsel at the guilt/innocence and sentencing phases of his trial for failing to present mitigation evidence, in violation of the Sixth, Eighth and Fourteenth Amendments.

    a.    Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XXI (B).

    b.    Mr. Hartley appealed the denial of his ineffective assistance of counsel claim at the penalty phase to the Florida Supreme Court in his Initial Brief filed on or about November 28, 2006.

21.    Mr. Hartley's trial counsel's failure to consult with a mental health expert was ineffective assistance of counsel and a violation of Ake v. Oklahoma.

    a.    Mr. Hartley raised this claim in his

7

Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XXII. Mr. Hartley amended this claim in Motion for Amended Claim filed on or about 10/20/03.

b.   Mr. Hartley appealed the denial of this claim to the Florida Supreme Court in his Initial Brief filed on or about November 28, 2006.

22.   The application of aggravating circumstances violated Mr. Hartley's Eighth and Fourteenth Amendment rights as the jury was not instructed on the elements of the aggravators.

a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 as Claim XXIII.

24.   Improper consideration of the victim's character and victim impact information violated Mr. Hartley's rights under the Eighth and Fourteenth Amendments.

a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XIX.

25.   The trial court erroneously shifted the burden of proof in its instructions and application of this erroneous standard to its own sentencing determination, depriving Mr. Hartley due process and equal protection as well as violating his rights under the Eighth and Fourteenth Amendments.

a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XX.

26.   The Prosecutor's improper closing arguments in the guilt and penalty phases denied Mr. Hartley a fundamentally fair and reliable capital trial and sentencing determination as

8

guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XXI.

27.   The prosecutor and the trial judge misled the jury as to its proper function at capital sentencing in violation of Mr. Hartley's Eighth and Fourteenth Amendment rights.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XXII.

28.   The trial court erred in permitting the state to argue lack of remorse in violation of Florida law and the Eighth and Fourteenth Amendments.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XXIII.

29.   The State's withholding material and exculpatory evidence, the state's presentation of misleading evidence and defense counsel's failure to investigate violated the Mr. Hartley's Fifth, Sixth, Eighth and Fourteenth Amendment rights and Florida discovery rules. Adversarial testing did not occur undermining confidence in the outcome.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XXIV.

30.   Mr. Hartley's trial was fraught with procedural and substantive error, which cannot be harmless when viewed as a whole, since the combination of errors deprived him of the fundamentally fair trial guaranteed under the Sixth, Eighth, and Fourteenth

Amendments.

    a.   Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02, as Claim XXV.

31.  Florida's capital sentencing procedure is unconstitutional under <u>Ring v. Arizona</u>.

    a.   Mr. Hartley raised this claim in his Motion to Declare Florida's Capital Sentencing Procedure Unconstitutional Under <u>Ring v. Arizona</u> dated 7/17/02.

32.  Mr. Hartley's counsel was ineffective at the guilt phase of his capital trial based on counsel's failure to investigate Mr. Hartley's alibi defense.

    a.   Mr. Hartley raised this claim in his Supplement to 3.850 Motion filed on or about 11/21/03.

33.  Mr. Hartley's counsel was ineffective at the penalty phase of is capital trial for failing to inform the jury that Mr. Hartley rescued a fellow inmate who attempted to hang himself and giving CPR.

    a.   Mr. Hartley raised this claim in his Supplement to 3.850 Motion filed on or about 11/21/03.

34.  Post conviction counsel is unable to file a complete 3.850 Motion due to incomplete public records resulting from former post conviction counsel's failure to request critical documents from state agencies.

    a.   Mr. Hartley raised this claim in his Supplement to 3.850 Motion filed on or about 11/21/03.

**12.  (b)  State the facts upon which petitioner relies.**
See Statement of Facts and Grounds for Relief,

see below.

**(c)   If you did file any matters within the realm of question 11, answer the following as to each motion or petition.**

**A) The type of motion/petition filed; B) Date motion/petition filed; C) Name of court; D) Result; E) Date of Result**

Motion for Post Conviction Relief

A)   Rule 3.850 Motion.

B)   1/15/02, Supplemental Ground to Amended Motion filed 7/17/02; Motion for Amended Claim filed 10/20/03; Supplement to 3.850 Motion filed 11/21/03.

C)   Duval County Circuit Court of the Fourth Judicial Circuit.

D)   Denied.

E)   6/10/04.

**13.   If your motion or petition described in paragraph 12 was denied, did you file an appeal of that denial with the appropriate state appellate court?** Appeal of 3.850 denial taken appropriately to Supreme Court of Florida.

**As to each motion or petition indicate:**

**A) Name of court where appeal filed; B) Date appeal filed; C) Result; D) Date of Result**

A)   3.850 denial appealed to the Supreme Court of Florida.

B)   Notice of appeal filed on 11/10/04.

C)   The Florida Supreme Court affirmed the lower court's denial of relief.

11

D)   5/22/08, <u>Hartley v. State</u>,  2008 Fla. Lexis
     918(Fla. 2008), mandate issued 9/26/08.

14.  **Did you file any other post conviction motions under
     either Florida Rule of Criminal Procedure 3.800 or
     3.850 with the state trial court or any other post
     conviction motions or petitions for writ of habeas
     corpus with the state trial court or state appellate
     court to this judgment and conviction?**

     No.

15.  **If you did file any other matters within the realm of
     question 14, answer the following as to each motion or
     petition.**

          **A)The type of motion/ petition filed; B) Date
          motion/petition filed; C) Name of court; D)
          Result; E) Date of Result**

     Not applicable.

16.  **Did you file any other post conviction motions under
     either Florida Rule of Criminal Procedure 3.800 or
     3.850 with the state trial court or any other post
     conviction motions or petitions for writ of habeas
     corpus with the state trial court or state appellate
     court to this judgment and conviction?**

     No.

17.  **If you did file any other matters within the realm of
     question 16, answer the following as to each motion or
     petition.**

          **A)The type of motion/petition filed; B) Date
          motion/petition filed; C) Name of court; D)
          Result; E) Date of Result**

     Not applicable.

18.  **If your motion or petition described in paragraph 17**

12

was denied, did you file an appeal of that denial with
the appropriate state appellate court? No.

As to each motion or petition indicate:

> A) Name of court where appeal filed; B) Date
> appeal filed; C) Result; D) Date of Result

Not applicable.

19. Did you file any other post conviction motions under
either Florida Rule of Criminal Procedure 3.800 or
3.850 with the state trial court or any other post
conviction motions or petitions for writ of habeas
corpus with the state trial court or state appellate
court to this judgment and conviction?

> No.

20. If you did file any other matters within the realm of
question 19, answer the following as to each motion or
petition.

> A)The type of motion/petition filed; B) Date
> motion/petition filed; C) Name of court; D) Result; E)
> Date of Result

Not applicable.

21. If your motion or petition described in paragraph 17 was
denied, did you file an appeal of that denial with the
appropriate state appellate court? Not applicable.

As to each motion or petition indicate:

> A) Name of court where appeal filed; B) Date appeal
> filed; C) Result; D) Date of Result

> Not applicable.

22. State concisely every ground on which you claim you are
being held unlawfully.  Summarize briefly the facts
supporting each ground.

13

## STATEMENT OF TRIAL FACTS AND GROUNDS FOR RELIEF

Mr. Hartley, along with Ronnie Ferrell and Silvester Johnson, was charged by indictment with first-degree murder of Gino Mayhew, armed burglary and aggravated assault (R. 1016). The three were tried separately and were each convicted of first degree murder, robbery and kidnapping (Id.). Mr. Hartley and Ferrell were sentenced to death while Johnson was sentenced to life in prison (Id.). Upon information and belief, the state circuit court vacated Ferrell's death sentence after a post-conviction hearing.

Gino Mayhew, the victim, was a seventeen year old drug dealer who carried a sawed off shotgun in the back seat of his Chevrolet Blazer (T. 2008-9; 2069). On the evening of April 22, 1991, he parked his car in the Washington Heights apartments in Jacksonville, a particularly dangerous area of town, to sell crack cocaine (T. 2069, 2106). Sidney Jones, 33 and a six time convicted felon, was a friend of Gino's and was helping him sell drugs by flagging down people who might be going to other dealers that were also in the vicinity (T. 2069-70). Jones took the rock that Gino offered him in exchange for his services and after walking a short distance, Jones realized that the rock was smaller than what he and Gino had agreed on earlier in the day (T. 2073).

Jones, who at the time of the trial was in custody at the

14

Duval County jail, testified that he headed back to the vehicle
and saw Mr. Hartley, Ferrell and Johnson near the blazer and that
Mr. Hartley was holding a gun (T. 2077).  Jones said that he saw
Mr. Hartley force Gino into the driver's seat and that Hartley
climbed in the backseat behind Gino (Id.).  Ferrell was in the
front passenger seat and Sylvester Johnson left in a separate
vehicle, heading in the same direction (Id.).

Jones expected that his good friend Gino was about to be
murdered, but instead of calling the police, Mr. Jones returned
home and smoked the crack that Gino had just paid him with (T.
2090; T 2116-7).  Jones was a confidential informant and had the
beeper number for the officer whom he was assisting with an
investigation of Gino's drug dealing but he did not call the
officer about Gino's abduction at gunpoint (T. 2091).  Jones had
been a paid confidential informant for the police since the 1970s
and admitted that his attorney negotiated with the prosecutor and
Judge Olliff for a lesser sentence on his January 25, 1993 armed
robbery arrest (T. 2098-9).1  Jones stated that there were other
witnesses to Gino's abduction that did not come forward, but he
refused to provide their names (T. 2114).  Mr. Jones also

---

1    Jones received a fifteen-month sentence on a March 11, 1985
charge of carrying a concealed firearm and possession of a
firearm by a convicted felon.  T 2101  The record does not
reflect that Jones' January 25, 1993 arrest for armed was reduced
to attempted robbery on return of a guilty plea with a sentence

admitted to lying in his deposition taken prior to trial (T.
2119).  Since Jones' arrest for trespassing, he was additionally
charged with armed robbery for which he received a year in prison
from Judge Olliff (T. 2094).

Witness Juan Brown, a two time convicted felon and good
friend of Gino's, testified that he was driving in his car with
two friends and saw Gino driving his blazer with Ferrell in the
passenger seat and a "light skinned black male" in the backseat
(T. 2136-7).  Brown never identified the person sitting behind
Mayhew in the Blazer (Id.).  Brown followed Gino's blazer, but
eventually lost him as he headed in the direction of Sherwood
Park Elementary School (Id.).  At the time of Mr. Hartley's
trial, Mr. Brown was actually being held for contempt because he
failed to appear for a trial preparation session with the
prosecutor on Mr. Hartley's case (T. 2149).  Brown did not come
forward but was contacted in May or June of 1991 by detectives
(T. 2145).  Police never asked him about his two friends who were
traveling in his car with him that night and also saw Gino's car
(T. 2144).

The next day Gino's body was discovered in the car at
Sherwood Park with six gunshot wounds to the head (T. 2038).
Hartley, Johnson, and Ferrell were arrested about three weeks

---

of one year with nine months suspended and credit for twenty-five
days.

16

later (Id.).

The state presented its theory of how the shooting occurred through the medical examiner.  The state also presented three witnesses in addition to Jones and Brown that inculpated Mr. Hartley.  Mr. Hartley's conviction relied completely on the credibility of these witnesses as there was no direct evidence of Mr. Hartley's involvement.

At trial, Medical Examiner Lipkovic testified that Gino had six gun shot wounds (T. 2032).  Lipkovic believed that the victim was seated in the driver's seat and the shots came from behind and somewhat to the right and the victim was turning around (T. 2054-5).  On cross examination, Lipkovic conceded that the state's theory of the victim and shooter's positions at the time of the shooting was not the only possibility and that the victim could have been seated in the right hand seat and turning to the left based on the angle of the gunshot wounds (T. 2056).

Witness Anthony Parkin had five felony convictions and had pled guilty on July 12, 1991 to dealing in stolen property (T. 2182).  At the time of trial, Parkin was in custody awaiting sentencing on that charge and on two violation of probation charges (T. 2182).  A week after Parkin watched a televised bond hearing that showed Mr. Hartley and his co-defendant, he contacted detectives with information that he had regarding Gino Mayhew's murder (T. 2189; 2199).  Parkin told police, and later

the jury, that he overheard Mr. Hartley confessing to another
inmate and that Mr. Hartley also confessed to him directly (T.
2190).  The felony that Parkin was awaiting sentencing on at the
time of Mr. Hartley's trial exposed him to a thirty-year sentence
and possible habitual offender status (T. 2207).  However, after
agreeing to testify for the prosecution, Parkin's plea agreement
specified that he would not receive more than fifteen years
concurrent on two charges and would not be sentenced as a
habitual offender (T. 2183).2  The judge had passed on sentencing
Mr. Parkin numerous times prior to Mr. Hartley's trial in order
to verify that he testified "truthfully" against Mr. Hartley.
ASA Bateh replaced the original prosecutor on Parkin's case and
Parkin's judge released Mr. Parkin on home detention based on the
State Attorney's recommendation (T. 2193-4).  This was permitted
despite Mr. Parkin's being charged with attempted escape on June
1992 and six counts of criminal mischief for breaking windows in
the jail.  He was sentenced to thirty days time served for each
criminal mischief charge (T. 2210).

State's witness Ronald Bronner, a four time convicted felon,
was awaiting sentencing on a cocaine trafficking charge at the

---

2    Mr. Parkin was ultimately sentenced in September of 1993,
the month following his testimony in Mr. Hartley's trial.  He
received a sentence of three years and six months with credit for
two years and 148 days time served.  The State did not prosecute
his escape attempt.  This is not reflected in the Record on
Appeal.

time of Mr. Hartley's trial (T. 2218).  He was arrested on
September 11, 1991 and was placed in a cell with Mr. Hartley (T.
2227).  On October 1, 1991, Mr. Bronner received notice of the
state's intent to prosecute him as a career criminal and the
following day, October 2, 1992, Bronner received notice that the
state was seeking habitual offender status on him (T. 2237).
Bronner testified that Mr. Hartley confessed to murdering Gino a
week later during recreation (T. 2227).  Mr. Bronner gave a sworn
statement to the prosecutor on October 30, 1991 (T. 2232).
Bronner ultimately entered into a plea agreement with the
prosecutor.  Under the agreement, the prosecutor withdrew the
habitual offender motion and the maximum sentence was reduced to
twenty-five years, but Bronner understood that the sentence could
be anything less than that (T. 2229).  Sentencing was delayed on
Bronner's guilty plea until the conclusion of Mr. Hartley's
capital trial (T. 2252).3

State's witness Eric Brooks, a two time convicted felon, was
in jail awaiting sentencing on armed robbery when he testified
against Mr. Hartley (T. 2254).  Brooks was placed in the jail on
August 26, 1991 in the same section as Mr. Hartley (T. 2259).  A

---

3    After testifying against Mr. Hartley- Bronner was actually
sentenced to three years at Florida State Prison, however he was
never sent to prison and was given two years time served and
released from the Duval County Pre-Trial Detention Center (PC-R.
977-8).

few days later, Mr. Hartley denied killing Gino in a conversation during recreation (T. 2260).  Brooks testified that sometime later, in October, Mr. Hartley confessed to shooting Gino in the back of the head "a few times." (T. 2262).  Brooks initially was not going to go to authorities but changed his mind because he was turned off by Mr. Hartley's allegedly "bragging" about murdering Gino (T. 2263).

Just like Bronner, Brooks entered into a plea agreement with prosecutors on November 14 1991.  In exchange for his testimony against Mr. Hartley, Brooks would not be classified as a habitual offender, would get a thirty-year maximum sentence and the three year minimum mandatory sentence was waived (T. 2255).  Sentencing was delayed until after Mr. Hartley's trial (T. 2256).4

Mr. Hartley's trial lawyer, Attorney Willis, presented no guilt phase witnesses and one lay witness at the penalty phase. Assistant public defender, Alan Chipperfield, testified as a sentencing expert about the incarceration assurance of the fifteen and twenty-five year mandatory minimum sentences.  The Reverend Coley Williams, the Hartley family's pastor, testified that Mr. Hartley had a quiet and peaceful spirit, attended church on and off, came from a good family and was intelligent.

--------

4    After testifying against Mr. Hartley - Brooks was actually sentenced to three years at Florida State Prison, however he was never sent to prison and was given two years time served and

Hartley v. State, 658 So. 2$^d$ 1316, 1319 (Fla. 1996).

After Reverend Williams concluded his brief testimony, the entirety of the mitigation evidence, Attorney Willis rested the defense case. The prosecutor, apparently surprised that no expert testimony had been presented regarding the important mental health mitigators, asked the trial judge to determine why no such evidence was being presented (R. 2554-5). Mr. Willis then explained "we are aware that the Court entered an Order transporting him for that purpose we did not request that it be done" and that his was a reasoned decision (Id.).

The state presented Detective Steve Higginbotham whose testimony outlined Mr. Hartley's January 19, 1987, conviction for manslaughter for shooting Angel McCormick in the chest with a shotgun (T. 2465). The state then presented Detective J.C. Perret who detailed Mr. Hartley's April 19, 1991, arrest for robbery and subsequent conviction. Mr. Hartley robbed a cab driver (T. 2468-70). The state also presented Edward Saple, another cab driver, who testified that Mr. Hartley robbed him at gunpoint (T. 2480-6). That trial resulted in a conviction (T. 2480).

Given the lack of evidence presented by the defense in the penalty phase, it was not surprising that the court found minimal

---

released from the Duval County Pre-Trial Detention Center (PC-R. 977-8).

mitigation and sentenced Mr. Hartley to death.   What is surprising -- given the defense's deficient presentation -- is that three jurors voted for life while nine voted for death (T. 2659).

### GROUND I

**TRIAL COUNSEL PROVIDED MR. HARTLEY PREJUDICIALLY INEFFECTIVE ASSISTANCE OF COUNSEL IN THE PENALTY PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Attorney Robert Willis represented Mr. Hartley at his capital trial.   According to his testimony at the evidentiary hearing, Mr. Willis could not recall explaining to Mr. Hartley that his capital trial would be bifurcated and that should he be found guilty, a penalty phase would follow a guilty verdict (PC-R. 1751-2).   Nor did Mr. Willis recall a specific defense strategy for the penalty phase (Id.).   Attorney Willis candidly admitted that his penalty phase strategy at the outset was to win a not-guilty verdict:

> Q:   Okay. Well, did you do a penalty phase investigation prior to the guilt phase?
>
> A:   Prior to the guilt phase, we had discussed it generally.   I mean I can't tell you the specifics as such.   There was, between the time of the – let me back up before that and put this in context.   Our view very much so was that the primary defense for "Kip" Hartley was in the guilt innocence phase because of his history and circumstances.   He met, I've forgotten how many aggravating circumstances, but we felt very strongly that there was a high probability that he was going to

22

> be – get a death penalty recommendation if he was
> convicted.   Certainly our focus was on the guilt phase.
>
> That is not to say we ignored the other, but our
> primary focus was on the guilt phase.   Once that
> verdict came in, we had a week and a half or two weeks
> or something, at which point I made an effort to gather
> witnesses to put on in mitigation as part of the
> penalty phase.   I don't know if you characterize that
> as an investigation or not, but the effort to get
> witnesses, I think I've discussed with you before, was
> largely unsuccessful.   We were not able to get the
> witnesses that I would have liked to have had.

(PC-R. 1541).

Attorney Willis' own words demonstrate that he did not begin

preparing for the penalty phase until after the jury returned

it's guilty verdict, only ten days prior the penalty phase.

Attorney Willis later stressed that he was "very interested in

getting witnesses after this verdict came back" and also

explained his panic during that ten-day period:

> We were disappointed in the verdict.   What I
> remember is being in a real – I don't want to use the
> word desperate, because that's probably over
> dramatizing it, but we were very seriously interested
> in getting witnesses to come in a testify.   I recall
> that it was getting close and I was faced with a
> prospect of having nothing to put on and I didn't –
> obviously we didn't want that.   So – and I cannot
> remember individual conversations and all of that sort
> of thing.   I have a general memory of, please, let's
> find some witnesses, and our primary interest back then
> was to get the family to come in, and that we were
> unable to do.

(PC-R. 1765).

Attorney Willis denied Mr. Hartley's providing names of

witnesses but he was aware of Mr. Hartley's brother Shawn

23

Jefferson, the NFL player who was paying for Mr. Hartley's defense, and sister Cheryl Daniels, who served as the contact person between Attorney Willis and the Hartley family (PC-R. 1751-2). Attorney Willis had no specific recollection of explaining that there could be a penalty phase, what it would consist of or a penalty phase strategy with Shawn Jefferson, Cheryl Daniels or Jean Hartley (PC-R. 1552-6). Attorney Willis was "pretty sure" he remembers Mr. Hartley's family failing to keep scheduled appointments with him that he had set up through Cheryl Daniels (PC-R. 1546).

Attorney Willis did not remember hiring an investigator (PC-R. 1531)(nor is one noted in his file); doesn't remember that Cheryl Daniels could be a possible penalty phase witness or specifically talking about that with her (PC-R. 1545); has no memory of talking with Mr. Hartley's mother (PC-R. 1546); doesn't remember speaking with Shawn Jefferson about the penalty phase or being a penalty phase witness (PC-R. 1547; 1553); nor does he have any specific recollections about his dealings with Mr. Hartley's family (PC-R. 1559). Attorney Willis did not recall Mr. Hartley asking him to call any specific person as a witness (PC-R. 1754). He did remember the name Coach Stevens but not the names of persons presented at the evidentiary hearing by postconviction counsel or names provided by Mr. Hartley including: Tiffany Groomes, Tanya Hawk, Dorothy Cherry, Reverend

24

Phoenix, Reverend Watson, Bruce Capers, Calvin Grant, or Cedric Cicero (PC-R. 1754-56).

Attorney Willis did have a strong, detailed memory of things he did do in Mr. Hartley's case that are memorialized in his file.  For example, Attorney Willis recalls his unsuccessful efforts to present Ronald Wright during the guilt phase; State Attorney Bateh's comments that the case against Mr. Hartley got stronger after he was in custody and State Attorney Bateh "neutralizing" Mr. Hartley's alibi witnesses (PC-R. 1533-4; PC-R. 1561).

Attorney Willis attempted to explain the absence of any memoranda in his file relating to the penalty phase and potential penalty phase testimony from Mr. Hartley's friends and family by stating that he knew they would provide general background information making notes or legal memoranda unnecessary (PC-R. 1776).  Mr. Willis had no memory of speaking to any specific witness during the ten-day period that he was urgently seeking witnesses (PC-R. 1767-8).  If Willis did speak with Cheryl Daniels during this time, they did not discuss the penalty phase. She was distraught and he attempted to reassure her, perhaps and didn't talk to her again (Id.).

Attorney Willis did remember calling a Reverend, who may have been provided by Mr. Hartley, as a witness during the penalty phase (PC-R. 1755).  Mr. Willis testified that he was

25

interested in family first and foremost, teachers and preachers
(PC-R. 1755).   Mr. Willis also remembered presenting Al
Chipperfield, a sentencing expert who testified on technical
matters concerning "life being life." (PC-R. 1756).   Mr. Willis'
purpose in providing Mr. Chipperfield's testimony was to make the
jury secure that the person they sentenced to life would actually
serve life.   Chipperfield's testimony was not mitigation, and not
about Mr. Hartley specifically (Id.).

Mr. Willis also testified that he spoke with the prosecutor
shortly before the hearing and discussed in great detail about
the claims in this case and the importance of Shawn Jefferson to
this case (PC-R. 1769-70).   However, there is no record of him
speaking to Mr. Jefferson, or to anyone in the family.   Mr.
Willis' trial file, which is in evidence, is completely bare of
penalty phase work and Mr. Willis' testimony does not provide any
indication that he did any non-memorialized work.   Mr. Willis
admitted that, while he may have thought a little about the
penalty phase prior to the verdict, he remembers no work that he
did before that time.   His excuse for not presenting any of Mr.
Hartley's family was that a telephone conversation that he had
with Cheryl Daniels the day after the jury rendered it's guilty
verdict in which she called him in tears and told him that, in
essence, the family wiped their hands of Kenneth Hartley when the
verdict came in (PC-R. 1568).   There is no indication that Mr.

26

Willis even explained what a penalty phase was to Cheryl Daniels
or to anyone else in the family (PC-R. 1552-6; 1611; 1635; 1662-
3).

Shawn Jefferson, Mr. Hartley's brother, was an NFL football
player for twelve years and at the time of his testimony was
still playing at the time he testified at Mr. Hartley's
evidentiary hearing (PC-R. 1571).  At the time of Mr. Hartley's
trial, Mr. Jefferson had just started playing in the league as a
late round draft pick and paid for his brother's legal defense by
borrowing money from his agent (PC-R. 1573).  Mr. Jefferson did
not attend Mr. Hartley's trial as he was at training camp in
Orlando, but he did receive permission from his coach to leave
training to go to the trial in the event that he was needed (PC-
R. 1598).  It was commonplace for players to leave training to
attend to family emergencies and Mr. Jefferson would have
traveled from Orlando to Jacksonville in order to testify on his
brother's behalf (PC-R. 1574).  Mr. Jefferson asked Attorney
Willis what he could do to help with his brother's defense, but
Attorney Willis never explained that Mr. Jefferson could testify
at the penalty phase, nor did Willis even discuss the bifurcated
nature of a capital trial and the possibility of a penalty phase
with Mr. Jefferson (PC-R. 1611).  Mr. Jefferson did not try to
hide his brother's murder charges and eventual conviction and in
fact gave numerous interviews with the media around the time of

27

trial and the penalty phase.   Willis did not even call Jefferson after the jury returned it's guilty verdict (PC-R. 1599).

Attorney Willis had all of Mr. Jefferson's contact numbers and Willis contacted Mr. Jefferson several times - always with requests for more money (PC-R. 1573).   Mr. Jefferson never spoke with Attorney Willis or an investigator about he and Mr. Hartley's youth or for that matter, anything substantive about Mr. Hartley's defense (PC-R. 1577).

Mr. Hartley explained that his mother transferred both he and Kenneth from their high school to a different high school due to gang activity at their former school and that the neighborhood was "tough." (PC-R. 1579).   Mr. Jefferson also discussed his brother's good qualities – that he was a caring person and told of their youth together playing sports, singing gospel and going to church (PC-R. 1576).   Mr. Jefferson credited his brother Kenneth with planting the seed in his heart which permitted him to persevere and prosper in the NFL (Id.).   Mr. Jefferson heard Kenneth's voice telling him to "come on and push on and he does." (Id.).   This encouragement helped Mr. Jefferson to achieve great things – he was the national spokesman for the Atlanta Falcons, volunteered for the Boys and Girls Clubs, provided free game tickets to underprivileged children and throughout his career only missed one game while playing hurt 60% of the time (Id.).

Coach Freddie Stevens, a football coach and teacher from Mr.

28

Hartley's and Mr. Jefferson's high school, described Kenneth
Hartley as "mannerable", polite and cooperative and confirmed
that the two boys were inseparable in high school (PC-R. 1627-8).

Cheryl Daniels, Mr. Hartley's sister, recalled Attorney
Willis assuring her that he was going to win her brother's case
and that she shouldn't worry (PC-R. 1634). Attorney Willis did
not discuss the bifurcated nature of the penalty phase with her
or the possibility of a penalty phase (PC-R. 1634-5). He did not
discuss potential mitigation evidence with her nor did he ask her
testify on her brother's behalf at the penalty phase (PC-R.
1636). She would have told the jury about growing up with her
brother, about her and her family's love for him and about Ken's
jovial "jokeable" nature (PC-R. 1636). She described Ken as a
very good brother, his respect for the elderly and his caring
nature (PC-R. 1637). Cheryl was willing to testify and would
have suggested other people for Attorney Willis to contact who
could have given information about Mr. Hartley's background
(Id.).

She called Attorney Willis in tears the day after the jury
returned it's guilty verdict. Willis consoled her and told her
that he would appeal (PC-R. 1645). Ms. Daniels affirmed that
both she and Shawn would have testified for their brother and
explicitly denied the prosecutor's suggestion that Mr. Jefferson
would have been "better off" not testifying (PC-R. 1647-8).

Jean Daniels, Mr. Hartley's mother, met with Attorney Willis but he never discussed the possibility of a penalty phase with her nor did he ask her about Mr. Hartley's background (PC-R. 1662-3). Ms. Daniels would have told the jury about her son singing in the church choir, his kindness to the elderly and about how even after Mr. Hartley left home, he called or visited her every day (PC-R. 1653-4; 1664). Ms. Daniels also testified that her son was eighteen years old when he was convicted of manslaughter and was released from prison at twenty-four (PC-R. 1663). She could have told the jury about the rough neighborhood Kenneth grew up in and the difficulties of a single mother on welfare raising a young man there (PC-R. 1653; 1655). Ms. Daniels also confirmed that Shawn Jefferson was in Orlando (not in California as the state suggested) at the time if the trial (PC-R. 1658).

Denise Groomes, a school teacher in Jacksonville and childhood friend of Mr. Hartley's, discussed Mr. Hartley's good traits - his ethical values, church attendance and community activities (PC-R. 1671). Ms. Groomes knew the young woman who Mr. Hartley accidentally shot, Angel McCormick, and called her a "very fine young lady." (PC-R. 1674). Ms. Groomes still wrote to Kenneth Hartley, visited him, and accepted his phone calls while he was in jail (PC-R. 1677). She would have testified at Mr. Hartley's penalty phase but she was not contacted by defense

counsel (PC-R. 1673; 1679).

Tanya Hawk testified at the evidentiary hearing that she knew Kenneth Hartley in elementary school and grew up with him (PC-R. 1681). She would have told the jury that she has known Kenneth Hartley since she was a little girl and has "loved him" from the third grade on (Id.). Her knowledge of Ken was "all good points." (PC-R. 1683). When she needed or wanted something all she had to do was "look to Kenneth" and he would help her (PC-R. 1684). Ms. Hawk also knew Angel McCormick and of Mr. Hartley's armed robbery convictions. She still visited him in prison three times (PC-R. 1687). She was available and would have testified (PC-R. 1688-9). A probation officer preparing a Pre-Sentence Investigation Report ("PSI") contacted her and asked her feelings on Mr. Hartley's possible sentence, yet Attorney Willis never contacted her (PC-R. 1690; 1695-7).

Dorothy Cherry, another friend of Mr. Hartley's and his family since childhood, discussed her warm feelings for Mr. Hartley (PC-R. 1701-3). After Mr. Hartley got out of prison, he lived with her at her invitation, in order to get out of his old neighborhood (PC-R. 1710). She allowed Mr. Hartley to stay in her second bedroom even though she already shared her home with her two children (Id.). Attorney Willis never contacted Ms. Cherry seeking information on Kenneth Hartley (PC-R. 1713).

Mr. Hartley testified at the evidentiary hearing (PC-R.

1715).  Mr. Hartley discussed his entire family's willingness to share information about his background with Attorney Willis and to testify on his behalf at the penalty phase (PC-R. 1716-7). Mr. Hartley never met with a private investigator in preparation for his trial - though he did instruct Attorney Willis on how to obtain his school records and provided Willis with a list of possible witnesses (Id.).  From day one, Attorney Willis said that he was going to win the case, but when Mr. Hartley arrived in Jacksonville for the start of the trial, he did not feel Attorney Willis was ready (PC-R. 1718).  Attorney Willis never discussed the penalty phase with him or his strategy for the penalty phase, except to say that Willis was going to call some witnesses (PC-R. 1727-8).  Mr. Hartley gave Attorney Willis all of the names of the people who testified at the evidentiary hearing and even more including: Franky Daniels, Bruce Capers, Anthony Grant, Calvin Grant and Ricky Daniels.  Mr. Hartley explained that "just like everybody that come through the system," we (defendants) are "ignorant of the system," so he didn't know that it was his responsibility to tell the judge about what his lawyer failed to do (PC-R. 1723).  Mr. Hartley mused "when you got an ignorant lawyer and an ignorant client, what you got?" (PC-R. 1724).

**Exhaustion of Ground I in state courts:**

32

1) **Did you raise Ground I in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground I in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is yes, then state:**

      i. **Date motion filed:** Mr. Hartley raised this claim in his Amended Rule 3.851 motion filed on or about 2/2/02 and again in Additional Allegations to the Amended 3.851 filed on or about

      ii. **Whether you received an evidentiary hearing:** Yes.

      iii. **Result:** Relief denied.

      iv. **Date of Result:** 6/10/04.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes.

      i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

      ii. **Date appeal filed, result of appeal, date of result:** Notice of appeal filed on 11/1004. The Florida Supreme Court affirmed the lower court's denial of relief, 5/22/08, Hartley v. State, 2008 Fla. LEXIS 918 (May 22, 2008). Mandate issued 9/26/08.

3) **Have you raised Ground I in any other petition, application, or motion filed in the state courts of Florida?** No.

33

## GROUND II

### MR. HARTLEY WAS DENIED AN ADEQUATE MENTAL HEALTH EXAMINATION IN VIOLATION OF AKE V. OKLAHOMA.

Trial counsel did not present a mental health expert or any mental health mitigating evidence at Mr. Hartley's penalty phase (T. 2554-5). The prosecutor, apparently surprised by trial counsel's failure to present such testimony, requested that the trial judge inquire as to why such mitigation was not presented (Id.). Attorney Willis explained that while he was "aware that the Court entered an Order transporting him for the purpose [to obtain a psychiatric evaluation] we did not request it to be done." (Id.). Likewise, trial counsel's file does not reflect that he consulted a mental health expert on Mr. Hartley's case. (PC-R. 1540). Attorney Willis' explanation for his failure to hire a mental health expert and failure to investigate statutory mitigation was that his penalty phase strategy was to win a not guilty verdict at trial (Id.). Thus, no mental health testing was conducted and no records of any kind were sought or obtained (PC-R. 1540).

Post conviction counsel, Jefferson Morrow, represented Mr. Hartley at his evidentiary hearing on held on September 27, 2002, and January 17, 2003. The trial court initially

granted an evidentiary hearing on the issue of trial counsel's failure to present mental health mitigation at Mr. Hartley's penalty phase and Morrow filed a postconviction motion to have a psychologist appointed to evaluate Mr. Hartley (PC-R. 2891-2). Based on the record, it does not appear that Mr. Morrow's motion was ever heard (PC-R. 2223).

When Morrow inexplicably failed to present a mental health expert, failed to investigate relevant issues and failed to present a host of other available exculpatory and mitigating evidence, Mr. Hartley requested that the court replace him (PC-R. 2384-94). As additional grounds for Morrow's excusal from his case, Mr. Hartley informed the court that Morrow told Mr. Hartley that Hartley would have to pay him additional money in order for him to do the kind of investigation that Hartley was requesting - even though Morrow was appointed and paid through the State of Florida (PC-R. 2384).

The court replaced Morrow with Ken Malnick in an Order dated July 21, 2003 (PC-R. 2220). Attorney Malnick requested the trial court's permission to present mental health mitigation at the evidentiary hearing in "Motion for Amended Claim" dated October 20, 2003, stating his belief that Mr. Hartley suffered from trauma. The motion further

stated: "Mr. Morrow filed a postconviction motion to have a psychologist appointed to evaluate Mr. Hartley.  It does not appear that Mr. Morrow's motion was ever heard." (PC-R. 2223).  The court refused to allow Attorney Malnick to present more witnesses, even though closing arguments had not yet been filed (PC-R. 2217-9).

The trial court denied Mr. Hartley's Motion for Appointment of a Mental Health Professional and refused to permit Mr. Malnick to present any mental health evidence, reasoning that Mr. Hartley had "waived" the presentation of mental health testimony (R. 2337).  In the trial court's Order denying relief on this claim, the court states:

> … [D]uring Defendant's penalty phase, Mr. Willis specifically stated concerning having Defendant's mental health evaluated that he and Defendant had 'discussed this on several different occasions over a matter of months with deliberate exercised judgment that we do not intend to do that." (T.T. 2554-2555).  Mr. Willis stated that despite the Court entering an order to transport Defendant for a mental health evaluation, the defense did not have any psychological evaluations conducted prior to Defendant's penalty phase. (T.T. 2555).  The Defendant elected to forego a mental health evaluation and present such evidence during the penalty phase of his trial.  Moreover, this Court granted an evidentiary hearing on this claim during which Defendant failed to present any evidence to support his claim that counsel rendered ineffective assistance regarding having Defendant's mental health evaluated and presenting such evidence during the penalty phase. (Exhibits "A," "B," "C.").  Accordingly, Defendant has

36

> failed to establish error on the part of counsel. <u>Strickland</u>. Finally, this Court notes that to the extend Defendant claims that he was denied his right to an evaluation by a competent mental health expert pursuant to <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), he is procedurally barred because it could have been raised on direct appeal.

(PC-R. 1513).

During argument to court on Mr. Hartley's Motion for Rehearing, Attorney Malnick pointed out to the trial court that it at one time granted an evidentiary hearing on the issue of mental health mitigation, but later reversed itself when it refused Mr. Hartley's Motion for Appointment of a Mental Health Professional (PC-R. 2891-2).

To date, Mr. Hartley has yet to ever be evaluated by a mental health professional for evidence of mitigation.

**Exhaustion of Ground II in state courts:**

1) **Did you raise Ground II in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground II in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is yes, then state:**

      i. **Date motion filed:** 2/2/02; amended 10/20/03.

      ii. **Whether you received an evidentiary hearing:** No.

      iii. **Result:** Denied.

      iv. **Date of Result:** 6/10/04.

37

**b)**   If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida? Yes.

    **i.**   If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why: N/A.

    **ii.**   Date appeal filed, result of appeal, date of result:   Filed 11/28/06, denied 5/28/08.

**3)**   Have you raised Ground II in any other petition, application, or motion filed in the state courts of Florida? No.

### GROUND III

**THE STATE COURTS VIOLATED MR. HARTLEY'S RIGHT TO DUE PROCESS AND A FAIR TRIAL BY EXCLUDING RONALD WRIGHT'S TESTIMONY AND LETTER REGARDING HANK EVANS CONFESSION TO MURDERING GINO MAYHEW.**

The credibility of the state's witnesses was a central issue in Mr. Hartley's case.  The prosecution did not have any direct evidence of Mr. Hartley's involvement with Gino Mayhew's death.  The prosecution's evidence linking Mr. Hartley to the crime consisted entirely of testimony from convicted felons, who were all in custody at the time of trial and all but one were confidential informants and jailhouse snitches. See supra Statement of Trial Facts.  The prosecution sought to exclude the Defense from presenting testimony of Ronald Wright, whom Mr. Hartley wanted to call as his witness at trial, via a motion in limine (R. 101).  According to Wright, a Hank Evans had confessed to Wright that he (Evans) had killed Gino Mayhew (T. 1316-7, SR

38

99). Further, Wright had a letter written by Evans that referenced this confession (Id.). Wright gave the letter to his lawyer, an Assistant Public Defender, and he in turn gave it to Mr. Hartley's counsel (T. 1444). The state argued for Wright's testimony and the letter to be suppressed based on the inapplicability of the against interest hearsay exception (R. 101; T. 1425-6).

The State and Defense presented numerous depositions and sworn statements in support of their positions and the court held a pre-trial hearing on the matter (T. 1407-10). The state produced Evans to explain what he had sent Wright. In it he had written "You was my home-boy and I never told you a thing about that Sherwood Blazer tip until we got to lake Butler and shit had cleared up." (R. 1387). Evans clarified that sentence at the hearing:

> Okay. What I meant, I was using this Sherwood Blazer tip as an example. When I was in the county jail, like during the time from May 25th, from November 1st, the rumors that I heard, I never went to the authorities trying to get a less, you know, a lenient sentence, you know, on my behalf, you know going to the authorities with this information, trying to help myself.

(T. 1387). He further said that Wright may have involved him in the Mayhew murder to retaliate against Evans' implicating Wright in an armed robbery (T. 1389). In his testimony to the court, Evans did admit to having a conversation with Wright about Gino Mayhew's murder, and he did admit to writing the letter and that

the statement about the Sherwood/Blazer tip was in reference to Gino's murder (T. 1376, 1383, 1392).

The trial court granted the state's motion, finding that neither the hearsay exception allowing declarations against penal interest, section 90.804 Fla. Stats. (1992), nor Chambers v. Mississippi, 410 U.S. 284, 92 S.Ct. 1038, 35 L.Ed2d 297 (1973) justified admitting this evidence (R. 363-8). The trial court's Order specifically found that Wright's statements were not trustworthy and that Evan's letter was not sufficient corroboration (R. 365). This finding was based on discrepancies between the medical examiner's testimony from co-defendant Ferrell's and Johnson's trials (that the judge also presided over) and Evan's confession as told by Wright (Id.). The trial court also cited to evidence presented by the state consisting of inmates Elijah Blackshear, Kareem Johnson and James Brown in claims that they overheard several meetings between Wright and Hartley during which Wright and Hartley concocted a plan for Wright to implicate another inmate in the murder (R. 366).

In depositions and sworn statements, James Michael Brown, Elijah Blackshear and Kareem Johnson –— all inmates at the Duval County jail -- claimed to have been present at a Muslim Service on August 18, 1992, where they overheard Mr. Hartley and Ronald Wright concocting a plan whereby Wright would implicate yet another unnamed inmate in Gino Mayhew's murder. See infra below.

40

The trio also claimed that they overheard Ronald Wright and Trevor Austin discussing the Pizza Time murder that they were awaiting trial on and that Wright confessed to committing that murder in those conversations. See infra below.

Brown was twice deposed regarding the August 18, Muslim Service -- the first deposition was taken in connection with State v. Ronald Wright, on December 8, 1992 (hereinafter "Brown 12/8/92 Depo"), and the second was taken in connection with State v. Hartley, on May 15, 1993 (hereinafter "Brown 5/15/93 Depo").

At the time of both depositions, Brown had pled guilty to multiple robberies with a deadly weapon and was awaiting sentencing (Brown 12/8/92 Depo, 35). In June or July of 1992, the State had filed notice of it's intent to seek habitual offender status and was seeking a life sentence with a fifteen year minimum mandatory (Brown 12/8/92 Depo, 42-3). Brown had wanted to plead out but the State failed to make an offer (Id., 52). A month or so after receiving the habitual offender notice, Brown got ASA Bateh's name and number from Kareem Johnson, contacted Bateh and gave a statement (Id., 49). On September 9, 1992, Brown pled guilty (Id., 109). The plea agreement specified a thirty-year maximum sentence with no habitual offender status (Id., 113). Brown hoped that he would actually serve less than one year. His sentence was conditioned on his cooperation in the State's cases against Ronald Wright and co-defendant Trevor

Austin as well as the Gino Mayhew murder cases.  Brown's case
would be passed for sentencing until those matters were closed,
depending on how Brown performed at trial (Id., 114).  Brown
testified that he overheard Wright confess to the Pizza Time
killing, but that case was dropped (5/13/93 Depo, 105-106).
Brown also was cooperating on the state's case against Leon
Jordan (Id.).  Brown claimed to have overheard Jordan confessing
to another inmate (Id., 108).

Brown said that while he attended the August 18, 1992,
Muslim service, he overheard Mr. Hartley telling Ronald Wright
that he shot Gino numerous times and that Gino had put his hands
up in front of his face when he shot him (Id., 138).  Brown also
claimed to have heard Hartley lamenting to Wright that he did not
have any witnesses and would discuss this later (Id., 140).

ASA Bateh also presented a deposition and statement from
Elijah Blackshear in support of his Motion in Limine.  Blackshear
also claimed that Mr. Hartley confessed to Gino's murder to him
(April 22, 1993 Deposition (hereinafter "Blackshear 4/22/93
Depo"), 211).  Blackshear claimed that Wright told him that
Wright was going to lie and say that another inmate confessed to
murdering Gino in order to help Mr. Hartley (Id. 222).  At the
time of his deposition, Blackshear had admitted to kidnapping
then killing his victim by shooting and subsequently burning the
body and planned to enter the guilty plea the following day (Id.,

42

183).   In addition to cooperating with prosecutors on Mr.
Hartley's case, Blackshear gave a pre-trial deposition in <u>State</u>
<u>v. Ronald Wright</u> claiming that Wright confessed to murder to him
(<u>Id</u>., 207).   Blackshear also gave a deposition and offered to
testify in the state's case against Tony Davis who also confessed
to murdering a two-year-old baby to Blackshear (<u>Id</u>., 208).
Blackshear had also turned state's witness in his own case and
was cooperating with the state in it's case against his seven co-
defendants (<u>Id</u>., 209).   While incarcerated, Blackshear
impregnated his girlfriend during a contact visit (Blackshear
12/11/92 Depo, 14).   Blackshear was facing the death penalty for
his crime and hoped that by cooperating he would not be sentenced
to death and a shorter sentence -- his primary reason for
contacting prosecutors with information (<u>Id</u>., 30-2; 85).
Blackshear also said that Mr. Hartley was sitting on the floor at
the August 16th Muslim Service when Hartley and Wright allegedly
discussed their plan to inculpate another inmate in Gino's death
(<u>Id</u>., 53).

     Blackshear explained his efforts to get prosecutors to offer
him a deal on his sentence.   After Blackshear had been indicted
for first-degree murder, Blackshear contacted John Jolly, the
prosecutor on his case and told him that he was not the shooter-
that it was somebody else (<u>Id</u>., 89).   Blackshear admitted at the
deposition that was a lie and that it didn't help with his plea

bargaining efforts (Id., 90).  Shortly after that failed attempt, Blackshear heard these conversations at the Muslim Service and called ASA Bateh (Id.).  Not coincidentally, Blackshear was in a cell with James Brown in July and August (Id., 91).  In addition to testifying against Ronald Wright and Trevor Austin, Mr. Hartley and the three co-defendants in his own case, Blackshear was also cooperating with prosecutors on Leon Jordan's case (the Pawnshop Murder)(Id., 98).  Blackshear claimed that Jordan had also confessed to murder to him in September - a month after Hartley, Wright's and Austin's confessions (Id., 100).

Blackshear and Brown were in neighboring cells and took recreation together.  Brown was contacted by police who in turn contacted Blackshear (Id., 220).  Blackshear also admitted that he lied under oath to police in a sworn statement when he told them that one of his co-defendant's was the shooter (Id., 229).

The State also deposed Bilal Saleem, the leader of the Muslim Service.  According to Saleem, Ronald Wright was not even present at the Muslim Service on August 18, 1992 — the day that Brown, Blackshear and Johnson allege that they overheard Hartley and Wright making a plan to blame Gino's murder on Hank Evans (PC-R. 276).  Saleem also said that he did not know Blackshear, Brown or Johnson but that he does know Kenneth Hartley and Ronald Wright — indicating that the three state witnesses were not actually present at the Muslim Service (PC-R. 305).  Saleem

44

explained that as a Muslim, when Mr. Hartley entered the room at the start of the service, he prays as opposed to visiting with other inmates (PC-R. 306-7).  In August of 1992, Mr. Hartley was a Muslim and Wright was not yet.  Accordingly, at the start of the service Hartley would sit in the front with other Muslims to pray whereas Wright, as a non-Muslim, would sit in a chair along the wall (PC-R. 307).  Saleem also said that Mr. Hartley has a knee injury, so he always brought a chair to the front of the room and sat in it while he prayed, as opposed to sitting on the floor.  This contradicts Blackshear's, Brown's and Johnson's version of events of the Muslim Service.  Saleem testified on Ronald Wright's behalf and the state subsequently dropped it's murder case against Wright.

Witness James P. Johnson testified on January 15, 2003, at Mr. Hartley's postconviction evidentiary hearing.  He had known of Mr. Hartley, generally, prior to Mr. Hartley's arrest and the two shared a mutual friend (PC-R. 2144-5).  Mr. Johnson knew Mr. Hartley was in jail in 1993 and 1994 when he was sentenced to death.  Mr. Johnson also knew Mr. Bronner and Mr. Brooks, who testified against Mr. Hartley.  In fact, Johnson was in a jail cell with them (PC-R. 2146).

While Johnson, Bronner, and Brooks were incarcerated together, Bronner and Brooks talked about their testimony against Mr. Hartley to Mr. Johnson (PC-R. 2147-50).

Initially, Mr. Johnson noticed that Mr. Brooks would be called out of his cell for very long visits every couple of weeks or so and when he returned he would be loaded down with jailhouse bounty such as cigarettes, lighters, candy bars and chewing gum. Brooks would say he was at the State Attorney's office when he came back loaded down with these goods (PC-R. 2147). He would say that the State Attorney had been rehearsing him to testify and say that they were feeding him Jenkins Barbeque, Red Lobster, or whatever he wanted and that they would give him cigarettes and stuff (Id.). Although he was signed out for visitation he was really at the State Attorney's office (Id.).

Subsequently, on the day that Brooks was released, Brooks and Bronner and Johnson all went to court together. While the three were waiting to go to court, Brooks said, about his testimony against Mr. Hartley at trial, that "man, I did some f'd up stuff, it was real f'd up what I did." Mr. Brooks told Johnson that he lied on "Kip" [referring to Mr. Hartley]. Then, Johnson continued, Brooks said he didn't like "Duck" and he didn't know "Fish," but he lied on "Kip." (PC-R. 2148). Brooks said he lied on "Kip" because "Kip" had it hard and he said he lied on him (PC-R. 2149).

Further, Johnson testified that Brooks said that the State told him exactly what to testify to against Mr. Hartley. Eric Brooks told him that Brooks intentionally lied in Court against

46

Hartley to help the State win a murder conviction (Id.).

Mr. Bronner told Mr. Johnson that the prosecutor asked him if he knew "Kip" and "Duck," and Mr. Bronner said that the prosecutor was going to put Mr. Bronner in the cell with Kip and Duck so that he could get them to tell him what they did and what they knew about the murder (PC-R. 2150). Bronner told the prosecutor that they had told him that they didn't know nothing about the murder, so the prosecutor told Bronner if he would play ball he could get free and that a prosecutor was going to tell Bronner what to say that Mr. Hartley and Mr. Ferrell allegedly said (Id.). Mr. Bronner told Johnson that he agreed to do it and the prosecutor asked him to recruit some more guys and that's when he recruited Eric Brooks and "Skag" and some more guys (Id.). Ronald Bronner frankly admitted to Mr. Johnson that he, Bronner, went to Court and lied against Mr. Hartley.

Mr. Johnson further testified that State Attorney Bateh, the prosecutor on Mr. Hartley's case, was harassing him (PC-R. 2152). Mr. Johnson testified that Mr. Bateh approached him and asked if he was Jimmy Johnson, to which Mr. Johnson said no because his name is James Johnson (Id.). Subsequently, Mr. Bateh properly addressed Mr. Johnson and said that he wanted to talk to Mr. Johnson about Mr. Hartley (Id.).

At that time Mr. Bateh declined to identify himself to Mr. Johnson (Id.). Mr. Johnson's lawyer told him that Mr. Bateh

wanted to get a statement from him regarding Mr. Hartley, but Mr. Johnson, who had a case pending, did not want to talk to the State at that time (Id.). Nevertheless, Mr. Bateh kept approaching him and trying to talk to him (PC-R. 2153). Eventually, Mr. Bateh even attempted to subpoena him (Id.). A deposition or sworn statement had been arranged and Mr. Johnson was threatened by the state with jail if he didn't attend (Id.).

Ultimately, Mr. Johnson testified that, when he went outside to wait for his ride, the detective came out and arrested him on an outstanding warrant from Georgia (PC-R. 2154). Mr. Johnson was handcuffed extremely tightly, so that his wrist still hurt from the handcuffing months later (Id.). After they handcuffed him, they took him to the State Attorney's office (Id.). Mr. Bateh said that Georgia had declined to extradite him on the warrant, but Mr. Bateh went ahead and called the Georgia authorities and asked them to come get him (Id.). This was done because Mr. Johnson said that he was not going to honor the subpoena in the Hartley matter (Id.). Then, although they took Mr. Johnson to jail, the Georgia authorities never did come to get him and they finally let him go (Id.).

Mr. Johnson specifically felt harassed by Mr. Bateh further when Mr. Bateh told him that Johnson did not want Bateh for an enemy (PC-R. 2157). Mr. Johnson interpreted that to mean that Mr. Bateh would do the same thing to him that he did to Mr.

48

Hartley, which is to frame him (Id.).

Also, Mr. Bateh brought up Johnson's son, who was only 11 years old and Johnson took that inquiry as a threat against his family (PC-R. 2158).

Mr. Johnson testified that he feared retribution from the state on his pending case for trafficking in cocaine (PC-R. 2186). Mr. Johnson testified that he was afraid that Mr. Bateh would manufacture some evidence or witnesses in the same way that he did Hartley (Id.).

During his testimony at Mr. Hartley's evidentiary hearing, Attorney Willis agreed that the longer Mr. Hartley was in jail pending trial, the stronger the state's case got against him because the prosecutor recruited several jailhouse informants (PC-R. 1897). Willis even recalled ASA Bateh commenting that when Mr. Hartley was initially arrested that the state's case was not all that strong, but he felt his case got stronger after Mr. Hartley went to jail (Id.). Attorney Willis believed Bateh was referring to the jailhouse informant witnesses that he recruited. (R. 1899). Willis knew that ASA Bateh has a very well established reputation for using jailhouse witnesses in the jurisdiction (Id.).

**Exhaustion of Ground III in state courts:**

1) **Did you raise Ground III in the Florida Supreme Court on a direct appeal of your conviction?** Yes.

49

2)   After your conviction, did you raise Ground III in the
     state circuit court that sentenced you by filing a
     motion under Florida Rule of Criminal Procedure 3.850?
     No.

     a)   If your answer is yes, then state:

          i.   Date motion filed:

          ii.  Whether you received an evidentiary hearing:

          iii. Result:

          iv.  Date of Result:

     b)   If your Rule 3.850 Motion was denied, did you file
          an appeal of that denial with the Supreme Court of
          Florida?

          i.   If you failed to appeal the denial of your
               Rule 3.850 motion, explain briefly why:

          ii.  Date appeal filed, result of appeal, date of
               result:

3)   Have you raised Ground III in any other petition,
     application, or motion filed in the state courts of
     Florida? No.

                          GROUND IV

          THE FLORIDA SUPREME COURT FOUND A POLICE
          OFFICER'S TESTIMONY THAT MR. HARTLEY KNEW
          MURDER VICTIM GINO MAYHEW BECAUSE MR. HARTLEY
          HAD ROBBED THE VICTIM TWO DAYS BEFORE THE
          MURDER IMPROPER.   THE STATE COURT'S
          SUBSEQUENT FINDING THE ADMISSION OF THIS
          TESTIMONY WAS HARMLESS ERROR VIOLATED MR.
          HARTLEY'S FOURTEENTH AMENDMENT RIGHT TO A
          FAIR TRIAL AND IS CONTRARY TO FEDERAL LAW.

     Prior to Mr. Hartley's trial, the state filed a notice

                             50

that it intended to introduce evidence that on April 20,
1991, (two days before the murder), Mr. Hartley robbed Gino
Mayhew (R. 41, 313).  At trial, the state sought to
introduce the testimony of Quinn Baxter, a police officer,
that he had arrested the defendant and Ronnie Ferrell for
Gino's April 22, 1991, murder.  When Hartley denied knowing
Gino, the detective told him that "we knew that on the
Saturday, two days prior to the murder of Gino Mayhew that
Mr. Hartley had robbed Gino Mayhew that was on April 20th,
1991, therefore we knew that he knew Gino Mayhew." (R.
2172).

Defense counsel objected to introducing this testimony,
and the state, arguing for its admission, said, "I'm
introducing the evidence of Williams rule on the issue of
credibility of this defendant to show that he was lying."
(T. 2158).  The prosecutor also said: "I will concede motive
is not the sole rationale, it's not the rationale for
introducing Williams' rule, it is on the issue of
knowledge." (T. 2161).  The court overruled Mr. Hartley's
objection, finding that "the evidence … as summarized by
[the prosecutor] is relevant and I think it comes within the
purview of the William's Rule 90.404." (T. 2166).

On direct appeal, the Florida Supreme Court found that

the admission of this testimony was improper but constituted
harmless error. Hartley at 1320 (Fla. 1996).

**Exhaustion of Ground IV in state courts:**

1) **Did you raise Ground IV in the Florida Supreme Court on a direct appeal of your conviction?** Yes.

2) **After your conviction, did you raise Ground IV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

    a) **If your answer is yes, then state:**

        i. **Date motion filed:**

        ii. **Whether you received an evidentiary hearing:**

        iii. **Result:**

        iv. **Date of Result:**

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?**

        i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:**

        ii. **Date appeal filed, result of appeal, date of result:**

3) **Have you raised Ground IV in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND V

**THE PROSECUTOR'S DISCRIMINATORY USE OF PEREMPTORY CHALLENGES TO EXCLUDE MS. STANFORD, A PROSPECTIVE BLACK JUROR, FROM THE**

**JURY DENIED MR. HARTLEY HIS RIGHT TO AN
IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.**

During jury selection, the prosecutor peremptorily
challenged prospective juror Theresa Stanford.  When defense
counsel objected and demanded a race-neutral reason for the
challenge the prosecutor stated:

> I challenged Miss Stanford because she stated
> that she was personally opposed to the death
> penalty but she felt she would be able to set
> aside her personal feelings and follow the law.
> My concern is that her feelings opposed [sic] to
> the death penalty are adverse to the State's
> position in this case, also I am concerned about
> her field of work – that's my primary reason but
> I'm also concerned with psycho therapist, I'm
> concerned she's too forgiving because of her line
> of work and understanding human frailties.

(T. 1887).

The court found the reasons "racially neutral" and Ms.
Stanford was struck from the jury (T. 1888).

In fact, the prosecutor had questioned Ms. Stanford
extensively regarding her views on the death penalty and she
clearly stated numerous times that she was not opposed to
the death penalty, but that she felt there may be other
forms of rehabilitation (T. 1674).  She also stated that
there were some cases where she would recommend the death
penalty (Id.).  When the prosecutor initially inquired into

the prospective juror's views on the death penalty, Ms.
Stanford said, "Well, my thoughts are I'm against it, I
think a person can be rehabilitated in some other form." (T.
1543).   However, upon further questioning by the state, Ms.
Stanford clarified that statement and stated unequivocally
that she would vote for death if the aggravating factors
outweighed the mitigating factors.   Ms. Stanford held a
master's degree in counseling psychology and was a
psychotherapist and program director for Lutheran Social
services (T. 1504).   She also explained that her training
and her job make her uniquely able to objectively weigh what
people tell her:

> Mr. Bateh:… [I]f the State – if the State proves its
> case against the defendant, proves him guilty of first
> degree murder, will you – would you be able to convict
> him of first degree murder knowing that it would
> subject him to a death sentence?
>
> Ms. Stanford:  Yes, I could objectively look at the
> facts without putting my personal judgment in it
> because that's what I do everyday, I have to
> objectively weigh what people tell me.
>
> Mr. Bateh:  All right. Now but your views opposed to
> the death penalty are based on very strongly held
> religious grounds?
>
> Ms. Stanford:  These are my personal beliefs but I can
> objectively weigh information because I deal with all
> types at least every day.
>
> Mr. Bateh:  All right.  Let me ask this, in the second
> part of the trial the penalty phase, assuming the

defendant were convicted of first degree murder, during
that second stage of the case, would you be able to or
will you be able to recommend death if the aggravating
factors outweigh the mitigating factors if that's the
test that the Judge explains to you, would you be able
to make a death recommendation on that defendant?

Ms. Stanford:  I couldn't say yes or no at this point.

Mr. Bateh:  I'm sorry?

Ms. Stanford:  I couldn't say yes or no.  I would have
to clearly see the evidence.  It would be hard for me
to objectively say what I would do at this point
because I haven't heard the evidence.

Mr. Bateh:  Well, but are your views opposed to the
death penalty against the death penalty, have they been
views that you've held for a long while?

Ms. Stanford:  No, these are views that I stated that I
feel that there are other ways of rehabilitation, to
take a life because I feel life is valuable, but it is
hard to pass judgment on any case without objectively
looking at what the facts are, so it would be very
unfair of me to stand here and say what I can or cannot
do because I don't know at this point.

Mr. Bateh:  All right. I understand, and this question
may be a bit unfair in that you obviously don't know
what the facts are and you're not suppose to know at
this stage, but I guess if I could ask that question in
kind of a vacuum, are your beliefs opposed to the death
penalty strongly held beliefs?

Ms. Stanford:  No.

Mr. Bateh:  They're not? You believe there are some
cases that you could recommend the death sentence?

Ms. Stanford:  Yes, I must evaluate the information, I
have to put myself in that situation and objectively
look at the facts that have been given to me.

Side bar

> Mr. Bateh:  Miss Stanford, if I may ask you one
> additional question, if during the penalty phase if the
> defendant were convicted of first degree murder during
> the guilt phase of the trial, during the penalty phase
> of the trial, if at the end of all the evidence if the
> aggravating factors outweigh the mitigating factors and
> the Judge told you that that was the test that was to
> apply in Florida, would you be able to recommend a
> sentence of death?
>
> Ms. Stanford:  Yes.
>
> Mr. Bateh:  On this defendant?
>
> Ms. Stanford:  Um-hum.
>
> Mr. Bateh:  You believe you could?
>
> Ms. Stanford:  Yes.

Later, the state attorney again questioned Ms. Stanford regarding her ability to recommend a death sentence:

> Mr. Bateh:  … [Y]ou feel that you would be able to
> recommend a death sentence during the guilt phase?
>
> Ms. Stanford:  Yes, sir, if I objectively reviewed the
> facts.

(T. 1670-4).

Venire member Mungin was a medical assistant whose eldest son was in prison for attempted murder (T. 1565). When asked her views on the death penalty, she responded with conflicting religious tenets - that it is "up to the Lord who goes and who stays" immediately followed by the biblical adage "an eye for an eye." (T. 1568).  Ms. Mungin

finished off her commentary by saying that she would "have to put a lot of thought and prayer" into the decision to recommend the death penalty (T. 1568).  When the **defense** challenged Ms. Mungin for cause based on an assault suffered by her daughter, the prosecution opposed the challenge arguing that Ms. Mungin said "that she could set her feelings aside" regarding the assault (T. 1870).

When the state attorney questioned prospective juror Cyrus about his thoughts on the death penalty, Mr. Cyrus informed the court:

> A Juror:  It's the law, I wish it weren't, but it is and if, you know, if it's deemed by society to be necessary then it is, then it's the law and that's the way it has to be, I wish it weren't.

> Mr. Bateh:  If it were in your power to do away with the death penalty, if you were the Governor of the State of Florida and could veto the law would you do that, sir?

> ******************

> A Juror:  I'd have to think about it, I'd want to but the death penalty is suppose [sic] to be deterrent to crime and I'm not sure it is.

> Mr. Bateh:  Thank you, Mr. Cyrus?

> A Juror:  Yes, sir.

(T. 1581-2).

The prosecutor's voir dire questioning revealed that venire member Judith Woodward favored the death penalty "in

57

certain conditions" (T. 1575) - yet the prosecutor did not ask her what those conditions were; Barbara Stevenson, whose husband was a substance abuse counselor at an Episcopal Church "[did]n't think" that her husband's employment by a Church who may oppose the death penalty would effect her ability to carry out the death penalty (T. 1571-2); Grace Monroe, a retired biology teacher, said that giving the death penalty "depend[ed] on the crime" and "if a person was in trouble before" and that she "believ[ed]" she could vote for the death penalty (T. 1559); Dr. Jude Perez said "unfortunately under certain circumstances" he strongly supported it (T. 1562); Ruth Ann Bachner said "all lives are precious" "but given a heinous crime - there is a place for it" (T. 1580); Margaret Mayer said that she had given the death penalty "a lot of thought" and "unfortunately it plays a part in today's society - wish it didn't" (T. 1551); Lisa Rappeport said that giving the death penalty is "totally based on the situation and I believe unfortunately there is a place for it" (T. 1586); Leslie Cotner said "unfortunately it is necessary in society" and "depending on the crime would support it" (T. 1589).  The state never questioned these white prospective jurors to determine under what circumstances they would support the death penalty and under

what circumstances they would oppose it.

**Exhaustion of Ground V in state courts:**

1)   **Did you raise Ground V in the Florida Supreme Court on a direct appeal of your conviction?** Yes.

2)   **After your conviction, did you raise Ground V in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850? No.**

  a)   **If your answer is yes, then state:**

      i.   **Date motion filed:**

      ii. **Whether you received an evidentiary hearing:**

      iii. Result:

      iv. Date of Result:

  b)   **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?**

      i.   **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:**

      ii. **Date appeal filed, result of appeal, date of result:**

3)   **Have you raised Ground V in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND VI

**THE FLORIDA SUPREME COURT'S FAILURE TO REWEIGH THE AGGRAVATING AND MITIGATING FACTORS UPON FINDING THE JURY INSTRUCTION ON THE COLD, CALCULATED AND PREMEDITATED AGGRAVTING CIRCUMSTANCE UNCONSTITUTIONAL AND**

**STRIKING THE HEINOUS, ATTROCIOUS AND CRUEL AGGRAVATING FACTOR FAILED TO PROVIDE MR. HARTLEY WITH THE INDIVIDUALIZED SENTENCING PROCEEDING GUARANTEED HIM BY THE EIGHTH AMENDMENT.  THE STATE COURT'S ARBITRARY IMPOSITION OF MR. HARTLEY'S DEATH SENTENCE VIOLATES HIS DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT.**

On direct appeal the Florida Supreme Court found that the trial court's jury instruction on the cold, calculated and premeditated ("CCP") aggravating factor was unconstitutional but that the issue was procedurally barred because trial counsel failed to object to the form of the instruction and failed to submit a limiting instruction. State v. Hartley, 686 So. 2d 1316, 1322-3 (Fla. 1996).  The court then struck the trial court's finding of the heinous, atrocious and cruel ("HAC") aggravating factor but went on the find it harmless error in light of the five remaining aggravating factors (CCP, prior violent felony convictions; committed during the course of a kidnapping; committed to prevent lawful arrest; committed for pecuniary gains) and minimal mitigation. Id. at 1324

**Exhaustion of Ground VI in state courts:**

1)   **Did you raise Ground VI in the Florida Supreme Court on a direct appeal of your conviction?**  Yes.

2)   **After your conviction, did you raise Ground VI in the state circuit court that sentenced you by filing a**

motion under Florida Rule of Criminal Procedure 3.850? No.

a)  If your answer is yes, then state:

    i.  Date motion filed:

    ii. Whether you received an evidentiary hearing:

    iii. Result:

    iv. Date of Result:

b)  If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?

    i.   If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:

    ii.  Date appeal filed, result of appeal, date of result:

3)  Have you raised Ground IV in any other petition, application, or motion filed in the state courts of Florida? No.

***************

23.  Have you previously filed any petitions, applications, or motions with respect to your judgment and conviction in any federal court?  No.

24.  If your answer to 20 was yes, give the following information: 1) Name of court; 2) Nature of proceedings and date action filed; 3) Grounds raised.  N/A.

25.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack? No.

26.  If you have previously filed a petition for writ of

habeas corpus related to this conviction and sentence in federal court, you must first move in the appropriate court of appeal for an order authorizing the federal district court to consider the application. Have you filed such a motion?   N/A.

27.   Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:

a)   At preliminary hearing:
Robert S. Willis
503 E. Monroe Street
Jacksonville, FL 32202-2838


b)   At arraignment, plea and pre-trial:

Same.

c)   At trial:

Same.

d)   At sentencing:

Same.

e)   On appeal:
David A. Davis
Leon County Courthouse
301 South Monroe Street, #4
Tallahassee, FL 32301-1861

f)   In any post conviction proceeding:

Capital Collateral Regional Counsel- North
1533 S. Monroe St.
Tallahasee, FL 32314

Jefferson W. Morrow
1301 Riverplace Blvd.
Suite 2600
Jacksonville, FL 32207-9031

Kenneth Malnik
1776 Pine Island Road, Suite 102
Plantation, FL 33322-5200

Harry P. Brody
Brody & Hazen, P.A.
P.O. Box 16515
Tallahassee, FL 32317

g) **On appeal from any adverse ruling in post-conviction proceeding:**
Same.

28. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** Yes.

29. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No, death.

a) **If so, give name and location of court which imposed sentence to be served in the future:** N/A.

b) **Date and length of sentence to be served in the future:** N/A.

c)   **Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?**  N/A.

WHEREFORE, petitioner prays that the court grant petitioner relief to which he is entitled in this proceeding.

Respectfully submitted,

LINDA McDERMOTT
Florida Bar No. 0102857

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing **PETITION** has been furnished by United States Mail, first class postage prepaid, to all counsel of record on October 6, 2008.

LINDA McDERMOTT
Florida Bar No. 0102857
McClain & McDermott, P.A.
141 N.E. 30th Street
Wilton Manors, Florida 33334
(850) 322-2172
Attorney for Mr. Hartley

Copies furnished to:
Meredith Charbula
Assistant Attorney General
Office of the Attorney General
The Capitol
Tallahassee, Florida 32399-1050