## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE, FLORIDA

**KENNETH HARTLEY**

        **Petitioner,**

**v.**                                      **CASE NO. 03:08-cv-962**

**WALTER A. MCNEIL**
**Secretary, Fla. Dept of Corrections**

        **Respondent.**

_____/

## RESPONSE TO ORDER TO SHOW CAUSE WHY A WRIT OF HABEAS CORPUS SHOULD NOT BE GRANTED

COMES NOW, Respondent, WALTER A. MCNEIL , Secretary of the Florida Department of Corrections, pursuant to rule 5, Governing Section 2254 Cases, and responds to this Court's Order to Show Cause and states as follows:

## I.    STATEMENT OF CUSTODY AND PARTIES

Named petitioner, KENNETH HARTLEY, is presently in the custody of the Florida Department of Corrections at Union Correctional Institution in Raiford, Florida.  Petitioner was convicted of one count of first degree murder, one count of armed robbery, and one count of armed kidnapping.

Hartley was sentenced to death for the murder of seventeen year old Gino Mayhew. Hartley was sentenced to fifteen years as a habitual felony offender for robbery and life in prison for kidnapping.

Accordingly, Petitioner is in the lawful custody of the State of Florida. Petitioner's custodian, Walter A. McNeil, Secretary of the Florida Department of Corrections, is the properly named party respondent. *See* 28 U.S.C. §2254, Rule 2(a). In addition, pursuant to Rule 2(b) of the Rules Governing Section 2254 Cases, Florida Attorney General Bill McCollum is also a properly named party respondent.

## II.   STATEMENT OF EXHIBITS, CITATIONS TO THE RECORD, AND KEY PLAYERS

### A.  Exhibits

Respondents' exhibits are set forth in the respondent's habeas corpus checklist which is hereby incorporated by reference and encompasses Tabs A-LL.  The exhibits will be  forwarded to this court under separate cover.

### B.  Citations

Citations to the record shall be as follows:

(1)   The record from Hartley's original trial will be referred to as "TR" followed by the appropriate volume and page number.   The supplemental record will be referred to as "TR Supplemental" followed by the appropriate volume and page number.

(2)  The record from Hartley's post-conviction proceedings will be referred to as "PCR" followed by the appropriate volume and page number.

(3)  The initial brief from Hartley original direct appeal will be referred to as "IB" followed by the appropriate page number.

(4)  The initial brief from Hartley appeal from the denial of his motion for post-conviction relief will be referred to as "PCR IB" followed by the appropriate page number.

(5)  Hartley's state habeas petition to the Florida Supreme Court will be referred to as "State Habeas Pet" followed by the appropriate page number.

(6)  Hartley's federal habeas petition will be referred to a "Pet" followed by the appropriate page number.  Hartley's memorandum of law in support of his petition will be referred to as "Memo" followed by the appropriate page number.

**C.**  <u>Key Players</u>

**(**1)  <u>Kenneth Hartley</u>**:**   The petitioner in the instant case.   At trial, the State alleged Hartley murdered Gino Mayhew and was the actual shooter.

(2)  <u>Ronnie Ferrell</u>:   Hartley's co-defendant.   At trial, the State alleged Ferrell was in the front passenger seat of Mayhew's Blazer after Hartley kidnapped Mayhew at gunpoint and enroute to the kill site.   Ferrell was convicted and sentenced to death. His case is pending before the Florida Supreme Court in post-conviction proceedings.

(3) <u>Sylvester Johnson</u>:  Hartley's co-defendant.  At trial, the State alleged that Sylvester Johnson was the get-away driver. Johnson was sentenced to life in prison.

(4) <u>Gino Mayhew</u>.  The victim.  At the time of his death, Mayhew was a high school student and 17 years old.

(5) <u>Sidney Jones</u> - An eyewitness to the kidnapping.

(6) <u>Anthony Parkin</u> - Testified at trial about Hartley's admissions that implicated Hartley and Ronnie Ferrell for the murder of  Gino Mayhew.

(7) <u>Ronald Bronner</u>:  Testified about Hartley's admissions that he killed Gino Mayhew.  Also testified that Hartley admitted robbing Mayhew two days before the murder.

(8) <u>Eric Brooks</u>:   Testified about Hartley's admissions that he killed Gino Mayhew.  Also testified that Hartley admitted robbing Mayhew two days before the murder.

(9) <u>Angel McCormick</u>:  The victim of a 1986 killing at Hartley's hands. Hartley killed her by shooting her with a shotgun.   Hartley was convicted of manslaughter.  Hartley killed Mayhew less than 80 days after being released from prison.   This conviction was used in aggravation by the state.

(10) <u>Alan Chipperfield</u>: Testified for Hartley during the penalty phase.

(11) <u>Reverend Coley Williams</u>**:** Testified for Hartley at the penalty phase.

(12) <u>Robert Willis</u>:   Hartley's trial counsel.

(13) <u>Shawn Jefferson</u>:  Hartley's "little" brother and former NFL football star. Hartley claimed counsel was ineffective for not presenting this "star" witness at the penalty phase.

## III.   <u>STATEMENT OF THE ISSUES</u>

Petitioner raises six claims in his   petition for writ of habeas corpus (hereinafter "Petition"):

(1)    Trial counsel was ineffective during the penalty phase of Hartley's capital trial.  *Petition at page 24-33.*

(2)    Hartley was denied an adequate mental evaluation in violation of <u>Ake v. Oklahoma</u>.  *Petition at pages 34- 37.*

(3)    The trial court erred in excluding Ronald Wright's testimony and Letter regarding Hank Evan's confession to murdering Gino Mayhew.  *Petition at pages 38-50*

(4)    The Florida Supreme Court erred in finding the admission of the testimony of a police officer to be harmless error.    *Petition at pages 50-52.*

(5)    The prosecutor  wrongfully excluded a juror from Hartley's jury because she was black.  *Petition at pages 52-59.*

(6)     The Florida Supreme Court erred when it failed to reweigh the aggravating and mitigating factors when it struck one aggravator and found the instruction as to another unconstitutional. *Petition at pages 59-65.*

IV.   **STATEMENT OF PROCEDURAL HISTORY**

In April 1991, Kenneth Hartley, along with Ronnie Ferrell and Sylvester Johnson, murdered seventeen-year-old Gino Mayhew.   Johnson was the get-away driver.

The three men were tried separately.  All three were convicted of first-degree murder, robbery, and kidnapping. Hartley and Ferrell were sentenced to death while Johnson was sentenced to life in prison.  At trial, Hartley was represented by attorney Robert Stuart Willis.  Mr. Willis was admitted to the Florida bar in 1972, is board certified in criminal law, and is AV rated by Martindale-Hubbell.

The relevant facts concerning Gino Mayhew's murder are recited in the Florida Supreme Court's opinion on direct appeal:

> …Sidney Jones worked for the victim in the victim's crack cocaine business.  He testified to the following information. On April 22, 1991, the victim was selling crack from his Chevrolet Blazer at an apartment complex. On that date, Jones saw the three codefendants together near the Blazer.  He saw Hartley holding a gun to the victim's head and saw him force the victim into the driver's seat.  Hartley climbed into the back seat behind the victim.  Ferrell climbed into the front, passenger seat. Johnson was outside the Blazer talking to Hartley. After Hartley, Ferrell, and the victim entered the Blazer, Jones saw it leave the apartment complex at a high speed and heard Ferrell shout out of the Blazer that the victim would "be back."  Johnson followed soon afterward in a truck.  Another witness confirmed that the victim, Ferrell, and another individual, whom the witness was unable to positively identify, left the apartment complex together in the victim's Blazer at a high rate of speed.

On April 23, police found the victim's Blazer parked in a field behind an elementary school. The victim's body was slumped over in the driver's side seat of the Blazer. The victim had died as a result of bullet wounds to the head (he had been shot five times: one shot into his forehead, three shots into the back of his head, and one shot into his shoulder).

Several weeks after the victim was found, Jones told police what he had seen on April 22, and Ferrell, Hartley, and Johnson were arrested for the victim's murder. Hartley told police that he did not know the victim but told several other witnesses that he had robbed the victim two days before the murder. Specifically, he told one witness that "the only reason they [are] saying that [I killed the victim] is because I robbed him two days before he was killed." Hartley later told the witness (who at the time of the second statement was Hartley's cellmate) that the plan was Sylvester Johnson's; that they originally planned to rob some "dreads" but then decided to "get [the victim]," i.e., rob and murder the victim; that they forced the victim to drive to the elementary school; that Johnson drove the getaway vehicle; that "I left my trade mark, left no witnesses"; and that his trademark was to "shoot the person in the head leaving no witnesses." He also told the witness that Ferrell and Johnson acted so nervous that he considered shooting them and that he would "get off" because everyone was too scared to testify. A number of the details provided by this witness were never released to the public.

Additionally, Hartley told another cellmate that he was not involved in the murder but that he had robbed the victim a few days before the murder. He later admitted to the cellmate that he had robbed and murdered the victim and provided numerous details of the crime very similar to those provided by the previous witness. Another witness testified that he heard Hartley state: "I think I really fucked up this time by doing this with that motherfucker Ferrell. I think he's going to turn on me and testify against me when he's just as guilty in doing this as I am."

Hartley v. State, 686 So.2d 1316 (Fla. 1996).

Hartley presented no witnesses at the guilt phase of the trial. After the defense rested its case, the court inquired of Mr. Hartley about his right to testify as well as his desire to present witnesses on his behalf. The following colloquy ensued:

COURT: Mr. Hartley, your attorney, Mr. Willis, has announced that he's rested his case in chief and that he will put on no evidence or testimony and of course I assume he's told you that you have the right to testify and that some of the questions would be asked of you, if you do testify and that if you do testify some of the questions the State would ask you if you've ever been convicted of a felony, if so how many times and so on. And he having made that announcement is that your desire to close your case in chief at this time.

HARTLEY: Yes, Sir.

COURT:   And put on no further testimony, either witnesses or yourself.

HARTLEY:   Yes, Sir.

(TR. Vol. LXIX  2285).

At the penalty phase, the state presented evidence that Hartley had been previously convicted of three felonies.    One of those felonies was Hartley's 1986 conviction in the  manslaughter death of 15 year old Angel McCormick (TR Vol. III 437, 489).   Additionally, Hartley was convicted of two armed robberies. In the days before and after Hartley kidnapped and murdered Gino Mayhew, Hartley robbed two taxi drivers, Michael Arthur and Edward Saple, with a sawed off shotgun.   (TR Vol. III 441-444, 481 ).  These robberies, as well as Mayhew's murder, were committed less than 80 days after he was released from his prison sentence imposed for the manslaughter of Angel McCormick.   (TR Vol. III 481).

8

In mitigation, Hartley put on two witnesses to testify on his behalf.  Just after Hartley presented the testimony of his last witness, trial counsel announced he had no further witnesses to present.  The prosecutor asked the trial judge to inquire as to the defense's failure to present any psychiatric testimony during the penalty phase. Trial counsel informed the court that he and Hartley had discussed the matter on several occasions and had decided, with "deliberate exercised judgment" not to put on mental mitigation evidence. (TR. Vol. LXX 2554-2555).

After hearing the evidence, arguments of counsel, and the trial court's instructions, the jury returned a recommended sentence of death by a vote of nine-to-three (9-3).  The trial judge found six aggravating circumstances: (1) Hartley had previously been convicted of a prior violent felony, specifically a 1986 manslaughter conviction for killing a fifteen year-old girl with a shotgun, and two separate 1991 convictions for armed robbery;  (2) the murder was committed during the course of a  kidnapping; (3) the murder was committed to prevent a lawful arrest; (4) the murder was committed for pecuniary gain; (5) the murder was particularly heinous, atrocious, or cruel (HAC), and (6) the murder was cold, calculated, and premeditated (CCP).  The court found minimal mitigation.  The trial judge followed the jury's recommendation and sentenced Hartley to death for the first degree murder of Gino Mayhew. The trial judge also sentenced Hartley to consecutive sentences for

robbery and kidnapping (fifteen years and life in prison, respectively).   Hartley v. State, 686 So.2d at 1319.

On direct appeal, Hartley raised eleven issues.  The Florida Supreme Court unanimously affirmed Hartley's convictions and sentence to death.  Hartley v. State, 686 So.2d at 1324.

Hartley next filed a Petition for Writ of Certiorari to the United States Supreme Court.  In Hartley v. Florida, 522 U.S. 825 (1997), the United States Supreme Court denied review.

On September 16, 1998, Capital Collateral Regional Counsel-North filed, on Hartley's behalf, a shell 3.850 motion for post-conviction relief raising thirty-three (33) claims.  (PCR Vol. I 1-42).  On or about September 18, 1998, Mr. Jefferson Morrow undertook to represent Hartley in his post-conviction proceedings.

On October 1, 1998, Mr. Morrow filed another shell motion, on Hartley's behalf, raising one claim of ineffective assistance of counsel at both phases of Hartley's capital trial.  (PCR Vol. I 43-48).  No reference was made to the shell motion filed just two weeks before and Hartley made no specific allegations of deficient performance against trial counsel.  Instead, Hartley simply claimed he was denied effective assistance of counsel at both phases of his capital trial when trial counsel failed to "insure an adversarial testing and a reliable outcome."  The second shell motion was not sworn to in accord with Rule 3.850(c), Florida Rules of

Criminal Procedure.  A second, apparently identical copy of the motion was filed on November 9, 1998.  (PCR Vol. I 49-54).   This motion contained the requisite oath. (PCR Vol. I 55).

On April 15, 2000, Hartley filed a motion for appointment of a psychologist, Dr. Harry Krop, to evaluate Hartley during the post-conviction proceedings. (PCR Vol. I 71).  Hartley never called the motion up for a hearing or requested a ruling on the motion.

Almost two years later, on February 2, 2002, Mr. Morrow filed, on Mr. Hartley's behalf, an amended Rule 3.851 motion for post-conviction relief raising thirty claims.  (PCR Vol. I 87-176).   The State filed a response to this motion on April 8, 2002.  (PCR Vol. I 178).   A case management conference was held on April 11, 2002. During the April 11, 2002 hearing, there were some preliminary discussions on the necessity for an evidentiary hearing on each of Hartley's claims.  (PCR Vol. XIV 2452-2471).

Particularly at issue were Claims V and XI of Hartley's amended motion for post-conviction relief.  The State averred the claims were insufficiently pled. Mr. Morrow agreed the claims were not sufficiently pled.  Mr. Morrow explained this was the case because, at the time he filed the motion, he had not yet received some of the transcripts required to present a legally sufficient claim. (PCR Vol. XIV 2462).  Mr.

Morrow requested, without objection from the State, that he be granted an additional two weeks to file an addendum to those two claims. (PCR Vol. XIV 2462).

On April 29, 2002, Hartley filed an addendum to Claims V and XI. In the addendum, Hartley claimed trial counsel was ineffective for failing to investigate and then present evidence regarding the allegedly improper use of informants, including Sidney Jones. Hartley also alleged that trial counsel was ineffective in his investigation and presentation of evidence regarding the testimony of certain jailhouse informants. (PCR Vol. II 272-273). As to Claim XI, Hartley claimed trial counsel was ineffective for failing to call Hartley's brother, football star Shawn Jefferson, during the penalty phase of Hartley's capital trial. (PCR Vol. II 273-274).

Finally, Hartley requested additional time to "develop the reputation of George Bateh in obtaining jail house confessions in order to bolster a murder case." (PCR Vol. II 274). Hartley alleged that "if" his reputation was "substantial", trial counsel was ineffective for failing to exploit this evidence at trial.

On May 14, 2002, Hartley filed "additional allegations regarding Issue Five and Jailhouse confessions." In his motion, Hartley alleged it is improper to use jailhouse informants at trial. (PCR Vol. II 399-401). On May 15, 2002, the Court denied this motion. (PCR Vol. III 399).

On May 17, 2002, the court entered an order granting an evidentiary hearing on three of Hartley's claims, specifically: (1) trial counsel was ineffective for failing

to call the "star witnesses" during the penalty phase of the trial (Claim XI); (2) counsel was ineffective for failing to prepare for the penalty phase of the trial and subpoena "crucial penalty phase" witnesses (Claim XXI); and (3) trial counsel was ineffective for failing to "adequately employ the services of an available mental health expert." (Claim XXII). The court reserved ruling on Hartley's remaining claims. (PCR Vol. III 404-405).

On July 17, 2002, Hartley filed a motion to declare Florida's capital sentencing procedure unconstitutional in light of the United States Supreme Court's decision in Ring v. Arizona. (PCR Vol. III 414. On July 26, 2002, the State filed a response to Hartley's Ring claim. (PCR Vol. III 426-438).

On September 27, 2002, an evidentiary hearing was conducted on Hartley's amended motion. Hartley presented several witnesses to testify on his behalf, including friends, his brother, a former coach, Hartley's sister, and Hartley's mother. Though granted an evidentiary hearing on Hartley's claim that counsel was ineffective for failing to call a mental health expert, Hartley put on no mental health expert to testify before the collateral court.

On October 1, 2002, Hartley filed an unsworn emergency motion titled "Emergency Motion Alleging Additional Grounds and Additional Witnesses for 3.851." (PCR Vol. V 961). In the motion, Hartley alleged that an unnamed witness had surfaced who was prepared to testify that unidentified State witnesses admitted

13

to him that they presented perjured testimony at trial and actually did not even know Kenneth Hartley.  (PCR Vol. V 961).  The witness was later identified as James Patrick Johnson.  (PCR Vol. XVII 2729).  Hartley never formally amended his motion for post-conviction relief to add a legally sufficient claim of newly discovered evidence.

On November 25, 2002, a status hearing was held in this case.  Mr. Morrow advised the collateral court it could now rule on Hartley's amended motion for post-conviction relief. Mr. Morrow told the court that Mr. Johnson refused to talk with him and that, as such, the defense would not call him at the evidentiary hearing.  Mr. Morrow reiterated he did not intend to call him as a witness and would not subpoena him to attend the evidentiary hearing. Upon inquiry from the collateral court judge, Mr. Morrow noted he had not had a chance to talk with Mr. Hartley about Mr. Johnson's refusal to cooperate.  The collateral court requested Mr. Morrow obtain a waiver from his client as to that witness.  (PCR Vol. XVII 2731).  The case was passed till January 17, 2003.  (PCR Vol. XVII 2733).

Subsequently, on January 17, 2003, the court reconvened  the evidentiary hearing.  Mr. Morrow announced that one witness, James Johnson, would be called to testify.   The court inquired whether there would be any additional witnesses called.  Mr. Morrow replied he had no other witnesses for the hearing. (PCR Vol. XVII 2740).  Mr. Johnson testified on Hartley's behalf.  Once again, Hartley did not

14

move to supplement his amended motion for post-conviction relief to add a claim of newly discovered evidence to conform to the testimony presented by Mr. Johnson. Likewise, Hartley did not move to add a claim the State committed a <u>Giglio</u> violation in presenting the testimony of State witnesses Ronald Bronner and Eric Brooks.

At the conclusion of the hearing on January 17, 2003, collateral counsel asked that Mr. Hartley be allowed to address the court. Counsel told the court that Mr. Hartley wanted to call more witnesses. The collateral court informed Hartley if he had more witnesses he wanted to bring forward, he could do that. (PCR Vol. XII 2198).

Mr. Morrow advised the collateral court that his client wanted him to bring additional witnesses to support a claim that Ronald Bronner and Eric Brooks testified falsely at Hartley's trial. Mr. Morrow told the court these witnesses included Bronner and Brooks and their unidentified family members who could testify as to their knowledge of the perjury. (PCR Vol. XII 2199). Mr. Morrow told the court he was in the process of attempting to locate Bronner and Brooks in order to present their testimony. (PCR Vol. XVII 2797). Mr. Morrow requested additional time to locate the witnesses. (PCR Vol. XVII 2797).

Hartley told the court he also wanted a witness by the name of "Stag" called. Collateral counsel did not know who "Stag" was and Hartley never identified him. (PCR Vol. XII 2199).

Hartley also told the court that, in addition to Bronner and Brooks, he wanted even more witnesses called. (PCR Vol. XVII 2798). When the collateral court pressed Hartley to reveal the names of the witnesses he wanted collateral counsel to present, Hartley informed the court he did not know any of these witnesses' proper names. Hartley claimed he only knew them by their "nickname." (PCR Vol. XIII 2201).

Eventually, Hartley identified these witnesses as "Tina, Bruce, and Rock. Hartley said he wanted Tina called because "I was not there." (PCR Vol. XIII 2203). Hartley claimed that at the time of the murder, he was with "Brucie" and "Tightman" and they went over to Tina's house and he was with a girl named "Sookie." (PCR Vol. XIII 2203). The trial court continued the evidentiary hearing until February 7, 2003, to allow collateral counsel to investigate and present any additional witnesses. (PCR Vol. XIII 2208).

However, on January 22, 2003, Mr. Morrow moved to withdraw from Hartley's case, citing to an unidentified conflict of interest. (PCR Vol. V 979). A hearing was held on the motion on February 14, 2003. The State opposed the motion and urged the court not to allow Mr. Morrow to withdraw so late in the proceedings. (PCR Vol. XVII 2816). Hartley told the court that if it permitted Mr. Morrow to withdraw, he wanted another attorney appointed to represent him. Hartley told the court he did not have the funds to hire counsel. (PCR Vol. XVII 2821).

On February 21, 2003, the Chief Judge of the Fourth Judicial Circuit held an in camera hearing on Mr. Morrow's motion to withdraw.   The defendant and Mr. Morrow were present.  The State was not present.  Hartley told the court he wanted Mr. Morrow off the case.  (PCR Vol. XVII 2857).  On April 3, 2003, the Chief Judge granted Mr. Morrow's motion to withdraw.  (PCR Vol. V 990).

On April 23, 2003, the collateral court appointed Mr. Dale Westling to represent Hartley. (PCR Vol. V 992). Hartley objected to Mr. Westling's appointment, citing to, among other things, the fact that Mr. Westling, upon assuming the case, discussed Mr. Hartley's case with Mr. Morrow.  Hartley alleged, in strong terms, that such conduct was improper.  (PCR Vol. VI 1007-1009).

On July 1, 2003, Mr. Kenneth Malnik, on behalf of Mr. Hartley, requested he be permitted to represent Hartley in this case. (PCR Vol. XIII 2213).  On July 21, 2003, a hearing was held on Mr. Malnik's motion. Hartley was present. (PCR Vol. XVII 2830).

At that hearing, Hartley informed the collateral court he wanted Mr. Malnik to represent him. Mr. Malnik agreed to represent Hartley.  (PCR Vol. XVII 2834).

Mr. Malnik requested an opportunity to file an amended motion.   The State objected to any amendment on the grounds that Hartley's motion for post-conviction relief had been amended many times and the evidentiary hearing had already been conducted to completion. (PCR Vol. XVII 2832, 2834).  Over the State's objection,

17

the court granted Mr. Malnik an opportunity to file a claim for "any issue he thinks should be filed." (PCR Vol. XVII 2835). The Court gave Mr. Malnik thirty days in which to file any new claim. (PCR Vol. XVII 2836).

On October 20, 2003, Mr. Malnik filed a motion entitled "Motion for Amended Claim." No amended claim was presented, however. Instead, Mr. Malnik averred that Hartley had not been evaluated by a psychologist during post-conviction proceedings. He requested appointment of a psychologist to evaluate Hartley. As grounds for the motion, counsel alleged only that "Mr. Hartley was physically assaulted as a teenager and appeared to be traumatized from the incident." (PCR Vol. XIII 2223).

On November 21, 2003, Hartley, through counsel Kenneth Malnik, filed a supplement to the amended Rule 3.850 motion. (PCR Vol. XIII 2227-2228). In this motion, Hartley alleged that trial counsel was ineffective for failing to investigate an alibi. Hartley also alleged trial counsel was ineffective for failing to present evidence that Hartley, while awaiting trial, stopped an unnamed fellow inmate from hanging himself and performed CPR on the inmate. (PCR Vol. XIII 2227). Finally, Hartley alleged he had been unable to obtain necessary records from predecessor collateral counsel. (PCR Vol. XIII 2227-2228). Once again, Hartley did not add either a legally sufficient claim of newly discovered evidence or a <u>Giglio</u> claim based on Johnson's testimony. (PCR Vol. XIII 2226-2229).

On December 5, 2003, the State filed a response to Hartley's new claims and on December 16, 2003, filed a supplemental response. (PCR Vol. XIII 2230-2235). The Court did not grant an evidentiary hearing on the supplemental claims.

With a view toward issuing an order on Hartley's amended and supplemented motion for post-conviction relief, the collateral court granted each side an opportunity to submit written closing arguments. In his written closing argument, Hartley argued that newly discovered evidence, in the guise of James Johnson's testimony, entitled him to a new trial. The State filed a reply to Hartley's closing argument. (PCR Vol. XIII 2321-2328).

After the written arguments were submitted, the collateral court granted the parties an opportunity to present oral closing arguments. Mr. Hartley requested, and was permitted, to address the court as part of the closing arguments. For the most part, Hartley simply complained about previous collateral counsel's investigation and presentation of evidence at the evidentiary hearing. (PCR Vol. XIII 2368-2393).

On June 10, 2004, the collateral court denied Hartley's amended motion for post-conviction relief. (PCR Vol. VIII 1495 et. Seq.). In its order, the collateral court made no ruling on Hartley's purported claim of newly discovered evidence. The court did rule on each of Hartley's other claims, including the three supplemental claims raised by Mr. Malnik and Mr. Malnik's motion for appointment of a psychologist. (PCR Vol. VIII 1517-1520).

Hartley filed a motion for rehearing on June 25, 2004.  (PCR Vol. XIII 2331-2338). Hartley did not complain that the collateral court judge had not ruled on his "newly discovered evidence claim."  (PCR Vol. XIII 2331-2338).  Likewise, Hartley did not seek a ruling on this purported claim.

On October 4, 2004, the collateral court entered an amended order denying Hartley's amended motion for post-conviction relief.  The collateral court made no mention of the purported newly discovered evidence claim in his amended order. (PCR Vol. XI 1853-1880).  Hartley, once again, did not seek a ruling.

On appeal from the denial of his motion for post-conviction relief, Hartley raised three claims: (1) Counsel was ineffective at the penalty phase of Hartley's capital trial; (2) the collateral court erred in denying his claim that newly discovered evidence in the guise of the evidentiary hearing testimony of James Johnson, establishes the state presented the false or misleading testimony of Ronald Bronner and Eric Brook at Hartley's capital trials; and (3) Post-conviction counsel was ineffective.

On November 6, 2007, oral argument was held on Hartley's appeal.  On May 22, 2008, the Florida Supreme Court affirmed the denial of Booker's motion for post-conviction relief.   Hartley v. State, 990 So. 2d 1008 (Fla. 2008).

20

On June 6, 2008, Hartley moved for rehearing.  On September 10, 2008, the Florida Supreme Court denied Hartley's motion.  <u>Hartley v. State</u>, 2008 Fla. LEXIS 1712  (Fla. 2008).    Mandate issued on September 26, 2008.

On October 7, 2008, Hartley filed the instant petition for writ of habeas corpus along with a memorandum of law.    On January 9, 2009, this Court ordered Respondents to show cause why Hartley's petition should not be granted.

This Court directed Respondents to file their response within 60 days of the order of this Court.  Accordingly, Respondents response is due to be filed on or before March 11, 2009.

## V.  <u>STATEMENT OF EXHAUSTION</u>

(1)      In his first claim (Claim I), Hartley avers that trial counsel was ineffective during the penalty phase of Hartley's capital trial.    <u>*This claim is exhausted*</u>.

Hartley raised this claim in his motion for post-conviction relief.   Hartley also raised this claim in his appeal from the denial of his motion for post-conviction relief.  The Florida Supreme Court denied this claim on the merits.  <u>Hartley v. State</u>, 990 So. 2d 1008, 1012-1014 (Fla. 2008).   In asserting this claim both in the collateral court and in the Florida Supreme Court, Hartley presented a federal question (whether counsel was ineffective in violation of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)).

(2)     In his second claim (Claim II), Hartley alleges he was denied an adequate

mental evaluation in violation of <u>Ake v. Oklahoma</u>.     *This claim is technically*

*exhausted but procedurally barred.* Hartley did not raise this claim as a claim of error

either on direct appeal or on appeal from the denial of his motion for post-conviction

relief. [1]

Hartley cannot, however, return to state court to raise this claim.   The Florida

Supreme Court has ruled that claims under <u>Ake v. Oklahoma</u> must be raised on direct

appeal.   Failure to do so bars review, under state law, in post-conviction proceedings.

<u>Davis v. State</u>, 928 So. 2d 1089, 1122 (Fla. 2005) ( An appellant's claim that he was

deprived of his right to an evaluation by a competent mental health expert pursuant

to <u>Ake</u> was procedurally barred in post-conviction proceedings because it could have

been presented on direct appeal); <u>Marshall v.  State</u>, 854 So.2d 1235, 1248 (Fla.

2003) (ruling that Marshall's post-conviction claim he was deprived of his right to an

---

[1]  In his motion for post-conviction relief, Hartley claimed trial counsel was
ineffective for failing to present a mental health expert to testify during the penalty
phase of Hartley's capital trial. The collateral court ruled that to the extent Hartley
was attempting to raise a substantive claim under <u>Ake v. Oklahoma</u>, the claim was
procedurally barred.    (PCR 1513).   Hartley did not raise a substantive <u>Ake</u> claim
on appeal from the denial of his motion for post-conviction relief.  Had he done so,
the claim would have been procedurally barred. <u>Marshall v. State</u>, 854 So.2d 1235,
1248 (Fla. 2003) (ruling that Marshall's post-conviction claim he was deprived of his
right to an evaluation by a competent mental health expert pursuant to <u>Ake v.
Oklahoma</u>, 470 U.S. 68 (1985), was procedurally barred because it could have  and
should have been  raised on direct appeal)

evaluation by a competent mental health expert pursuant to <u>Ake v. Oklahoma</u>, 470

U.S. 68 (1985), was procedurally barred because it could have  and should have been

raised on direct appeal); <u>Cherry v. State</u>, 781 So.2d 1040, 1047 (Fla.2000) ("[T]he

claim of incompetent mental health evaluation is procedurally barred for failure to

raise it on direct appeal.").

Although Hartley did not fairly present this claim to the Florida Supreme Court

on direct appeal, Hartley is now precluded, under state law, from raising this claim

in any post-conviction proceedings.  Accordingly, Hartley has technically exhausted

this claim.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115

L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in

state court meets the technical requirements for exhaustion; there are no state

remedies any longer 'available' to him.") (<u>citing</u> See 28 U.S.C. § 2254(b); <u>Engle v.

Isaac</u>, 456 U.S. 107 (1982).

(3)    In his third claim (Claim III), Hartley avers the trial court erred in

excluding Ronald Wright's testimony and Letter regarding Hank Evan's confession

to murdering Gino Mayhew.    <u>*This claim is exhausted*</u>.

 Hartley raised this as a claim of error on direct appeal. The Florida Supreme

Court denied the claim on the merits.  <u>Hartley v. State</u>, 686 So. 2d 1316 1320-1321

(Fla.1996).  In asserting this claim both in the collateral court and in the Florida

Supreme Court, Hartley presented a federal question (whether admission of this evidence was required pursuant to <u>Chambers v. Mississippi</u>,410 U.S. 284 (1973)).

(4)     In his fourth claim (Claim IV), Hartley avers the Florida Supreme Court erred in finding the admission of the testimony of a police officer to be harmless error.   <u>*This claim is technically exhausted but procedurally barred.*</u>

On direct appeal, Hartley claimed the trial court erred when it admitted the testimony of a police officer (Detective Baxter) who testified at trial about Hartley's arrest and interrogation.    However, Hartley did not present this claim of error as a federal constitutional violation.  Instead, in presenting his argument, Hartley relied solely on state law. (TAB T 15-27).

Although Hartley did not fairly present this claim to the Florida Supreme Court on direct appeal as an issue of federal law, Hartley is now precluded, under state law, from returning to state court to litigate this issue again.   Accordingly, Hartley has technically exhausted this claim.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.") (<u>citing</u> See 28 U.S.C. § 2254(b); <u>Engle v. Isaac</u>, 456 U.S. 107 (1982).

(5)     In his fifth claim (Claim V), Hartley avers the prosecutor exercised a peremptory challenge in a racially discriminatory manner.     *This claim is technically exhausted but procedurally barred*.

Hartley raised this claim on direct appeal.   The Florida Supreme Court rejected this claim on the merits.   Hartley v. State, 686 So. 2d 1316, 1322  (Fla.1996). However, this claim was not fairly presented as a federal claim of constitutional error. Instead, in asserting his argument in support of a claim of error, Hartley relied solely on state law.  (Tab T at page 44-48).   Although Hartley did not fairly present this claim to the Florida Supreme Court on direct appeal as an issue of federal law, Hartley is now precluded, under state law, from returning to state court to relitigate this issue.   Accordingly, Hartley has technically exhausted this claim. Coleman v. Thompson, 501 U.S. 722, 732, 111 S.Ct. 2546, 2555, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.") (citing See 28 U.S.C. § 2254(b); Engle v. Isaac, 456 U.S. 107 (1982).

(6)   In his sixth claim (Claim VI), Hartley alleges the Florida Supreme Court erred when it failed to reweigh the aggravating and mitigating factors when it struck one aggravator (HAC) and found the instruction as to another (CCP) unconstitutional. *This claim is exhausted, however a portion of the claim is procedurally barred*.

On direct appeal, Hartley alleged the trial judge erroneously instructed the jury regarding the aggravating factor of CCP.   While acknowledging the instruction had been held to be unconstitutional in another case, the Florida Supreme Court did not rule on the merits of Hartley's attack on the constitutionality of the instruction. Instead, the Florida Supreme Court found the issue to be procedurally barred because Hartley posed no objection to the form of the instruction nor offer an alternative instruction.   Hartley v. State, 686 So. 2d 1316, 1322  (Fla.1996).   [2]

The Florida Supreme Court did, however, find insufficient evidence to support the trial court's conclusion the murder was especially heinous, atrocious or cruel. (HAC).   The Court found the error to be harmless beyond a reasonable doubt in light of the five remaining valid aggravating factors (CCP; prior violent felony convictions; committed during the course of a kidnapping; committed to prevent a lawful arrest; and committed for pecuniary gain) and minimal mitigation.   Hartley v. State, 686 So. 2d 1316, 1324  (Fla.1996).

---

[2] Hartley also alleged, on direct appeal, the trial court erred in finding the murder was CCP because the grounds for that finding, set forth in the trial court's sentencing order, was not supported by the evidence.   The Florida Supreme Court agreed, but found the error harmless because there was ample other evidence to support a finding the murder was CCP.   Hartley v. State, 686 So.2d at 1323.

## VI.   **PROCEDURAL BAR**

Examination of Hartley's petition, along with the decisions of the Florida Supreme Court in his case, indicate that claims I, III, and a portion of Claim VI are free from procedural bar.  Claims II, IV, V are procedurally barred because they were either not fairly presented to the state court  at all or were presented in a manner that did not alert the Florida Supreme C to the federal nature of the claim.

In order to obtain habeas relief, a prisoner must first fairly present his claim to the state court.   In order to meet the fair presentment requirement, a Florida prisoner must  present his claim to the Florida Supreme Court in a manner that alerts the court to the federal nature of the claim. Baldwin v. Reese, 541 U.S. 27, 30-31 (2004).   A "fly-by" reference to an amendment to the United States Constitution is not enough. *See, e.g.*, Adams v. Robertson, 520 U.S. 83, 89, n. 3, 137 L. Ed. 2d 203, 117 S. Ct. 1028 (1997) (per curiam) (concluding that "passing invocations of 'due process'" that "fail to cite the Federal Constitution or any cases relying on the Fourteenth Amendment" do not "meet our minimal requirement that it must be clear that a federal claim was presented"); Webb v. Webb, 451 U.S. 493, 496, 68 L. Ed. 2d 392, 101 S. Ct. 1889 (1981) (finding a reference to "full faith and credit" insufficient to raise a federal claim without a reference to the U.S. Constitution or to any cases relying on it); New York Central R. Co. v. New York, 186 U.S. 269, 273, 46 L. Ed. 1158, 22 S. Ct. 916 (1902) ("[I]t is well settled in this court that it must be made to appear that

some provision of the Federal, as distinguished from the state, Constitution was relied upon, and that such provision must be set forth"); <u>Oxley Stave Co. v. Butler County</u>, 166 U.S. 648, 655, 41 L. Ed. 1149, 17 S. Ct. 709 (1897) (a party's intent to invoke the Federal Constitution must be "unmistakably" declared, and the statutory requirement is not met if "the purpose of the party to assert a Federal right is left to mere inference"). *See also* <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999) ( Before a state prisoner may bring a claim in a habeas petition in federal court, he must "invok[e] one complete round of the State's established appellate review process."); <u>Mancill v. Hall</u>, 545 F.3d 935 (11th Cir. 2008) ( Failure to exhaust can result in a procedural default that bars a federal court from hearing that claim if the appellate review which should have been pursued is no longer available to the petitioner).

Claim II in which Hartley avers he was denied an adequate mental evaluation in violation of  <u>Ake v. Oklahoma</u> is procedurally barred because Hartley did not present this as a claim on direct appeal as he was required to do under state law.

Claim IV is procedurally barred.   Hartley did not present this claim on direct appeal as a claim of constitutional error.   Instead, Hartley presented the claim solely on state law grounds.   While Hartley averred in the heading of his claim a Fourteenth Amendment violation,  such a fly by reference does not satisfy the fair presentment requirement.   (Tab T at pages 15-27)

Claim V is procedurally barred. Hartley did not present this claim on direct appeal as a claim of constitutional error. Instead, Hartley presented the claim solely on state law grounds. (Tab T at pages 44-48). While Hartley averred in the heading of his claim a Sixth Amendment violation, such a fly by reference does not satisfy the fair presentment requirement.

As to Claim VI, a portion of Hartley's sixth claim is procedurally barred from federal review because the Florida Supreme Court found that Hartley's attack on the constitutionality of the CCP instruction was procedurally barred under state law. Hartley v. State, 686 So. 2d 1316, 1324 (Fla.1996). Because the Florida Supreme Court found Hartley's constitutional attack on the CCP instruction procedurally barred under state law, this portion of Hartley's claim should not be reviewed in federal court. Lambrix v. Singletary, 520 U.S. 518 (1997)(federal habeas review not available if the defendant's federal claims have been defaulted in state court). *See also* Coleman v. Thompson, 501 U.S. 722, 729, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991). Instead, this Court should review only that portion of Hartley's claim that alleges the Florida Supreme Court erred in declining to reweigh the aggravators and mitigators when it struck the HAC aggravator.

## VII.  COGNIZABILITY

All six of Hartley's claims, to the extent they are free from procedural bar, appear to be cognizable in a petition for habeas corpus.

## VIII.  NECESSITY FOR AN EVIDENTIARY HEARING

Only one of Hartley's claims (Claim I) presents any factual issues.     The remainder of his claims (claims II- VI) can be decided as a matter of law on the record.

When an evidentiary hearing is granted in state court or if the prisoner fails to factually develop his claim so as to present a legally sufficient claim, this Court may grant a federal habeas petitioner an evidentiary hearing only under very limited circumstances.[3]

The standard is articulated in 28 U.S.C. §2254(e)(2) as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

---

[3]  In addition to the language in Section 28 U.S.C. 2254(e) that notes a court "shall not" hold an evidentiary hearing, the Eleventh Circuit in Kelley v. Secretary for Dept. of Corrections, 377 F.3d 1317 (11th Cir. 2004), observed that "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." Id. at 1337.

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Hartley was granted an evidentiary hearing on his claim that trial counsel was ineffective during the penalty phase of Hartley's capital trial. In particular, Hartley was permitted to present evidence in support of three general allegations claims: (1) trial counsel was ineffective for failing to call the "star witnesses" during the penalty phase of the trial  (2) counsel was ineffective for failing to prepare for the penalty phase of the trial and subpoena "crucial penalty phase" witnesses  and (3) trial counsel was ineffective for failing to "adequately employ the services of an available mental health expert.      (PCR Vol. III 404-405).

At the evidentiary hearing, Hartley called numerous witnesses in support of his claim that counsel was ineffective.  Hartley was given a full and fair opportunity to develop the factual basis for his claims.   Hartley is not entitled to an evidentiary hearing pursuant to 28 U.S.C. §2254(e)(2).

## IX.   __STANDARD OF REVIEW__

Hartley's petition, filed in 2008, is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Under AEDPA, this Court's review is "greatly circumscribed and highly deferential to the state courts." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

31

Accordingly, this Court owes deference to the Florida Supreme Court's decisions in Hartley v. State, 686 So. 2d 1316 (Fla.1996) and Hartley v. State, 990 So. 2d 1008 (Fla. 2008) as well as to the factual findings of the state collateral court. This deference requires this Court to presume the state courts' factual determinations are correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. Stewart, 476 F.3d at 1208.

Additionally, pursuant to AEDPA, this Court may grant federal habeas relief only if the Florida Supreme Court's ruling resulted in a decision that was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Stewart, 476 F.3d at 1208. Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently than the United States Supreme Court on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412-413 (2000).

Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the United States Supreme Court but unreasonably applies that principle to the facts of the

prisoner's case.  Id.   The  unreasonable application clause requires this Court to examine "whether the state court's application of clearly established federal law was objectively unreasonable" given the facts of the particular prisoner's case.  Williams v. Taylor, 529 U.S. 362, 407-08, 410. (2000).  For this standard to be satisfied, the state court decision must have been objectively unreasonable, not just incorrect or erroneous.  Id. at 409.

## X.   LAW APPLICABLE TO INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

A claim of ineffective assistance of counsel is governed by the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).   The Florida Supreme Court applied Strickland in deciding Hartley's  claim that counsel was ineffective during the penalty phase of Hartley's capital trial.   Hartley v. State, 990 So. 2d 1008, 1012-1014 (Fla. 2008).

In Strickland, the United States Supreme Court outlined the standard which must be met before a defendant may prevail on a claim of ineffective assistance of counsel.  The test is two-pronged and the defendant bears the burden of proof.

First, the petitioner must prove his attorney's performance was deficient.  A petitioner satisfies Strickland's performance prong by proving that counsel's performance failed to meet the standard of "reasonableness under prevailing professional norms." Id. See also Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495,

1511, 146 L. Ed. 2d 389 (2000); <u>Chandler v. United States</u>, 218 F.3d 1305, 1313

(11th Cir. 2000) (*en banc*); <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003)

Under <u>Strickland</u>, there is a strong presumption that counsel's performance was

reasonable and that counsel made all significant decisions in the exercise of reasonable

professional judgment.  Moreover, counsel's performance is evaluated at the time of

trial in order to avoid the distorting effects of hindsight.  <u>Strickland v. Washington</u>,

466 U.S. at 689.

In cases where the petitioner alleges that trial counsel was ineffective for failing

to adequately investigate and present mitigating evidence at trial, the United States

Supreme Court in <u>Strickland</u> explained:

 ....Strategic choices made after thorough investigation of law and facts
relevant to plausible options are virtually unchallengeable; and strategic
choices made after less than complete investigation are reasonable
precisely to the extent that reasonable professional judgments support the
limitations on investigation. In other words, counsel has a duty to make
reasonable investigations or to make a reasonable decision that makes
particular investigations unnecessary. In any ineffectiveness case, a
particular decision not to investigate must be directly assessed for
reasonableness in all the circumstances, applying a heavy measure of
deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or
substantially influenced by the defendant's own statements or actions.
Counsel's actions are usually based, quite properly, on informed strategic
choices made by the defendant and on information supplied by the
defendant. In particular, what investigation decisions are reasonable
depends critically on such information. For example, when the facts that
support a certain potential line of defense are generally known to counsel
because of what the defendant has said, the need for further investigation

34

may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Strickland v. Washington, 466 U.S. at 691-692.

Review of counsel's performance is objective. This means a reviewing Court must consider whether there was any reasonable justification for the attorney's conduct. Chandler v. United States, 218 F.3d at 1315. If so, the petitioner cannot prevail. Indeed, to prevail, Hartley must show that no competent counsel would have taken the action that Mr. Willis took in his case. Id.; Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001).

If the petitioner demonstrates trial counsel's performance was deficient, he must also show prejudice. A petitioner satisfies Strickland's prejudice prong if he demonstrates "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Where, as here, the petitioner contends that, but for counsel's error, he would not have received a sentence of death, a reviewing court considers whether "there is a reasonable probability that, absent the

errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence  -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695; Newland v. Hall, 527 F.3d 1162 (11th Cir. 2008).

## XI.    MERITS

### Ground I

In this claim, Hartley presents a claim of ineffective assistance of counsel during the penalty phase of Hartley's capital trial.   At trial, trial counsel presented two witnesses to testify on Hartley's behalf. Hartley, first, presented the testimony of seasoned criminal defense attorney, Alan Chipperfield, to provide some assurance that if the jury recommended a life sentence, Hartley would indeed spend his life in prison. [4] Next, Hartley called his pastor, Reverend Coley Williams.  Reverend Williams testified he had known Hartley since 1980.  According to Reverend Williams, Hartley had a quiet and peaceful spirit, attended church off and on, was remorseful about killing Angel McCormick, came from a good family, and was intelligent. (TR Vol. LXX 2525-2535).  Reverend Williams told the jury that Hartley was not deprived as a child and was raised in a loving home.  He was not abused and his childhood

---

[4]Trial counsel testified at the evidentiary hearing that he called Mr. Chipperfield because studies into the death penalty strongly suggested that persons are less likely to recommend death if they are secure in the belief that life means life. (PCR Vol. XII 2128-2129).

environment was wholesome and stable. (TR Vol. LXX 2540). Reverend Williams thought Hartley was a mature individual.  (TR Vol. LXX 2541).

Before this Court,  Hartley alleges that trial counsel was ineffective for failing to present Hartley's brother, Shawn Jefferson as well as, various family and friends during the penalty phase of Hartley's capital trial.   Hartley also claims trial counsel was ineffective for failing to put on a mental health expert to testify at trial.

In a motion for post-conviction relief, Hartley raised the same claim as he does here.    The collateral court granted an evidentiary hearing on the claim.  Hartley presented several witnesses in support of his claim.

A.   **Testimony at the Evidentiary Hearing**

> (1)  Shawn Jefferson

At the evidentiary hearing, trial counsel, Robert Willis, testified about his failure to call Shawn Jefferson as a witness during the penalty phase of Hartley's capital trial. Mr. Willis recalled he had talked with Shawn Jefferson at some point prior to trial. He could not recall specifically speaking with him about testifying at the penalty phase.  (PCR Vol. XV 2532).

Mr. Willis told the collateral court that, from his conversation with Mr. Jefferson, he understood that Mr. Jefferson did not want to have anything to do with the case and, as such, was unavailable as a witness. (PCR Vol. XV 2532).  According to Mr. Willis, Mr. Jefferson told him that, while he loved his brother, he had a good

thing going and could not afford to be associated with this [the murder trial]. (PCR Vol. XV 2524, 2532). Mr. Willis told the collateral court Mr. Jefferson wanted him to do everything he could for Hartley and even hired and paid him to defend his older brother but did not want to be publicly linked with him.  (PCR Vol. XV 2533).

Mr. Willis testified that, in his view, Mr. Jefferson would have been an excellent witness to put a human face on his client.  (PCR Vol. XV 2542).  Mr. Willis told the court he would have called Mr. Jefferson during the penalty phase of the trial if he would have been willing to testify. (PCR Vol. XV 2530).  He would not, however, want to put on an unwilling witness at a murder trial. (PCR Vol. XV 2542).  Mr. Willis told the court that Hartley did not request that he call Mr. Jefferson at the penalty phase and that Mr. Jefferson never informed him he would be willing to testify on Hartley's behalf.  (PCR Vol. XV 1861).

Mr. Jefferson also testified at the evidentiary hearing. Mr. Jefferson is Hartley's younger brother. Mr. Jefferson told the collateral court he did not recall telling Mr. Willis he did not want to be associated with the murder trial because he was an NFL player. (PCR Vol. XI 2550). He told the collateral court he would have testified if needed.  (PCR Vol. XV 2555).

Mr. Jefferson averred that if called to testify at trial, he would have told the jury his brother was not the person the prosecutor depicted him to be. Mr. Jefferson told the collateral court that Hartley was a caring person.  Hartley and Jefferson sang in the

38

church choir together even though Hartley was an awful singer. They played sports together and Hartley encouraged his younger brother to always do his best. (PCR Vol. XV 2554). When things got tough, Mr. Jefferson heard his brother's voice of encouragement. (PCR Vol. XV 2555).

Mr. Jefferson testified both he and his brother had the same opportunities in life. They grew up in the same household, had the same mother and father, played sports together and went to the same school and church. (PCR Vol. XV 2560). The year Mr. Jefferson went off to college, Hartley went to prison for manslaughter. Mr. Jefferson was not aware of the details of Hartley's manslaughter conviction.

Mr. Jefferson told the collateral court that he was no saint but that he tries to live an exemplary life. (PCR Vol. XV 2587). Mr. Jefferson testified that he always tries to do the right thing. (PCR Vol. XV 2587). Mr. Jefferson told the collateral court that as result of his success in the NFL he was the breadwinner of his family. He allocated a significant amount of his salary to help his extended family. (PCR Vol. XV 2572-2573). Mr. Jefferson testified that during the course of his career he donated his time and his money to the United Way and the Boys and Girls Clubs of America. He was even the United Way spokesman when he was with the Atlanta Falcons. (PCR Vol. XV 2564-2565).

Mr. Jefferson told the collateral court he did not attend his brother's trial. Mr. Jefferson testified he did not do so because his family thought it was best for him to

go to training camp. (PCR Vol. XV 2575). At the time of trial, he was still trying to make it in the NFL. (PCR Vol. XV 2575). At the time of Hartley's trial, Mr. Jefferson was in the third year of his career. He had been drafted in 1991 in the ninth round. (PCR Vol. XV 2562).

Mr. Jefferson told the collateral court that while he felt he should be at the trial, his family felt he should stay where he was because he was competing for his job. (PCR Vol. XV 2577). He told the court it was decided it was more important for Mr. Jefferson to make the team.

Mr. Jefferson testified that he and his family, including his sister Cheryl Daniels, discussed the fact he needed to focus on making the team. (PCR Vol. XV 2598). Family members reassured him that the rest of the family would be Hartley's moral support. (PCR Vol. XV 2596). Mr. Jefferson told the court that while it was a tough decision, he decided he would try to make the team and his family would watch how the trial was progressing. (PCR Vol. XV 2596). Mr. Jefferson told the collateral court his family told him, whenever he inquired about the trial, not to worry and to concentrate on the game. (PCR Vol. XV 2597).

(2)  Other Family and Friends

Trial counsel testified at the evidentiary hearing about his efforts to get family members to testify on Hartley's behalf. Mr. Willis testified he attempted to get family members to testify but Hartley's family members were uncooperative and unwilling

to testify. (PCR Vol. XI 1926). Mr. Willis testified that Cheryl Daniels was his liaison with Hartley's family and she told him that none of the family members were willing to testify.

Hartley called several witnesses, at the evidentiary hearing, that he alleged trial counsel should have called during the penalty phase. The first witness to testify at the evidentiary hearing on Hartley's behalf was Coach Freddie Stevens.

Coach Stevens told the collateral court that Hartley was a mannerable and cooperative boy. (PCR Vol. XVI 2607). Coach Stevens knew Hartley about a year and a half but did not actually coach him in football. (PCR Vol. XVI 2609). He taught him in physical education and saw him around school. (PCR Vol. XVI 2608).

Coach Stevens testified he was not contacted to testify but would have been happy to testify that Hartley was mannerable. (PCR Vol. XVI 2608). Coach Stevens was not aware that Hartley had previously been convicted of two robberies but was aware of his manslaughter conviction. (PCR Vol. XVI 2610-2612). Coach Stevens had not seen Hartley since Hartley was 17 years old. (PCR Vol. XVI 2610). He believed that Hartley had been in prison since he last saw him. (PCR Vol. XVI 2612).

Hartley next called his sister, Cheryl Daniels to the stand. Ms. Daniels testified that she spoke with trial counsel, Bob Willis, about her brother's case. (PCR Vol. XVI 2614). She did not know she could testify on her brother's behalf at the penalty phase. (PCR Vol. XVI 2615). She would have if asked to do so.

Ms. Daniels told the collateral court that if she would have been called to testify, she would have told the jury that Hartley was a good brother and a caring person when it came to elders.  (PCR Vol. XVI 2616).  He was a jokeable person and a sweet person.  (PCR Vol. XVI 2616).  He loved everyone.  (PCR Vol. XVI 2616).  According to Ms. Daniels, "there wasn't no particular person that he did not love." (PCR Vol. XVI 2616).  She testified that she gave trial counsel some names that he could call as witnesses who could testify about Hartley's good points.  (PCR Vol. XVI 2616).

She grew up in the same household as Shawn Jefferson and Hartley.  She left home at age 18.  She could not recall how old her brothers were when she left home. (PCR Vol. XVI 2618).

Ms. Daniels did not volunteer to be a witness. (PCR Vol. XVI 2625-2526). Ms. Daniels had no actual knowledge of the manslaughter conviction but knew it happened.  She was also not aware of Hartley's two robbery convictions until they got to trial in 1993.  (PCR Vol. XVI 2626).

The next witness called on Hartley's behalf was Jean Daniels.  She knew none of the facts of the murder case.  (PCR Vol. XVI 2629).  She knew about Hartley's convictions for robbery and manslaughter but did not know any of the facts underlying the convictions. (PCR Vol. XVI 2630, 2636). She testified that if she had been called at trial, she would have testified that Hartley was raised in the church, had a curfew

and was a good boy. (PCR Vol. XVI 2632). Hartley sang in the choir, was an usher, and was good to elderly folks. (PCR Vol. XVI 2632).

Ms. Daniels testified that she lived on welfare but she raised good children. She raised her children with discipline and that school, church, and rules were a must in her house. She provided her sons, Shawn Jefferson and Kenneth Hartley, the same love and opportunity. (PCR Vol. XVI 2634). According to his Mom, Hartley knew right from wrong. (PCR Vol. XVI 2645). She said that Hartley told her not to come to the trial. (PCR Vol. XVI 2637-2638).

Roanie Groomes testified next. She was a life-long friend of Kenneth Hartley and a school teacher. Ms. Groomes told the collateral court that, had she been called, she would have testified he was mannerable and was raised in a good home with ethical values. She also would have testified Hartley was active in the church and in sports. (PCR Vol. XVI 2650). Ms. Groomes knew about Hartley's manslaughter conviction. She testified the victim, Angel McCormick, was a very fine young lady and there was no reason for Hartley to have killed her. (PCR Vol. XVI 2653). She did not know about his robbery convictions. (PCR Vol. XVI 2654).

Ms. Groomes told the collateral court she talked to Hartley when he was in jail. Hartley never asked her to come down for the trial. (PCR Vol. XVI 2657). She was afraid to come down and did not want to deal with it. (PCR Vol. XVI 2657).

Nonetheless, she would have, if asked, testified at the penalty phase. (PCR Vol. XVI 2658).

Next, Hartley called Tanya Hawk. She was unemployed at the time of the hearing. (PCR Vol. XVI 2659). She had not worked since 1991. (PCR Vol. XVI 2665). She blew a kiss to Hartley as she came forward to the witness stand. (PCR Vol. XVI 2675). Ms. Hawk testified she had loved Hartley since the third grade. (PCR Vol. XVI 2661). She always wanted to be Hartley's girlfriend. (PCR Vol. XVI 2664).

Hartley always helped her out. (PCR Vol. XVI 2662). She told the court Hartley was helpful to elderly people and to others as well. (PCR Vol. XVI 2662). She had heard about his prior criminal record. (PCR Vol. XVI 2666). Mr. Willis did talk with her before trial. (PCR Vol. XVI 2668). She told him she was willing to be a character witness. (PCR Vol. XVI 2669). She could have come to the trial but chose not to. (PCR Vol. XVI 2668).

Finally, Hartley called Ms. Dorothy Cherry to testify at the evidentiary hearing. Ms. Cherry testified that Hartley was a friend of the family. (PCR Vol. XVI 2680). She told the collateral court that Hartley was a great guy always. (PCR Vol. XVI 2682). She described him as upright and wonderful. (PCR Vol. XVI 2682). She testified she does not know anything bad about him. (PCR Vol. XVI 2682). Ms. Cherry told the collateral court she did not know he had been convicted of two robberies. She knows the shooting that resulted in Hartley's manslaughter conviction just had to be an

44

accident. She was told it was an accident. (PCR Vol. XVI 2683, 2686). She knew, however, that Hartley pled guilty to shooting Angel McCormick. She had heard that Ms. McCormick was a fine young woman. (PCR Vol. XVI 2685).         Ms. Cherry told the court that she did not want to get involved with the case because there was so much going on in her life.  At the time of trial, she was in Atlanta taking care of her mother. (PCR Vol. XVI 2684). Her problems pretty much required her full attention. (PCR Vol. XVI 2692).

(3)   Mental Health Expert

At the evidentiary hearing, Hartley did not present the testimony of a mental health expert.   None of the witness testified that Hartley ever had any history of mental illness or suffered any brain damage.  (PCR Vol. XI 1872).   None of the witnesses testified that Hartley suffered from low intelligence, low self-esteem, substance abuse, impulse control, or childhood head injuries. (PCR Vol. XI 1872). Likewise, none reported that Hartley suffered any neglect or  sexual, psychological, or physical abuse that might contribute to his mental or emotional condition at the time of the murder.

B. **The Collateral Court's Ruling**

The collateral court denied Hartley's claim that counsel was ineffective at the penalty phase of Hartley's capital trial.  The collateral court applied Strickland to review Hartley's claims.  (PCR Vol. VII 1871).  The collateral court first found that

trial counsel's testimony at the evidentiary hearing was more credible than Hartley's allegations in his motion for post-conviction relief. (PCR Vol. XI 1871).   The court found that the witnesses presented at the evidentiary hearing were either unwilling or unavailable to testify at the time of trial.  The Court also found that even if this were not the case, Hartley failed to show prejudice.   The court found that even if the potential witnesses had been presented during the penalty phase, there is no reasonable probability that the balancing of aggravating factors and mitigating factors would have resulted in a life sentence.    (PCR Vol. VIII 1866-1872).

C.   **The Florida Supreme Court's Ruling**

(1)   Shawn Jefferson and Other Family and Friends

On appeal from the denial of Hartley's motion for post-conviction relief, Hartley claimed that trial counsel was  was ineffective for failing to call Shawn Jefferson and other family and friends, the Florida Supreme Court denied the claim.    The Court found:

> ..Hartley first argues that counsel was ineffective for failing to present several additional witnesses at the penalty phase to testify about Hartley's background. Because Hartley fails to show either that the witnesses were ready, willing, and able to testify at trial or that counsel's failure to present them prejudiced Hartley, we reject this claim.
>
> During the penalty phase, two witnesses testified on Hartley's behalf. An attorney testified to the extensive amount of time that Hartley would serve in light of the habitual violent felony offender sentence imposed in an armed robbery case, the potential for a similar sentence in another armed robbery case, and the twenty-five-year mandatory minimum

46

sentence on a life sentence for murder. Then the Reverend Coley Williams, who had known Hartley and his family since Hartley was about ten years old, testified that Hartley was intelligent, had a quiet and peaceful spirit, intermittently attended church, and came from a good family. Further, the minister had regularly spoken to Hartley while Hartley was previously imprisoned on a manslaughter charge and had seen or spoken to him several times after his release in 1991.

At the postconviction evidentiary hearing, Hartley's trial counsel testified that in order to humanize Hartley, he sought to have family members testify at the penalty phase, but none were willing. His efforts to meet with or talk with family members failed as they did not keep their appointments or did not respond to phone calls. Hartley's sister Cheryl told trial counsel that once Hartley was convicted, the family was no longer willing to support him. Regarding Hartley's brother, Shawn Jefferson (a professional football player), counsel was specifically informed that he was not available to testify because of his career demands. Regarding other witnesses presented at the postconviction hearing, trial counsel did not recall being informed of their existence.

Some of Hartley's family members also testified at the evidentiary hearing. Hartley's brother Jefferson testified to the close relationship he had with Hartley growing up--going to school, singing in the church choir, and playing sports--and that Hartley inspired and encouraged him. When Jefferson went to college, Hartley went to prison for manslaughter. Jefferson did not attend the trial because he and his family agreed that, as he had an extended family to support, he should concentrate on establishing his pro football career. Hartley's sister Cheryl Daniels served as the family's liaison with trial counsel, whom she had recommended because he once represented her. She said she was not asked to testify at trial but would have said that Hartley is a "jokeable person," a "good brother," and that he cared about the elderly. Hartley's mother testified that Hartley asked her not to attend the trial, and so she did not. She would have testified at the penalty phase that she raised Hartley and Jefferson the same way--with love and discipline and insistence on church and school attendance. When Hartley got older, however, she could no longer handle him.

Several other character witnesses testified. Coach Freddie Stevens, who knew Hartley for a year when Hartley was in his high school physical education class, testified that Hartley was "mannerable and cooperative." Denise Groomes said she feared attending the trial, but she would have testified that Hartley was "mannerable," had "ethical values," and attended church. Her sister Tanya Hawke testified that she had had a crush on Hartley since third grade, and he always "help[ed] out." Groomes's other sister, Dorothy Cherry, testified that she was in Atlanta during the trial and did not want to be involved, but she thought Hartley was a "great guy."

We review claims of ineffective assistance of counsel under the two-pronged standard established in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, a defendant must point to specific acts or omissions of counsel that are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. In addition, the defendant must establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Claims of ineffective assistance of counsel present mixed questions of law and fact subject to plenary review. Occhicone v. State, 768 So. 2d 1037, 1045 (Fla. 2000). This Court independently reviews the trial court's legal conclusions and defers to the trial court on questions of fact and credibility.

In ruling on Hartley's claims of ineffectiveness for failing to call these witnesses, the trial court found that the witnesses presented at the evidentiary hearing were "either unwilling or unavailable to testify" at the penalty phase of trial. The court also found no prejudice under Strickland's second prong. The court concluded that even if the witnesses had testified, "there is no reasonable probability that the balancing of aggravating and mitigating factors would have resulted in a life sentence."

We agree that Hartley has failed to meet either of Strickland's requirements. Competent, substantial evidence supports the postconviction court's conclusion that the witnesses were unwilling or

unavailable to testify. The circuit court found trial counsel's testimony about his attempts to obtain witnesses, particularly family members, to be more credible than the testimony of the other witnesses. In addition, several witnesses gave contradictory statements about their availability to testify.

Even if Hartley had met the first prong, however, he has failed to demonstrate prejudice. Hartley's mother testified that she raised Jefferson and Hartley the same way, with emphasis on discipline, morals, knowing right from wrong, church, and education, but she could not control Hartley when he was older. Jefferson testified that his brother inspired and encouraged him. He also testified, however, that when he went to college Hartley went to prison for manslaughter. Jefferson stressed the responsibilities his own professional football career imposed on him and his attendant responsibility to support his extended family, which included paying for Hartley's trial counsel. Further, Jefferson went to church and actively participated in a variety of charitable activities. Had this testimony been presented in the penalty phase, the jury would have seen a stark contrast between the two brothers, who were close in age and raised together. In addition, all the other testimony from the postconviction hearing combined presents little of substance about Hartley's character. His friends, sister, and coach agreed that Hartley was "mannerable" and a "good guy" who cared about the elderly. Such generalities would add little to Reverend Williams's testimony at the penalty phase, which provided a more detailed and positive estimation of Hartley.  In light of the five weighty aggravators in this case, the mitigation presented at the postconviction hearing fails to demonstrate prejudice.

Hartley v. State, 990 So.2d 1008, 1011-1014 (Fla. 2008).

> (2)  Mental Health Testimony

The Florida Supreme Court also addressed Hartley's claim that counsel was ineffective for failing to present a mental health expert at trial.   The Court rejected Hartley's claim.   The Court found that:

...Hartley also argues that trial counsel was ineffective for failing to have Hartley examined by a mental health expert and present the expert as a witness. In denying the claim, the trial court noted that the issue was set for evidentiary hearing, but no evidence was presented on it. The court is correct. The witnesses who testified at the hearing, including Hartley, his mother, his brother, and his sister, provided no evidence that Hartley had suffered any mental health or related problems, such as brain damage, low IQ, slow learning development, or abuse (sexual, physical, or neglect), or experienced problems with drugs, alcohol, or school work. Moreover, the transcript from the murder trial clearly indicates that trial counsel and Hartley discussed over a period of months whether to have Hartley examined by a mental health expert and decided not to do so. In light of Hartley's failure to present any evidence on the claim, we affirm the circuit court's conclusion that Hartley has failed to demonstrate either error or prejudice.

Hartley v. State, 990 So.2d 1008, 1014 (Fla. 2008).[5]

---

[5] In his habeas petition, Hartley complains that the collateral court denied a successor counsel's request to appoint a mental health expert. (Pet. at 36). Hartley also complains that while post-conviction counsel filed a motion for appointment of a mental health expert, the motion as never heard. To the extent that Hartley seeks to weave this into some kind of separate claim, this Court should reject the claim. Hartley did not appeal the collateral court's ruling denying the appointment of a mental health expert well after the evidentiary hearing was concluded. Accordingly, to the extent Hartley seeks to present this as some sort of error, Hartley's claim is procedurally barred. Mr. Malnik's request for appointment of a mental health expert came well after the evidentiary hearing was concluded and years after Hartley filed his initial motion for post-conviction relief. Even so, when Hartley's collateral counsel finally did seek to retain a mental health expert, his only grounds were that Hartley had been physically assaulted as a child and appeared to be traumatized. (PCR Vol. XIII 2223-2224). This request was not sufficient to trigger a duty on the part of the collateral court judge to appoint a mental health expert, especially so late in the proceeding. In his motion, Hartley pointed to no nexus between the murder and this alleged assault, which occurred years before the murder. In his motion, Hartley made no claim he suffered from any brain damage or even had a history of brain damage as a result of this injury or from any other specific trauma or injury. Further, none of the evidentiary hearing witnesses testified about any mental problems, low intelligence, substance abuse, brain damage, childhood injuries, sexual or mental

Hartley has failed to show the Florida Supreme Court's ruling in this case was contrary to, or an unreasonable application of clearly established law from the United States Supreme Court, specifically the United States Supreme Court's decision in Strickland v. Washington. [6]   Accordingly, Hartley's first claim should be denied.

_____

abuse, or any other factor relating to available mental mitigation. Given these considerations and the fact Hartley waited years after he first filed his motion for post-conviction relief to pursue appointment of a mental health expert, the collateral court judge did not abuse his discretion in denying Hartley's motion for appointment of a mental health expert.

To the extent that Hartley complains the collateral court never heard post-conviction counsel's  motion to appoint a mental health expert to examine Hartley,   Hartley's argument is without merit.  Nothing in Rule 3.851 or in Florida law requires appointed collateral counsel to seek leave of court to consult with a mental health expert in post-conviction proceedings as part of the investigation into whether trial counsel was ineffective for failing to investigate mental mitigation or present the testimony of a qualified mental health expert. Section 27.711(6), Florida Statutes provides reimbursement for collateral counsel for up to $15,000 for miscellaneous expenses including payment of expert witness fees.

[6] Petitioner also cites to Wiggins v. Smith, 539 U.S. 510 (2003).  However, in Wiggins, the United States Supreme Court applied Strickland to find counsel was ineffective for failing to investigate and then present evidence of the inmate's unfortunate life history, including severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother, physical torment, sexual molestation, repeated rape during subsequent years in foster care, a period of homelessness, and diminished mental capacities. Accordingly, the clearly established case law is still that outlined in Strickland v. Washington, 466 U.S. 668 (1984).

Contrary to Petitioner's suggestion, a free standing failure to investigate,  does not entitle a habeas petitioner to relief. Instead, to meet both prongs of Strickland, a petitioner must show that the failure to investigate prejudiced the petitioner at trial. A petitioner may only do this if he shows that calling the witnesses the petitioner has been able to discover during the years of post-conviction investigation and presented

As to Shawn Jefferson, the collateral court found that Shawn Jefferson was unavailable to testify during the penalty phase of Hartley's capital trial.    (PCR Vol. XI 1871) . [7] The collateral court found Mr. Willis' testimony to this effect credible. (PCR Vol. XI 1871).    The Florida Supreme Court affirmed.  Hartley has presented no evidence let alone clear and convincing evidence to permit this court to ignore the deference it owes to both the collateral court's factual finding and the Florida Supreme Court's decision on appeal.    Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).    Although Mr. Jefferson told the collateral court he would have testified at the penalty phase if he would have been asked to, his subsequent testimony belies any notion Mr. Jefferson was actually available and willing to testify.  This is so because, Mr. Jefferson's testimony at the evidentiary hearing established that Mr Jefferson, in consultation with is family, made a conscious decision to remain in training camp rather than attend and testify at Hartley's trial.

Mr. Jefferson told the collateral court he did not attend his brother's trial. Mr. Jefferson testified he did not do so because his family thought it was best for him to

_____

at the evidentiary hearing, probably would have resulted in a life sentence.

[7]  The Florida Supreme Court has rule that  proof a witness would have been available to testify at trial is integral to the prejudice prong of a claim of ineffective assistance of counsel for failing to call a particular witness at trial.  The Court concluded that "if a witness would not have been available to testify at trial, then the defendant will not be able to establish deficient performance or prejudice from counsel's failure to call, interview, or investigate that witness. Nelson v. State, 875 So.2d 579, 583 (Fla. 2004).

go to training camp. (PCR Vol. XV 2575). At the time of trial, he was still trying to make it in the NFL. (PCR Vol. XV 2575).  At the time of Hartley's trial, Mr. Jefferson was in the third year of his career.  He had been drafted in 1991 in the ninth round. (PCR Vol. XV 2562).    Mr. Jefferson told the collateral court that while he felt he should be at the trial, his family felt he should stay where he was because he was competing for his job.  (PCR Vol. XV 2577).  He told the court it was decided it was more important for Mr. Jefferson to make the team.  Mr. Jefferson testified that he and his family, including his sister Cheryl Daniels, discussed the fact he needed to focus on making the team.  (PCR Vol. XV 2598).  Family members reassured him that the rest of the family would be Hartley's moral support.  (PCR Vol. XV 2596).  Mr. Jefferson told the court that while it was a tough decision, he decided he would try to make the team and his family would watch how the trial was progressing. (PCR Vol. XV 2596).  Mr. Jefferson told the collateral court his family told him, whenever he inquired about the trial, not to worry and to concentrate on the game.  (PCR Vol. XV 2597).

Even if this Court were to assume that Shawn Jefferson would have been available to testify, Hartley failed to show that there is a reasonable probability the introduction of his testimony would have resulted in a life sentence.  First, Mr. Jefferson, though apparently sincere in his views, added little to mitigate this murder. Much in the same vein as Reverend Williams, who did testify at Hartley's capital trial,

Mr. Jefferson testified that Hartley was a caring person who was an untalented, but willing, church choir member. Jefferson's testimony added little more than his opinion that Hartley had been a good big brother. When viewed against the nature of the cold, calculated and premeditated murder of Gino Mayhew, a prior manslaughter conviction involving the shotgun death of a 15 year old girl, and two armed robberies committed within less than three months after Hartley's release from prison, this evidence was of minimal value.

Too, while Mr. Willis did not testify his failure to call Mr. Jefferson was a tactical decision, calling Mr. Jefferson would have been like playing with the proverbial double edged sword. In this case, however, the sword's sharper edge cut against Hartley's plea for a life sentence.

Mr. Jefferson would have presented to the jury a young man who grew up in the same household as Hartley, attended the same schools and church, lived in the same community, and, unlike Hartley, grew to be a fine upstanding and law abiding young man. Generous with his money and time to charities such as The United Way, supportive of family, and successful in the National Football League, Shawn Jefferson was a success story, and as different from his brother as night and day.

Had trial counsel called Mr. Jefferson during the penalty phase, the prosecutor could have exploited Mr. Jefferson's success to Hartley's detriment. Certainly, the

prosecutor would have pointed out to the jury that Mr. Jefferson's desire to "always do the right thing" was in stark contrast to his brother.

Mr. Jefferson's appearance for the defense would have presented the prosecution with an opportunity to point out that Mr. Jefferson and Mr. Hartley were raised in the same environment and given the same opportunities and that while Mr. Jefferson went the right way, Hartley willfully and consciously took a path toward violence and ultimately toward murder.   Hartley set a very poor example for his little brother yet Mr. Jefferson's strength of character led him to take a completely different path than the one Hartley freely and voluntarily took.   It is  reasonable to conclude the minimal good character evidence offered by Mr. Jefferson would have been greatly overshadowed by this stark contrast between these two brothers.

As to Hartley's other family members and friends, the collateral court found the witnesses were unavailable or unwilling to testify.   Hartley has presented no evidence let alone clear and convincing evidence to permit this Court to ignore the deference it owes to both the collateral court's factual findings in this regard and the Florida Supreme Court's decision on appeal.    Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

Even if all the witnesses would have been available and willing to testify, none of the witnesses presented at the evidentiary hearing provided any weighty mitigation. The fact Hartley was mannerable, considerate, "jokeable"  and helpful to elderly

people pales in comparison to his three prior violent felonies, one of which involved the manslaughter of fifteen-year-old Angel McCormick, a person who one of Hartley's own witnesses described as a very fine young lady.

Unlike many defendants who can point to a troubled or deprived childhood and claim it contributed, or simply added some context, to their own violent acts, the evidence elicited from Hartley's character witnesses demonstrated Hartley's childhood was both stable and nurturing.

Testimony at the evidentiary hearing refuted any notion that Hartley grew up in a home marred by drug addiction, violence, sexual abuse, or neglect. Moreover, none of the witnesses who testified at the evidentiary hearing, or even at trial, presented any testimony to establish that Hartley was in any way impaired by the long term effects of alcohol or drug addiction, suffered from a low IQ, was impulsive, or had any sort of mental impairment, learning disability, or brain injury. Indeed, Hartley's mother, Jean Daniels, painted a picture of a son who was taught right from wrong and who grew up in a cohesive, loving, church-going family; a son who was perfectly capable of choosing to do the right thing but consistently chose the wrong thing.

Additionally, all of the testimony presented at the evidentiary hearing revealed Hartley's "character witnesses" knew little about the character of Kenneth Hartley. For the most part, the witnesses had little knowledge of the facts surrounding the death of

Angel McCormick and no knowledge at all of the two robberies that Hartley committed in the days before and after he executed Gino Mayhew by shooting him five times in the head.   Certainly, these witnesses were unaware that within less than 80 days after being released from prison for manslaughter, Hartley had robbed two cab drivers at the point of a sawed-off shotgun and murdered a 17 year old high school student.   Because Hartley did not demonstrate at the evidentiary hearing that but for counsel's failure to call these witnesses at trial, he probably would have received a life sentence, the Florida Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of the dictates of the United States Supreme Court's decision in <u>Strickland v. Washington</u>.

Finally, as to his claim that counsel was ineffective for failing to present mental health testimony, Hartley cannot show the Florida Supreme Court's decision was contrary to or an unreasonable application of clearly established Federal law.

Hartley presented no testimony at the evidentiary hearing to support this claim. Hartley did not call a mental health expert to testify at the hearing.   Hartley, himself, did not testify at the evidentiary hearing that at the time of the murder, he was under the influence of drugs or alcohol.   Nor did Hartley explain that, at the time he killed

Gino Mayhew, he was under some sort of emotional or mental impairment that clouded his judgment or was in any way, linked to the murder of Gino Mayhew. [8]

Hartley also did not present any evidence of his upbringing that trial counsel could have, but did not exploit, in mental mitigation.  Neither Hartley's siblings nor his mother provided any testimony to support the notion that, as a child or teenager, Hartley suffered from mental health problems, low intelligence, low self-esteem, substance abuse, learning disability, brain damage, impulse control, or childhood head injuries. (PCR Vol. XI 1872).

Likewise, none reported that Hartley suffered any sexual or physical abuse that might contribute to his mental or emotional condition at the time of the murder. Though granted an evidentiary hearing on this claim, Hartley failed to produce any evidence to support his claim that trial counsel was ineffective for failing to present the testimony of a qualified mental health expert to the jury.

Hartley failed to show the Florida Supreme Court's opinion in this case was contrary to, or an unreasonable application of the United States Supreme Court's decision in Strickland.   This Court should reject this claim.

_____

[8]Florida has two statutory mental mitigators.   One is that at the time of the murder the defendant was under the influence of an extreme mental or emotional disturbance.   The second is that at the time of the murder, the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.   Section 921.141 (6)(b)(e),

## Claim  II

In this claim, Hartley alleges that he was denied an adequate mental health examination in violation of <u>Ake v. Oklahoma</u> 470 U.S. 68 (1985) . [9]   To the extent, this Court does not find this claim procedurally barred, this claim should be denied for two reasons. [10]

---

[9] In his petition, Hartley avers that trial counsel explained that the reason why he failed to hire a mental health expert and failed to investigate was that his penalty phase strategy was to win a not guilty verdict. .   Thus, no mental health testing was conducted and no records of any kind were sought and obtained.   (Pet. at page 34).

The record does not support Hartley's "factual" assertion.  By making this statement of "fact".  Hartley seeks to persuade this Court that trial counsel was asked, at this point in the record,  why he did not gather mental health records (which there is no evidence any exists) or consult with a mental health expert and that, in response to that direct counsel trial counsel testified he did not do any mental health investigation because he was so focused on the penalty phase he simply did not do anything.  The record does not support Hartley's representation of the record.  Instead, trial counsel was asked generally what he did in preparation for the penalty phase. (PCR Vol. VIII 1540, lines 13-14).  Trial counsel explained  that the primary defense was in the guilt phase because the defense was aware that, given his history and the circumstances, there was a high probability he would get death if convicted.   Trial counsel told the collateral court that, in the time between the guilt and penalty phase, he made an effort to get witnesses to testify during the penalty phase.  Trial counsel testified his his effort to get witnesses to testify at the penalty phase were largely unsuccessful. (PCR Vol. VIII 1541).  Trial counsel told the collateral court that while his focus was on the penalty phase, the defense did not ignore the penalty phase.  (PCR Vol. VIII 1541).

[10] As noted above, Hartley did not raise an <u>Ake</u> claim on direct appeal nor in his appeal from the denial of his motion for post-conviction relief.. <u>Hartley v. State</u>, 686 So. 2d 1316 (Fla. 1996); <u>Hartley v. State</u>, 990 So.2d 1088 (Fla. 2008). According, there is no opinion from the Florida Supreme is Court from which this Court may determine whether its decision was contrary to, or constituted an unreasonable application of clearly established federal law.

First, trial counsel requested and the trial court granted Hartley's request for a mental health evaluation by a mental health expert.   Prior to trial, Hartley moved for an order to transport Hartley for evaluation by a mental health expert. The Court granted the motion.  (TR. Vol LXX 2554-2555).

Hartley did not, however, call any mental health expert to testify on his behalf at the penalty phase.   Once the defense announced it would rest its case at the penalty phase, the prosecutor asked the trial judge to inquire as to the defense's failure to present any psychiatric testimony during the penalty phase.  The following exchange took place after the prosecutor made his request:

> TRIAL COUNSEL: Your Honor, let me say--I don't mean this sarcastically--this is an odd time for Mr. Bateh to be worrying about the record.  But the fact of the matter is I have told Mr. Bateh this before and I will repeat it for the purposes of the record although I do not think it is required, Mr. Hartley and I have discussed this on several different occasions over a matter of months with deliberate exercised judgment that we do not intend to do that.  We do not wish to do that.  Certainly we are aware that the Court entered an order transporting him for that [to obtain psychiatric evaluation] purpose if we wanted it to be done.  We did not request it to be done.  I don't know that we need to do any official waiver or formal waivers in as much counsel acknowledges those things are not required, they are not done in other situations.

> COURT: I don't know anything else we need to do.

> PROSECUTOR: That is probably sufficient....

(TR.  Vol LXX 2554-2555).

Hartley cannot show that he was deprived of an adequate mental health examination because the court granted trial counsel's request for the assistance of an expert.   The state does not violate the dictates of <u>Ake</u>, if the court grants the defendant's request for an evaluation, but the defendant with "deliberate exercised judgment" decides not to submit to the evaluation.   Even if this Court could review, this claim *de novo* Hartley cannot show  the trial court "denied" Hartley an adequate mental health expert.

This claim may also be denied because, in presenting this claim, Hartley seeks to extend the dictates of <u>Ake</u> way beyond the four corners of the decision.    In <u>Ake</u>, the United States Supreme Court ruled that when a capital defendant has made a preliminary showing to the trial judge that the defendant's mental status is likely to be a significant factor in sentencing, the Constitution requires that a state must assure the defendant access to a competent mental health expert.     <u>Ake v. Oklahoma</u>, 470 U.S. 68, (1985).

Hartley seeks to have this Court extend the holding in <u>Ake</u> to mean that a constitutional violation occurs if, in every capital case, the defendant is not examined by a competent mental health expert if not at trial, in post-conviction proceedings. This Court should decline Hartley's invitation.

In order to trigger the requirements of <u>Ake</u>, a defendant must first show that his mental status is likely to be a significant factor in sentencing.    At trial, the defendant

61

made no such showing.  Instead, the only evidence that Hartley offered at the trial was that, according to Reverend Williams,  Hartley had a quiet and peaceful spirit, attended church off and on, was remorseful about killing Angel McCormick, came from a good family, and was intelligent. (TR Vol. LXX 2525-2535).  Reverend Williams also told the jury that Hartley was not deprived as a child and was raised in a loving home.  According to Reverend Williams, Hartley was not abused and his childhood environment was wholesome and stable. (TR Vol. LXX 2540). In Reverend Williams opinion,  Hartley was a mature individual.  (TR Vol. LXX 2541).

Even at the evidentiary hearing, Hartley never presented any evidence that put his mental status, at the time of the murder, at issue.   Not a single witness provided any testimony that Hartley suffered from brain damage, a low IQ, substance abuse or had any history of mental illness or instability.   Hartley has failed to show he was deprived of the assistance of a competent mental health expert in violation of the dictates of <u>Ake v. Oklahoma</u>.  [11]

---

[11]   Hartley has offered no authority for the notion that <u>Ake</u> imposes a constitutional right to the assistance of a qualified mental health expert during post-conviction proceedings.  A defendant in post-conviction proceedings is not even constitutionally entitled to the assistance of counsel.  As such, Hartley can show no constitutional violation if the collateral court fails to appoint a post-conviction mental health expert.  This is especially true since collateral counsel in Florida are free to hire a mental health expert without leave of court.

## CLAIM III

In this claim, Hartley alleges the trial court erred in excluding hearsay testimony from Ronald Wright that Hank Evans confessed to murdering Gino Mayhew.    On February 11, 1993, prior to trial, defense counsel notified the trial court he had discovered a witness who was prepared to testify that a associate of his confessed to the murder of Gino Mayhew. (TR Vol. I 73).   The alleged confession was memorialized in a letter.  (TR Vol. I 73).   According to counsel, Wright was willing to testify on Hartley's behalf  but was not willing to do so until his own case, also a capital murder case, was concluded.    (TR Vol. I 74).   Counsel requested the court continue Hartley's trial until Wright's proceedings could be concluded. (TR Vol. I 76).

In response, on May 14, 1993, the state filed a motion in limine to preclude the introduction of this hearsay testimony.  (TR Vol. I 101-108).  On June 18, 1993, a hearing was held on the motion.   The first part of that hearing on the state's motion can be found in Volume LVI of Hartley's trial transcript at pages 1306-1326.

A subsequent hearing on the state's motion in limine was held on July 1, 1993. That hearing may be found at Volume LVIII of the trial record.

Only one witness testified before the trial court.  Trial counsel declined to call Ronald Wright to testify at the hearing.  Instead, the State called Hank Evans to testify. Evans is the person who allegedly admitted to Ronald Wright that it was he, and not Hartley that killed Gino Mayhew.

63

Evans testified that he is in Florida State prison serving time for robbery, both of which were committed in May 1991.    One of the robberies was of a Texaco gas station.  (TR Vol. LVIII 1371).

Evans knows Ronald Wright.  He has known him for ten years.   Wright and Evans participated in one of the robberies for which Evans was convicted. (TR Vol. LVIII 1370).   When Evans was arrested, he told the police that he participated in both robberies.  He also told the police that Ronald Wright was with him during the Texaco robbery.  (TR Vol. LVIII 1373).   As a result, Wright was arrested. (TR Vol. LVIII 1373).   Both he and Wright pled guilty to the robbery.  (TR Vol. LVIII 1374).

 When Evans was in the Duval County jail, he heard rumors about the murder of Gino Mayhew.   Evans knew Mayhew but they were not friends. (TR Vol. LVIII 1375).     The rumor was that Hartley and Sylvester Johnson took Mayhew to Sherwood Elementary School, robbed him and shot him several times. (TR Vol. LVIII 1376).

He and Ronald Wright talked about the murder.  Evans told Wright what he had heard.    Evans did not tell Ronald Wright that he killed Gino Mayhew.    (TR Vol. LVIII 1377).

After their conversation, Evans was interviewed by Assistant State Attorney Jay Plotkin.   Mr. Plotkin wanted to know whether Wright was involved in a Pizza place robbery and murder.  Evans told Mr. Plotkin that he overheard Wright and Trevor

Austin talking.   They said they had robbed a pizza place and shot someone.  Evans

gave a sworn statement to that effect to Mr. Plotkin.  (TR Vol. LVIII 1378).   Evans

also gave a deposition in July 20, 1992 in Wright and Austin's case .   He testified

against them during the deposition.  (TR Vol. LVIII 1380).

Subsequently, Evans got a letter from Ronald Wright.   Wright told Evans in

the letter that he had heard Evans might be a witness against him.   Wright asked

Evans not to testify.   (TR Vol. LVIII 1382).

Evans wrote a letter back to Wright.   Evans wanted to assure Wright he did

not plan to testify against him.   Evans explained what he was referring to in the

letter. (TR Vol. LVIII 1385).   Evans told Wright not to mention any of the other

robberies they pulled together if he talked to the police. (TR Vol. LVIII 1385-1386).

Evans told the court that he mentioned the Sherwood Blazer tip in his letter. He

testified that what he meant by the comment was that he did not go to the authorities

about the rumors he heard until after he was already sentenced.  He was telling Wright

that he did not try to get a lenient sentence by going to the authorities to help himself.

 (TR Vol. LVIII 1389).

Evans thinks that Wright has a grudge against him and a reason to lie against

him.  Evans told the court that Wright believes Evans got him locked up because he

mentioned Wright's name when the police questioned him about other robberies. (TR

Vol. LVIII 1389).   He also believes that Ronald Wright has a grudge against him

because Evans was willing to be a state witness against him in the Good Times Pizza murder. (TR Vol. LVIII 1390).   The charges in that murder were eventually dropped.

In November 1991, he did not believe that Wright had a reason to hurt him because they were friends.   Six months later, he did.   (TR Vol. LVIII 1407).

At the hearing, trial counsel requested the court to consider the depositions of several individuals including Hank Evans and Ronald Wright.   (TR Vol. LVI 1324). Those depositions, along with several other depositions and sworn statements, may be found in Volume I of the Supplemental Record.  The letter that Hank Evans wrote to Wright is also contained in that volume.   (TR Vol. LVIII 1407-1409).

In his deposition, Ronald Wright testified that Hank Evans admitted to him that he murdered Gino Mayhew.   (TR Supplemental Vol. I 16).        Evans told him about the murder in October or November 1991. Evans told him he did it.

Evans told him that as he was leaving the Washington Heights area, he was looking for someone to rob.  He saw Gino Mayhew by a convenience store.  He went up to Mayhew and asked him if he had any drugs. Mayhew did.  Mayhew got into his Blazer and got a bag.

Evans said he approached Mayhew on the drivers' side, pulled out an automatic and shot Mayhew.  Evans told Wright that he pushed Mayhew to the passenger side, drove down to Sherwood 6th grade center, wiped down the van and threw a couple of pieces of dope on the floor or seat. (TR Supplemental Vol. I 25).

Evans told Wright that when he shot him,  Mayhew was inside the vehicle and Evans was outside the vehicle. ((TR Supplemental Vol. I 28).      Evans did not tell Wright that he moved Gino back to the drivers' seat.    (TR Supplemental Vol. I 30). Evans only talked about the murder once. (TR Supplemental Vol. I 32).   Evans did write him a letter.  (TR Supplemental Vol. I 40, 99).

When questioned whether Wright knew Evans could have been a witness against Wright in a case involving a murder at Good Times Pizza, Wright said he could have been.    He does not know that for a fact.   (TR Supplemental Vol. I 56).  Wright denied there was ever any kind of dispute between him and Evans.

Wright admitted he read Evans' deposition given about the Good Times Pizza murder.  Wright said the deposition was taken in his co-defendant Trevor Austin's , case. (TR Supplemental Vol. I 58).   Wright knows that his lawyer also took Evans' deposition. (TR Supplemental Vol. I 67).   Nonetheless, Wright denied knowing that Evans was a possible witness against Wright.  (TR Supplemental Vol. I 64).

In November 1991, Wright wrote a letter to Hartley's defense counsel, Charlie Cofer.  He heard Cofer was representing Hartley. Wright wanted to tell Cofer that an innocent man was being charged with murder. (TR Supplemental Vol. I 61).

James Brown gave a sworn statement to prosecutor George Bateh.   Mr. Bateh took Browns' statement on August 18, 1992 just two days after Brown heard Hartley and Wright talked about the Mayhew murder.  (TR Supplemental Vol. I 172).  Brown

told the prosecutor that he overheard Wright and Hartley talking about the Mayhew murder.    Hartley told Wright that he should have blamed the murder on Duck (Sylvester Johnson).   (TR Supplemental Vol. I163).

Brown told the prosecutor that he overheard Hartley tell Ronald Wright that he didn't have enough witnesses.   Hartley told Ronald Wright that he needed him to come in an help him on this. (TR Supplemental Vol. I 162).   Wright told Hartley that he would get on the stand for him and testify for him. (TR Supplemental Vol. I163-164).   Brown thought that Wright was telling Hartley he would lie for him.  (TR Supplemental Vol. I 165).

Hartley told Wright that Gino Mayhew tried to buck the robbery by telling him he did not have anything.  Hartley told Wright that he was not going to go on any blank trip.  When asked to explain what a "blank trip" was,  Brown explained that Hartley meant that he wasn't going to "get him like that" then get nothing. (TR Supplemental Vol. I 167).

Hartley told Wright that Gino put his hands up to his face. Hartley said Gino got shot in the hands and in the face.  (TR Supplemental Vol. I 168).  [12]Wright asked what happened and Hartley showed how Gino put his hands up to block himself. (TR Supplemental Vol. I 169).  Hartley told Wright that Mayhew was begging for his life.

---

[12]   The testimony at trial established that one of Hartley's shots went through Mayhew's hand into his face.

68

(TR Supplemental Vol. I171).  Hartley shot him anyway.  (TR Supplemental Vol. I 172).

Brown told the prosecutor that he overheard Hartley tell Ronald Wright that he didn't have enough witnesses.   Hartley told Ronald Wright that he needed him to come in an help him on this. (TR Supplemental Vol. I 162).   Wright told Hartley that he would get on the stand for him and testify for him. (TR Supplemental Vol. I163-164).   Brown thought that Wright was telling Hartley he would lie for him.  (TR Supplemental Vol. I 165).

James Brown also gave a deposition on May 5, 1992 about ten months after he gave a sworn statement to prosecutor George Bateh.   For the most part, Brown's testimony was consistent with his sworn statement.

In his deposition, however, he denied overhearing Wright and Hartley talking specifically about Wright testifying for Hartley.    He did hear Hartley tell Wright he did not have any witnesses.   Hartley told  Wright he would talk to him later. (TR Supplemental Vol. I 140).    He did not overhear any specific conversation about Wright testifying for Hartley.  (TR Supplemental Vol. I 141).

Elijah Blackshear also gave a deposition on April 22, 1993.  Blackshear testified that Hartley told him that he shot Gino Mayhew.     (TR Supplemental Vol. I 204).    Blackshear also overheard  Wright and Hartley talking.  Hartley asked

Wright if he was still making plans for him.  Wright said yes.  (TR Supplemental Vol. I 222).

Blackshear asked Wright what was going on. Wright told him that he was going to lie on some dude in prison and say the dude shot Mayhew.((TR Supplemental Vol. I 223).  Blackshear asked why he would do that.  Wright said he and the dude in prison got into a conflict.  Blackshear advised Wright to stay out of it.. Wright said he was going to "help my dog."  (TR Supplemental Vol. I 223).  Hartley told Blackshear that he and Wright had a master plan.  (TR Supplemental Vol. I 223).

Kareen Johnson gave the prosecutor a sworn statement on August 13, 1992. He spoke with Ronald Wright on August 9, 1992.    Wright told Johnson that he was going to say that the guy in prison, with whom he fought, was the one who killed Gino Mayhew.

 Johnson said the guy told him he shot Mayhew.  Johnson testified that Wright would "put it like that" meaning it wasn't the truth. Wright told Johnson that he knew Hartley had killed Gino Mayhew  (TR Supplemental Vol. I  245-246).   Wright said the state did not have any evidence on him.  (TR Supplemental Vol. I 247).   Wright said that he was going to help Hartley by testifying.  His testimony would not be the truth. He was just going to make it up to help Hartley.  (TR Supplemental Vol. I 247).

On August 13, 1993, the court entered a preliminary order granting the state's motion in limine.   (TR Vol. II 348).   On August 23, 1993, the trial court entered a

detailed order.    The court found that Ronald Wright's testimony about his conversations and letter of Hank Evans would be hearsay.   The trial court noted that as such, the evidence would only be admissible if it fell into any exception to the hearsay rule.     (TR Vol. II 364).

The trial court addressed both of Hartley's theories of admissibility.  First the trial court found that the statements would not be admissible as a statements against penal interest.

Section 90.804, Florida Rules of Evidence provides that an out-of-court statement of an unavailable declarant is admissible if at the time of its making, it was so far contrary to the declarant's pecuniary or proprietary interests, or tended to subject the declarant to liability, that a person in the declarant's position would not have made the statement unless he believed it to be true.    If the statement tends to expose the declarant to criminal liability and is offered to exculpate the accused, the statement is inadmissible unless corroborating circumstances show the trustworthiness of the statement.  *Section 90.804 (2)(c), Florida Rules of Evidence.*

The trial court found that the statement was inadmissible for several reasons. First, Evans was not unavailable to testify.   Second, the statements were not made under circumstances that would tend to expose Evans to criminal liability.  (TR Vol. II 364).   Lastly, the trial court found there were not corroborating  circumstances to show the trustworthiness of Evans' alleged admission.  (TR Vol. II 366).       The

court, having presided over both co-defendant's trials found that, in light of the

medical examiners' testimony as to the position of the victim at the time of the slaying

and the position of Mayhew's body when it was found, Evans alleged statement to

Wright was "clearly at odds with the physical facts brought out in the two separate

trials." (TR Vol. II 365). [13]

The Court also considered Hartley's claim the evidence must be admitted

pursuant to Chambers v. Mississippi, 410 U.S. 284 (1973) despite any finding the

testimony was inadmissible hearsay under Florida's Evidence Code.    The trial court

rejected Hartley's argument  the statements were admissible under Chambers.

The trial court ruled that Chambers forbids a state from applying arbitrary rules

that illogically prohibit the presentation of reliable trustworthy evidence.    The trial

court found that Chambers does not apply to Section 90.804(2)(c) that applies

---

[13]  The medical examiner testified that Mayhew was shot while seated in the
driver's side.  He fell over where he was found.   Dr. Lipovic opined the shooter was
in the back seat of the Blazer (TR Vol. LXVII 2054).   Depending on how he turned
his heard, the shot to his face could have come from someone sitting in the passenger
seat.  (TR Vol. LXVII 2056).     To a high degree of probability the shooter was
behind Mayhew. (TR Vol. LXVII 2059). Mayhew's wounds were not consistent with
being shot by someone standing outside the driver's side door.   (TR Vol. LXVII
2058).

Shell casings were also found in the Blazer. (TR Vol. LXVII 1995).  Mahew's body
was found seated on the driver's side leaning over with his head on the passenger seat
facing downward.   (TR Vol. LXVII 1990).

reasonable and logical requirements to insure te trustworthiness of the type of hearsay evidence that Hartley wished to offer.  (TR Vol. II 367).

The court found that Wright's statement does not have the abundant corroboration and signs of trustworthiness that the statements had in Chambers.   The trial court found that contrary to the statement at issue in Chambers that had a laundry list of circumstances indicating the statement was reliable, the hearsay statements that Hartley sought to introduce was almost completely devoid of corroboration. (TR Vol. II 368).   The trial court found that application of 90.804(2)(c), Florida Rules of Evidence, in this case fully comports with the necessity for the logical and orderly presentation of reliable evidence and the fundamental dictates of fairness and due process.  (TR Vol. II 368).

Hartley appealed.   The Florida Supreme Court considered his claim under the dictates of Chambers and rejected his claim:

> ..Next, Hartley contends that the trial judge improperly excluded the testimony of  Ronald Wright regarding a letter Wright received from Hank Evans, in which Evans purportedly confessed to murdering the victim. In the letter, Evans stated: "You was my home-boy and I never told you a thing about that Sherwood Blazer tip until we got to Lake Butler and shit had cleared up." The State moved to exclude this evidence and the trial judge granted the State's motion after finding the testimony to be inadmissible hearsay. Hartley acknowledges that the testimony constitutes inadmissible hearsay, but contends that the testimony should have been introduced under Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)(on rare occasions the strict requirements of the evidence code  should be set aside in the interests of justice). We disagree.

The trial judge rejected the <u>Chambers</u> argument after finding that Wright's testimony was unreliable and untrustworthy and that no evidence corroborated Evans's alleged confession. The testimony at the pretrial hearing on this issue revealed that Wright submitted the letter but refused to testify until his own cases were resolved. When Wright eventually did testify, he stated that Evans told him the following facts about the murder: that Evans shot the victim outside a convenience store; that Evans was standing outside the car when he shot the victim, who was in the driver's seat; and that Evans moved the victim to the passenger's seat and drove the vehicle to the field where he left it. Wright also stated that he knew Evans was listed as a witness against him. Evans, on the other hand, testified that he discussed rumors he had heard about this case with Wright but that he never confessed to him. Additionally, Evans testified that his letter to Wright was in response to a letter he had received from Wright asking him not to testify against him. The trial judge also considered testimony from a number of others, including two individuals who overheard Wright state that he was going to lie for Hartley by stating that someone else had confessed to killing the victim. Based on this evidence, we find that the trial judge properly found the evidence to be unreliable and inadmissible under <u>Chambers</u>.

<u>Hartley v. State</u>, 686 So.2d 1316, 1320-1321 (Fla. 1996).

The Florida Supreme Court properly applied <u>Chambers</u> to the fact of this case.

In <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973), the United States Supreme Court reversed a Mississippi state court conviction when, on the basis of the state's hearsay rule, the state court refused to admit hearsay testimony that someone else had committed the crime. <u>Chambers v. Mississippi</u>, 410 U.S. at 289-90.

The Court observed that the proffered testimony was trustworthy and admissible under a common exception to the hearsay rule (statements against penal interest) not adopted in Mississippi. The Court noted that the testimony at issue was  critical to

Chambers' defense and "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302.   The Court added, however, that in the exercise of the right to present witnesses, the accused "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."   Id.

Hartley cannot show the Florida Supreme Court's decision was contrary to, or an unreasonable application of, the United States Supreme Court's decision in Chambers.   This is so for two reasons.

First, the Florida Supreme Court's decision in this case in not contrary to Chambers because Chambers is clearly distinguishable from the case at bar.   In Chambers, the hearsay statement at issue was cloaked with several indicia of reliability (1) the existence of corroborating evidence; (2) the fact that the statements at issue were made spontaneously to close acquaintances after the murders; and (3) the fact that the statements were "unquestionably against [the] interest" of the declarant. Chambers, 410 U.S. at 299-300).

No such indicia of reliability are present here.  Evans's alleged confession does not even comport with the evidence admitted at trial.  Wright testified that Evans told him that he shot Mayhew from outside the car, pushed and pulled him, with difficulty, over to the passenger side, and drove him to Sherwood Elementary and left him there.

Evans' alleged "confession" does not comport with the evidence. When Mayhew was found, Mayhew was seated in the driver's side. More than one shell casing was found inside Mahew's blazer, which belies any notion the shooter was outside the car, and the medical examiner testified Mayhew's wounds were not consistent with being shot by someone standing outside the driver's side door. (TR Vol. LXVII 1995, 2058). Additionally, at least three people gave statements tending to show that Wright and Hartley cooked up a scheme to have Wright falsely blame someone else for the murder in order for Wright to "help [his] dog" (TR Supplemental Vol. I 223).

Second, the Florida Supreme Court's decision was not contrary to, or an unreasonable application of, Chambers because Rule 90.804(2)(c) is a well established rule of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence in Florida. "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). Only those rules that are applied mechanistically so as to exclude reliable evidence would violate Chambers.

Hartley cannot show that Section 90.804(2)(c) creates a mechanistic rule that would unfairly exclude exculpatory testimony. Indeed, the rule acknowledges a hearsay statement from an unavailable witness that would expose a declarant to

criminal liability yet exculpate the accused is admissible.  The rule requires only that the proponent offer some corroborating evidence in order to demonstrate the trustworthiness of the statement.  *Section 90.804(2)(c), Florida Rules of Evidence.*

A rule of evidence aimed, *inter alia,* at precluding unreliable and manufactured evidence is far from arbitrary and fanciful.   Instead, such a rule comports with the plain language of <u>Chambers</u>.   Hartley's claim should be denied.

## <u>CLAIM IV</u>

In this claim, Hartley avers the Florida Supreme Court's conclusion, that the admission of a police officer's testimony constituted harmless error, was contrary to, or an unreasonable application of the United States Supreme Court's decision in <u>Kotteakos v. United States</u>. (Memo at page 48).    As noted above, this claim is procedurally barred because Hartley never asked the Florida Supreme Court to review this claim under a federal harmless error standard.  (Tab T at pages 15-27).

Hartley did not even raise the substantive claim below as a claim of federal constitutional error.    Instead, Hartley raised the substantive claim on state law grounds.    While Hartley alleged in the heading to his argument a violation of Hartley's Fourteenth Amendment rights, Hartley argued only, in the body of his initial brief, that the testimony was admitted in violation of state law.  (Tab T at pages 15-27).    Should this Court decide to review this claim on the merits, the Florida Supreme Court's harmless error analysis did not run afoul of <u>Kotteakos</u>.

The issue arose during the testimony of Officer Quinn Baxter.   The defense moved to exclude the evidence and in response the state proffered Officer Baxter's testimony.   (TR Vol. LXVIII 2162-2166).   The state court admitted the testimony citing to state law (Williams rule) in admitting the testimony.   [14]

Before the jury, Detective Baxter testified that he is a homicide detective with the Jacksonville Sheriff's Office.   He interviewed Kenneth Hartley in connection with the investigation into the murder of Gino Mayhew. (TR Vol. LXVIII 2168). Detective Baxter testified that he advised Hartley he and Ronnie Ferrell were under arrest for the murder of Gino Mayhew.   Baxter told the jury that Hartley told Officer Baxter that he did not know Ronnie Ferrell, did not murder Gino Mayhew, and did not know Gino Mayhew.   (TR Vol. LXVIII 2172).   Detective Baxter testified that he responded to Hartley's denials by telling him that "we knew that on Saturday, two days prior of the murder of Gino Mayhew that Mr. Hartley robbed Gino Mayhew that was on April 20, 1991, therefore we knew that he knew Gino Mayhew."   (TR Vol. LXVIII 2172).

At that point, at a side-bar the trial court offered trial counsel an opportunity to request a limiting instruction.   The trial court noted that he would give the standard jury instruction which instructs the jury that evidence of any other crime can be

_____

[14] Williams v. State, 110 So. 2d 654 (Fla. 1959).

considered only for limited purposes. (TR Vol. LXVIII 2173). Trial counsel demurred and told the court that he may request the instruction later if the state sought to introduce evidence of this earlier robbery. (TR Vol. LXVIII 2173).

When the parties returned to counsel table, Detective Baxter testified that Hartley persisted in his denial that he knew Gino Mayhew. Hartley also denied any involvement in the earlier robbery or in the murder of Gino Mayhew.    (TR Vol. LXVIII 2174).

This was not the only testimony the jury heard about this earlier robbery. This time, the testimony came in as an admissions from Kenneth Hartley.

Ronald Bronner testified that during a conversation with Kenneth Hartley, Bronner confronted Hartley with the Gino Mayhew murder. Bronner told Hartley that the word on the street was that Hartley killed Gino Mayhew. Hartley told Bronner that "the only reason they saying that because I robbed him two days before he was killed." (TR Vol. LXVIII 2224).

At this time in the proceedings, Hartley requested the limiting instruction offered earlier. The trial court obliged. (TR Vol. LXVIII 2225-2226). The trial court reminded the jury that evidence of the earlier robbery could only be used for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, and the absence of mistake or accident on the part of the defendant. (TR Vol. LXVIII 2226).

79

Eric Brooks testified that he discussed Mayhew's murder with Kenneth Hartley. In their first conversation about the matter, Hartley told Brooks that he did not murder Gino Mayhew.  Hartley did, however, tell Brooks that he had robbed Gino Mayhew a couple days before the murder. Hartley told Brooks that if he wanted to kill him, he would have killed him then. (TR Vol. LXVIII 2260).  Hartley subsequently admitted to Brooks that he killed Mayhew with a .25 automatic.  (TR Vol. LXVIII 2261-2262).

Hartley appealed. [15]  The Florida Supreme Court agreed with Hartley that admission of Officer Baxter's testimony was error.  The Court however, found the error to be harmless, ruling:

> In his first claim, Hartley contends that the State was improperly allowed to introduce the testimony of a police officer at trial regarding Hartley's arrest. The police officer testified that when he arrested Hartley and Ferrell for the victim's murder, Hartley  denied knowing the victim. The police officer then testified that he told Hartley they knew he had robbed the victim two days before the murder. The trial judge allowed this testimony, over defense counsel's objection, as relevant Williams rule evidence under section 90.404(2)(a), Florida Statutes (1995)(similar fact evidence). According to Hartley, this testimony constituted inadmissible and irrelevant prejudicial evidence regarding a dissimilar prior crime, which was introduced simply to prove propensity and bad character.
>
> Section 90.404(2)(a), provides as follows:  Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation,

---

[15] Hartley did not raise a claim on direct appeal that the trial court erred in permitting Bronner or Eric Brooks to testify as to Hartley's admission to the earlier robbery.  (TAB T).

plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

Under this statute, evidence of other crimes is admissible only if it is "similar fact evidence." Griffin v. State, 639 So. 2d 966 (Fla. 1994), cert. denied, 514 U.S. 1005, 115 S. Ct. 1317, 131 L. Ed. 2d 198 (1995); Drake v. State, 400 So. 2d 1217 (Fla. 1981). Clearly, under the circumstances set forth in this record, evidence that Hartley had robbed the victim in this case two days before the murder was not similar fact evidence, and, thus, was inadmissible under section 90.404(2)(a). This does not mean, however, that evidence of other crimes is never admissible unless it is similar. Rather, evidence of other crimes that are "inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged," is admissible under section 90.402 (admissibility of relevant evidence) because it is relevant and necessary to adequately describe the crime at issue. Griffin, 639 So. 2d at 968; Bryan v. State, 533 So. 2d 744 (Fla. 1988), cert. denied, 490 U.S. 1028, 109 S. Ct. 1765, 104 L. Ed. 2d 200 (1989).

Applying this standard, we find that the testimony of the officer should not have been admitted. The officer was not testifying to the fact that Hartley admitted robbing the victim; the officer was merely repeating the officer's own statement that he knew Hartley robbed the victim two days before the murder. Under the circumstances of this case, however, we do not find that this error warrants reversal of Hartley's conviction. In Hartley's own admissions to other witnesses, he stated that "the only reason they [are] saying that [I killed the victim] is because I robbed him two days before he was killed." This testimony was properly introduced through two other witnesses as after-the-fact evidence of a desire to evade prosecution, which is relevant to the consciousness of guilt. Anderson v. State, 574 So. 2d 87 (Fla.), cert. denied, 502 U.S. 834, 112 S. Ct. 114, 116 L. Ed. 2d 83 (1991). Moreover, Hartley's own counsel made reference to this robbery during opening statements when he told the jury:

And I might add there are a couple of other informants that appeared along this same line that couldn't -- didn't mention in fact an informant showed up, the police went out, thought it might be a suspect in this case

turned around and talked about yet a second robbery accusing Kenneth
Hartley of being involved, same guy, [the victim], two nights  ago, two
nights before this. Maybe we'll hear about it, maybe we won't, maybe
counsel is not going to put that evidence on.

In sum, because defense counsel himself told the jury about the robbery
and because other witnesses properly testified about Hartley's own
statements regarding the robbery, we do not find the admission of the
police officer's statement constituted harmful error.

Hartley v. State, 686 So.2d 1316, 1320-1321  (Fla. 1996)

Error involving the conduct of trial is grounds for federal habeas relief only if

it "had substantial and injurious effect or influence in determining the jury's verdict."

Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d

353 (1993) (quoting Kotteakos v. United States, 328 U.S.750, 776, 66 S. Ct. 1239,

1253, 90 L. Ed. 1557 (1946)).   Under this standard, habeas petitioners may obtain

plenary review of their constitutional claims, but they are not entitled to habeas relief

based on trial error unless they can establish that it resulted in actual prejudice. Id.

Hartley cannot show prejudice because the fact that Hartley had robbed Gino

Mayhew two days before the murder because this same testimony came out through

other witnesses, specifically Ronald Bronner and Eric Brooks.    Even trial counsel

mentioned it during his opening statement.  (TR Vol. LXVII 1969).    Given that other

substantive testimony was presented to show that Hartley admitted he robbed Gino

Mayhew two days before he murdered him and the court's limiting instruction on how

the jury must consider his evidence, Hartley cannot show Detective Baxter's statement of opinion - "we know" you robbed Gino two days before the murder- had substantial and injurious effect or influence in determining the jury's verdict.

The Florida Supreme Court properly found harmless error.   Hartley's claim should be denied.

## CLAIM V

In this claim, Hartley avers the prosecutor improperly struck Ms. Stanford, a black juror, in violation of the United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79 (1986). [16]   Hartley never raised a Batson claim in either the trial court or before the Florida Supreme Court.   Instead, Hartley raised this claim under state law. [17] Likewise, the Florida Supreme Court did not decide the case

---

[16]   The victim in this case was a seventeen year old African American boy. Hartley is also African-American.

[17]Florida reviews allegations of the discriminatory use of peremptory challenges under Article I, section 16 of the Florida Constitution.   State v. Neil, 457 So.2d 481,486 (Fla. 1984); Melbourne v. State, 679 So. 2d 759 (Fla. 1996).   While Florida law on this issue largely mirrors Batson's second and third step, Florida defendants have no burden to make a prima facie case of discrimination.   An objection and the identification of the juror as a member of the protected class in enough to require the prosecutor to offer a race neutral reason for the strike. The trial judge must then determine if the proffered reason is genuine and not a pretext for discrimination. If he find the offered reason, the trial court should permit the strike. If he finds it was not genuine, the trial court must deny the strike.  In determining whether a reason is genuine, the relevant circumstances to be considered may include, but are not limited to, the following: "the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged

pursuant to <u>Batson</u>.  Instead the Florida Supreme Court applied state law to deny Hartley's claim.   Because Hartley never raised this as a <u>Batson</u> claim in state court, this Court cannot determine, under AEDPA,  whether the Florida Supreme Court's rejection of Hartley's discrimination claim was contrary to, or an unreasonable application of clearly established federal law.

Even if this Court were to consider Hartley's claim as a <u>Batson</u> claim, on the merits, Hartley is not entitled to relief.  <u>Batson v. Kentucky</u> provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race. First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.   Step three of the <u>Batson</u> inquiry involves an evaluation of the prosecutor's credibility.  <u>Snyder v. Louisiana</u> 128 S. Ct. 1203, 1207-1208 (2008)

In this case, after voir dire was completed, the attorneys for both sides met to exercise their challenges.  The court heard the parties various challenges for cause and ruled on each one.  Respondents can find nothing in the record to demonstrate the race

_____

juror; or singling the juror out for special treatment." <u>Melbourne</u>  n. 8.

of any juror challenged by either side for cause.   Next the court advised the parties that each side would have ten peremptory challenges.  Twelve jurors were in the box subject to challenge.

The first twelve in the box were Hardy, Whidby, Karam, Jones, Rukab, Stanford, Mayer, Butler, Horne, Homme, Mitchell and Allen.   Among those first twelve were five black prospective jurors;  Hardy, Whidby, Butler, Allen and Stanford.  (TR Vol. LXVII 1887).

The state went first.   Bypassing the first two black jurors among the first twelve, Ms. Whidby and Mr. Hardy, the state sought to challenge Ms. Stanford. Hartley objected pointing out that Ms. Sanford was black.  Hartley offered no theory upon which to support an allegation the prosecutor struck Ms. Stanford because she was black.    Trial counsel requested a race neutral reason.   (TR Vol. LXVII 1887).

The prosecutor offered two reasons for the strike.    The prosecutor told the court:

> ...Your Honor, I challenged Ms. Stanford because she stated she was personally opposed to the death penalty but she felt she would be able to set aside her personal feelings and follow the law. My concern is that her feelings opposed to the death penalty are adverse to the State's position in this case, also I am concerned about her field of work-that's my primary reason, but I'm also concerned with psycotherapist, I'm concerned she's too forgiving because of her line of work and understanding human frailties.

(TR Vol. LXVII 1887).

The defense objected claiming that "Your Honor, I don't think that's a basis for excusing."   The court found the prosecutor's reasons for the challenge were racially neutral and were permissible reasons for the strike.   The Court also noted that the prosecutor had not challenged the other four black jurors of the first twelve.   (TR Vol. LXVII 1887).

The  state offered no challenge to the four black jurors remaining of the first twelve after it struck Ms. Stanford.   Instead, Hartley, himself, removed two of the black jurors from the first twelve, Mr. Hardy and Mr. Allen.   (TR Vol. LXVII 1889, 1894).

The prosecutor used only six of his ten challenges and did not use any of his remaining peremptory challenges to strike either  Ms. Whidby or Ms. Butler, two black jurors who remained among the first twelve.   (TR Vol. LXVII 1895).   Both Ms. Whidby and Ms. Butler  sat on Hartley's jury.   (TR Vol. LXVII 1899).    Nothing in the record shows the prosecutor used any of his strikes, save for Ms. Stanford, against a black juror who came up after the first twelve.

On direct appeal, the Florida Supreme Court considered Hartley's claim that the trial judge erred in finding the State had a race-neutral reason for excusing a prospective juror.    The court found:

> ... [Hartley] claims that the trial judge erred in finding that the State had
> a race-neutral reason for excusing a prospective juror. One of the

prospective jurors in this case was an African-American who worked for a social services agency and had a master's degree in psychology.  When asked about her views on the death penalty, she stated that she was against it because she thought people could be rehabilitated in some other form. She later stated that she would have to see the evidence before determining whether the death penalty would be appropriate. The State peremptorily challenged the prospective juror. When challenged, the State responded that her negative feelings about the death penalty and her line of work raised concerns about her ability to impose the death penalty. The judge found these reasons to be racially neutral. Hartley contends that these reasons were insufficient to establish a race-neutral basis for challenging the juror. According to Hartley, this Court rejected a similar argument in State v. Slappy, 522 So. 2d 18 (Fla.)(simple assumption that a teacher was "liberal" was an insufficient reason, without record support, to justify the peremptory challenge), cert. denied. 487 U.S. 1219, 108 S. Ct. 2873, 101 L. Ed. 2d 909 (1988).

This Court has repeatedly held that a prospective juror's view against the death penalty is a legitimate, race-neutral reason for a peremptory challenge. Walls v. State, 641 So. 2d 381 (Fla. 1994), *cert. denied*, 513 U.S. 1130, 115 S. Ct. 943, 130 L. Ed. 2d 887 (1995); Atwater v. State, 626 So. 2d 1325 (Fla. 1993), *cert. denied*, 511 U.S. 1046, 114 S. Ct. 1578, 128 L. Ed. 2d 221 (1994). Here, the juror specifically stated that she was against the death penalty. That reason was sufficient to provide a race-neutral reason for the peremptory challenge.

Hartley v. State, 686 So.2d 1316, 1322 (Fla. 1996)

This Court should deny this claim. Hartley has failed to show a Batson violation. [18]

---

[18] Hartley made no *prima facie* showing below that the prosecutor exercised a peremptory challenge in a racially discriminatory manner.  The *prima facie* case requires the defendant to show that the prosecutor used a peremptory strike to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race, and that the facts and circumstances surrounding the peremptory strike give rise to an inference that the prosecutor acted due to the venire member's group identity. United

Hartley's claim must fail because the prosecutor offered a reason for his challenge that the trial court ruled was both race neutral and a permissible basis for challenge.   Implicitly, the trial court found the prosecutor's explanation credible. Hartley has offered no evidence, let alone clear and convincing evidence, to overcome the presumption of correctness this Court must afford the trial court's implicit factual finding.

Hartley's claim must also fail because Hartley failed to show purposeful discrimination, in light of all relevant circumstances found in the record.   Hartley seeks to convince this Court that two things are true.   First,  that  if this Court were to  do  a side-by-side analysis of white jurors who the prosecutor did not seek to

_____

States v. Martinez-Salazar, 528 U.S. 304, 315, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000); United States v. Bryant, 2008 U.S. App. LEXIS 25498 (4th Cir. 2008).  Ms. Stanford was the first black juror stricken.  Moreover, the State passed over two other black jurors among the first twelve in the box and never attempted to backstrike them with any of its remaining challenges.    In objecting to the state's challenge against Ms. Stanford , Hartley pointed out only that Ms. Stanford was black. Hartley did not point to any fact or circumstance surrounding the peremptory strike, including the ones urged by Hartley now,  which gave rise to an inference the prosecutor acted due to Ms. Stanford's race.

Although Hartley failed to make even a prima facie case, this failure was rendered moot when the trial court made a determination that the prosecutors reason for the strike was race-neutral and a valid basis for a strike.  Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.  Hernandez v. New York, 500 U.S. 352 (1991).

challenge from the jury, this Court would find purposeful discrimination. [19]   Second, that the prosecutor questioned black jurors more intently than white jurors so as to justify a challenge. The record refutes Hartley's claims.

In support of his first argument, Hartley points to other jurors he claims were white and similarly situated to Ms. Stanford.   Hartley avers a side by side comparison with these similarly situated jurors, whom the prosecutor did not seek to strike, demonstrates the peremptory challenge against Ms. Stanford was racially motivated.

Hartley's ten comparators are Virginia Mungin, Benjamin Cyrus, Judith Woodward, Barbara Stevenson, Grace Monroe, Jude Perez, Ruth Bachner, Margaret Mayer, Lissa Rappaport, and Leslie Cotner. (Memo of Law at pages 58-60).  Hartley's "comparator" argument is flawed for several reasons.

First, Hartley has offered no citation to the record to demonstrate that all of his comparators are white.   Instead, Hartley simply claims they are.

Respondents can only find one record citation, during the voir dire proceedings, that identifies the race of any of Hartley's alleged comparators.   The record supports

---

[19]   Hartley pointed to none of these alleged comparators when presenting his claim of error to the Florida Supreme Court.  (Tab T at pages 44-48).  Moreover, while Hartley faults the trial court and the Florida Supreme Court for failing to consider all the relevant circumstances, including a side by side comparison and the prosecutors alleged history of excluding black jurors,   Hartley never asked the trial court or the Florida Supreme Court to do such a comparison.  Hartley makes the arguments he does in support of his habeas petition for the first time in his federal habeas petition.

that Margaret Mayer, a juror among the first twelve seated in the jury box, is not black. The record does not, however, show she is white. (TR Vol. LXVII 1887).

It is Hartley's obligation to demonstrate his entitlement to relief. This Court should decline Hartley's invitation to accept his unsupported claim his alleged comparators are all white or to comb the record to find support for that allegation.

Hartley's argument is also flawed because several of Hartley's comparators are not comparators at all. In order to be a valid comparator under these circumstances, Hartley must show two things.

First, the comparator must have been subject to challenge but accepted by the prosecution to sit on Hartley's jury. That is, the prosecutor must have had the opportunity to challenge the comparator but, in contrast to his challenge of Ms. Stanford, specifically declined to exercise a peremptory challenge. Next, the alleged comparator must have similar views of the death penalty and be in a profession similar to Ms. Stanford's, where in the view of the prosecutor, the juror might be too forgiving and understanding of human frailties. [20] *See* Snyder v. Louisiana, 128 S. Ct.

_____

[20] A prosecutor's reason for exercising a peremptory challenge does not have to be right or even reasonable. Under Batson, almost any plausible reason can satisfy the striking party's burden, as long as the reason is race or gender neutral." United States v. Walker, 490 F.3d 1282, 1293 (11th Cir. 2007). That the prosecutor might be completely wrong about Ms. Stanford's capacity to forgive and to understand Hartley's human frailties is of no import. Even now, peremptory challenges may be used for the most subjective reason (e.g. I don't want people on my jury who wear red and orange together because in my experience they are too free-spirited and lenient

1203 (2008)(implausibility of prosecutor's alleged race neutral reason for striking a black juror is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious as Mr. Brooks').

Several of the jurors to which Hartley points are not valid comparators.   Ms. Mungin is also not a valid comparator because she was challenged for cause by the defense. [21]  Accordingly, the state never got the opportunity to either exercise a peremptory challenge against Ms. Mungin or to accept her on the jury.

Prospective jurors Cyrus, Perez, Bachner, Rappaport, and Cotner are also not valid comparators because none of these five prospective jurors actually made it into

on defendants).  As long  the prosecutor does not challenge a juror because of his/her membership in a protected class, a peremptory strike, even for the most misguided or ridiculous reason, does not violate the defendant's constitutional rights.  Of course, an implausible or ridiculous reason may give rise to a finding that reason was not genuine once the trial court reached Batson's third step.   However, a peremptory strike, absent intentional discrimination, can still be exercised for any reason.

[21] Hartley avers that when the defense attempted to challenge Ms. Mungin for cause because her daughter had been assaulted suffered by her daughter, the prosecutor, improperly,  opposed the challenge arguing "that she could set her feelings aside." (Memo of Law at 58).  Hartley misquotes the record because Hartley leaves out part of the prosecutor's comment.   What really happened is that trial counsel challenged Ms. Mungin for cause because although her son was in prison for murder, her daughter was assaulted and she is not sure she can set it aside.  The prosecutor noted " Your honor, I thought she indicated she would be able to set that aside." (TR Vol. LXVII 1870). The Court told the prosecutor that Ms. Mungin did say that she was not sure she could set that aside and be fair.   Thereafter the Court granted trial counsel's challenge without any further objection from the State. (TR Vol. LXVII 1871).   The prosecutor's equivocal comment that he believed that Ms. Mungin said she could set aside her daughter's assault" is not evidence of discrimination.

the jury box to be subject to a peremptory challenge.  (TR Vol. LXVII 1888- 1898).

Accordingly, the prosecutor never was presented with an opportunity to challenge or

accept these five prospective jurors.      This Court should reject the notion that

prospective jurors Cyrus, Perez, Bachner, Rappaport, and Cotner are valid

comparators.. [22]

Arguably, only Margaret Mayer, Judith Woodward, Barbara Stevenson, and

Grace Monroe  could  be considered as valid comparators.   Each of the four met the

first prong of a proper comparator analysis - that is all four were subject to challenge

and the prosecutor did not use a peremptory challenge to remove them from the jury.

---

[22]Hartley seems to implicitly acknowledges that many of his alleged comparators were not subject to a peremptory challenge because they never got into the jury box.  To solve this dilemma, Hartley claims the prosecutor did not question these comparators as intently as he did Ms. Stanford. (Memo at law 59-60).  Clearly discriminatory questioning can demonstrate discriminatory intent.   Discriminatory questioning however does not violate a defendant's constitutional rights.  Only when the prosecutor uses the results of his discriminatory questions as a pretext to justify a challenge is a defendant's constitutional rights infringed.

Respondents challenge Hartley's claim the prosecutor engaged in discriminatory questioning.  The record actually refutes it.  Even so, there can be many legitimate reasons that a prosecutor may not dig as deep with his questioning with some jurors.
 For instance, a prosecutor might not question a venireman closely when he can reasonably tell from his place on the venire that it is unlikely he will even make it to the jury box to be subject to a peremptory challenge.   To illustrate, Ms. Bachner, Rappaport, Cotner, and Cyrus were all near or at the bottom of the venire pool.  (TR Vol. LXV 1492).   Or as he did here, a prosecutor may only question more intently those jurors who express reservations about imposing the death penalty.  (TR Vol. LXV 1662).

Neither did the defense.   All four actually sat on Hartley's jury.  (TR Vol. LXVII 1899).

The record supports a finding, however, that these prospective jurors do not meet the second prong because their views on the death penalty were not similar to Ms. Stanford's.   Nor did they share, with Ms. Stanford,  a similar "forgiving" profession.

Margaret Mayer is a housewife.  Her husband is a stock room manager.   (TR Vol. LXV 1508).  When asked her thoughts on the death penalty, Ms. Mayer told the prosecutor that she had given it a lot of thought.  She told the court that "unfortunately I think it plays a part in today's society, wish it didn't".  (TR Vol. LXV 1551)

Grace Monroe is a retired biology teacher.    She has two friends who work at the Sheriff's Department. (TR Vol. LXV 1512). Her husband worked before retirement as an intake counselor at a juvenile detention center.  (TR Vol. LXV 1560).  When asked her views of the death penalty, she told the court that it depends on the crime and it depends on whether the person has been in trouble before.     When the prosecutor asked whether she could vote for the death penalty in the appropriate case, she replied "I believe I could."  (TR Vol. LXV 1561).

Barbara Stevenson is a claims representative for the Social Security Administration.   Her husband is a pastoral counselor. (TR Vol. LXV 1515).   Ms. Stevenson told the court that there was a place for the death penalty in the system.

She did not believe her husband's association with the church would interfere with her ability to carry out the law and vote for death if it was the appropriate sentence. (TR Vol. LXV 1571).

Judith Woodward is a medical assistant employed by a doctor.  She is divorced. (TR Vol. LXV 1517).  She is in favor of the death penalty under certain conditions. (TR Vol. LXV 1575).

Ms. Stanford works for Lutheran Social Services.   She is a psychotherapist and a program director.    She works in private practice and also by contract with the city. (TR Vol. LXV 1542).  She has a masters degree in counseling. (TR Vol. LXV 1542).

Ms. Stanford told the court that she was against the death penalty.  She believes a person can be rehabilitated in some other form.  (TR Vol. LXV 1542).

When asked whether she would be able to recommend death if the aggravating factors outweighed the mitigating factors, she told the court that she could not answer yes or no.   She would have to see the evidence.  It would be hard for her to say what she would do because she has not heard the evidence.    Her beliefs are not strongly held beliefs.  She feels that there are other ways of rehabilitation.  Ms. Stanford feels life is valuable.   She could possible recommend a death sentence in some instances. (TR Vol. LXVI 1666).  Ms. Stanford does not know whether the possibility is unlikely or not. (TR Vol. LXVI 1667).  If the judge instructed her that if the test to apply was

that the aggravators outweighed the mitigators , she would be able to recommend a sentence of death. (TR Vol. LXVI 1667).

The record refutes Hartley's claim that Judith Woodward, Grace Monroe, Margaret Mayer, and Barbara Stevenson are similarly situated to Ms. Stanford. None worked as a psychotherapist or worked in a profession that required them to work with people whose emotional or mental conditions affect their lives in some adverse way. Likewise, when the prosecutor asked them, in his preliminary questioning what their thoughts on the death penalty were, not one of them said they were against it. Ms. Stanford did. (TR Vol. LXV 1542).

The record also refutes Hartley's claim the prosecution singled out black jurors and subjected them to more intense questioning than white jurors. After some preliminary questions, the prosecutor identified several jurors he believed had expressed strong reservations about the death penalty. Ms. Stanford was in that group. So were prospective jurors Harrack, Chambers, and Goldman. (TR Vol. LXV 1662). Stevenson, Woodward, Monroe and Mayer were not. Neither was Ms. Whidby or Ms. Butler. (TR Vol. LXV 1662).

The record does not support a finding that, except for Ms. Stanford, all or any of these more closely questioned jurors were black. Respondents can find nothing in its record to show the race of prospective jurors Harrack, Chambers, and Goldman.

The record does support a conclusion the prosecutor singled these jurors out for one reason.  That reason is not because they were black.  Rather, the reason as clearly stated by the prosecutor was that during the preliminary questioning, these prospective jurors  expressed strong personal reservations about the death penalty. (TR Vol. LXV 1662).

Even if this Court could review this claim *de novo*, Hartley's claim is due to be denied.   The record does not support Hartley's claim the State challenged Ms. Stanford from the jury because she was black.   The record does not support Hartley's claim the prosecutor singled out black jurors to questioning so as to support a pretextual peremptory challenge.

Hartley failed to show the Florida Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law.  Hartley has also failed to show any other entitlement to relief under AEDPA.  This Court should deny Hartley's fifth claim. [23]

---

[23]  Hartley also claims the Florida Supreme Court should have looked to two other cases to see that this particular prosecutor typically uses his peremptory strikes to remove black jurors.  Hartley did not raise this argument on direct appeal.  (Tab T). Nor did Hartley direct the trial court's attention to these cases when he objected to the prosecutor's strike against Ms. Stanford.

The two cases to which Hartley points are not helpful to Hartley's cause. In State v. Smith, 560 So.2d 203(Fla. 1st DCA 1990), the prosecutor was not found to have exercised any challenge in a discriminatory manner.  Moreover, the court noted that the questioning by the state in this case was practically the same as to all jurors and

## CLAIM VI

In this claim Hartley asserts the Florida Supreme Court failed to conduct a proper harmless error analysis after striking the heinous, atrocious or cruel (HAC) aggravating circumstance and finding the cold, calculated, and premeditated (CCP) instruction invalid. Hartley alleges the Florida Supreme Court violated the dictates of Clemons v. Mississippi, 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) and Parker v. Dugger, 498 U.S. 308, 322 (1991) in upholding Hartley's death sentence.   (Memo of Law at page 64).

In both  Clemons and Parker, the United States Supreme Court  ruled that the constitution of the United States does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance.  The Court went on to note that a state court may uphold a death sentence in these circumstances by either reweighing the aggravating and mitigating evidence or by conducting a harmless-error review.    Clemons v.

it produced a reasonable amount of knowledge of each prospective juror's background and individual and family involvement in crime. Id. at 790.  In Reed v. State, 560 So. 2d 203 (Fla. 1990), a case involving a white defendant and white victim, while the record did show the prosecutor used 8 of his 10 peremptory challenges to remove black jurors, two black jurors remained on Reed's jury.   The Florida Supreme Court found no abuse of discretion when the trial court concluded the defense had failed to make a prima facie showing that there was a strong likelihood the black jurors were challenged because of their race.

Mississippi, 494 U.S. at 741; Parker 498 U.S. 319. [24]   To find an error harmless, the

state court must employ the "beyond a reasonable doubt" standard of Chapman v.

California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967). [25]

On direct appeal, Hartley challenged both the CCP and HAC aggravators.   The

Florida Supreme Court addressed his claims and struck the HAC aggravator.   The

Court also conducted a harmless analysis after striking the HAC aggravator:

---

[24] In conducting a review of this claim, this Court should be mindful that the Florida Supreme Court did not strike the CCP aggravator.   Instead, the Court found the aggravator was valid because there was record evidence  supporting the trial judge's finding the murder of Gino Mayhew was cold, calculated, and premeditated. Hartley v. State, 990 So. 2d 1008 (Fla. 2008).   Accordingly, this Court should consider only whether the Florida Supreme Court's harmless analysis after striking the HAC aggravator violated the dictates of Clemons and Parker.

In Parker, the United States Supreme Court remanded the case to the Florida Supreme Court to conduct an appropriate review.  The Court remanded the case to the State of Florida because it was not clear the Florida Supreme Court actually conducted a harmless error analysis in light of the mitigating circumstances in the record.   Parker v. Dugger, 498 So.2d at 319-320.

[25] Florida is a weighing state.  Parker v. Dugger, 498 U.S. 308, 313, 318-319, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991) (citing Fla. Stat. § 921.141(3)(b) (1985)). Accordingly,  if one of the factors considered by the jury is deemed to be invalid, a death sentence must be reversed unless a state appellate court, in this case the Florida Supreme Court,  determined the error was harmless or reweighed the mitigating evidence against the valid aggravating factors.  Brown v. Sanders, 546 U.S. 212 (2006). *See also*  Lambrix v. Singletary, 520 U.S. 518 (1997)(The United States Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless error review).

... Next, Hartley argues that the trial judge erroneously instructed the jury regarding the aggravating factor of CCP. The jury instruction provided in this case on CCP was found to be unconstitutional in <u>Jackson v. State</u>, 648 So. 2d 85 (Fla. 1994). We conclude, however, that this issue is procedurally barred because Hartley merely objected to the constitutionality of the CCP aggravator generally. He did not object to the form of the instruction given, nor did he submit a limiting instruction. <u>Crump v. State</u>, 654 So. 2d 545 (Fla. 1995)(objection at trial must attack the instruction itself, either by submission of a limiting instruction or by an objection to the instruction as worded). In this case, as in Crump, Hartley's objection to the CCP instruction concerned the constitutionality of the aggravating factor itself and whether CCP applied to his case. In a related claim, Hartley contends that the trial judge erroneously found this murder to be CCP. In his sentencing order, the trial judge stated that Hartley "planned to kidnap, rob, and murder [the victim] so he could not retaliate for [the] earlier robbery." As Hartley correctly points out, no record support exists for this conclusion. Although testimony in this case revealed that an earlier robbery did occur, there was no specific testimony to support a finding that the murder in this case was to prevent retaliation for the earlier robbery. This record reflects that the original plan was to rob some "dreads," but that the defendants then decided to "get [the victim]." Apparently, in his sentencing order, the trial judge confused the facts presented in this case with the facts presented in co-defendant Ferrell's case in which testimony was presented to show that the victim was executed to prevent retaliation. See <u>Ferrell v. State</u>, 686 So. 2d 1324, 1996 Fla. LEXIS 1627, No. 83,076 (Fla. Sept. 19, 1996). Consequently, we conclude that the trial judge erred in relying on these facts, as stated in the sentencing order, in finding this murder to be CCP. Nevertheless, we find this error to be harmless beyond a reasonable doubt given that we find other record evidence to support the conclusion that this murder was CCP. Hartley obtained a gun and a getaway vehicle in advance; he did not act out of frenzy, panic, or rage; he forced the victim to drive to a remote area where there would be no witnesses; he shot the victim five times execution-style; and he told a witness that he and the other defendants decided to "get [the victim]." Consequently, we reject the claim that this murder was not CCP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . .. . .

Hartley's final two claims concern the aggravating factor of HAC. Hartley claims that the judge provided an unconstitutional HAC

instruction to the jury and erroneously found the murder to be HAC. We reject the claim that the instruction was erroneous. The instruction provided was approved by this Court in <u>Hall v. State</u>, 614 So. 2d 473 (Fla.), *cert. denied*, 510 U.S. 834, 114 S. Ct. 109, 126 L. Ed. 2d 74 (1993). We agree, however, that the trial judge improperly found the murder to be HAC. In order for the HAC aggravating circumstance to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim. <u>Richardson v. State</u>, 604 So. 2d 1107 (Fla. 1992). Execution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim. In this case the medical examiner could not determine the order in which the shots had been fired and there is no evidence that Hartley deliberately shot the victim to cause him unnecessary suffering. In fact, the evidence reflects that the murder was carried out quickly. Speculation that the victim may have realized that the defendants intended more than a robbery when forcing the victim to drive to the field is insufficient to support this aggravating factor. Nevertheless, we find this error to be harmless beyond a reasonable doubt in light of the five remaining valid aggravating factors (CCP; prior violent felony convictions; committed during the course of a kidnapping; committed to prevent a lawful arrest; and committed for pecuniary gain) and minimal mitigation.

<u>Hartley v. State</u>, 668 So.2d 1316, 1322-1324 (Fla. 1996).

Pursuant to the requirements of <u>Clemmons</u> and <u>Parker</u>, the Florida State Supreme Court conducted a harmless error review in Hartley's case after striking the HAC aggravator. The Court also applied the "beyond a reasonable doubt" standard. In conducting its harmless error analysis, the Florida Supreme Court properly considered the remaining valid aggravating circumstances and the mitigating circumstances present in the record.

While the Florida Supreme Court did not discuss its analysis extensively, no magic words are required. Cf. <u>Sochor v. Florida</u>, 504 U.S. 527, 540, 112 S.Ct. 2114,

119 L.Ed.2d 326 (1992) (there is no federal requirement that state courts adopt "a particular formulaic indication" before their review for harmless error will pass scrutiny).   The court, noted that consideration of the HAC aggravating factor was "harmless beyond a reasonable doubt in light of the five remaining valid aggravating factors (CCP; prior violent felony convictions; committed during the course of a kidnapping; committed to prevent a lawful arrest; and committed for pecuniary gain) and minimal mitigation". Hartley v. State, 668 So.2d 1316, 1322-1324 (Fla. 1996). Notably, the prior violent felony convictions included two prior convictions of armed robbery of Michael Arthur and Edward Staple and a manslaughter conviction stemming from an incident where Hartley killed a fifteen year old girl by shooting her with a shotgun.   (TR Vol. III 437-441).

Hartley cannot show the Florida Supreme Court's analysis was contrary to, or an unreasonable application of clearly established federal law.  Hartley's sixth claim should be denied.

## CONCLUSION

For the reasons stated above, Respondent prays that this Court will deny Hartley's Petition for Writ of Habeas Corpus.

Respectfully submitted,

BILL McCOLLUM
ATTORNEY GENERAL

/S/ Meredith Charbula
MEREDITH CHARBULA
Assistant Attorney General
Florida Bar No. 0708399

OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
PHONE: (850) 414-3583
FAX: (850) 487-0997

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by ECF filing and by U.S. Mail to Linda McDermott this 10th day of March 2009.

/S/ Meredith Charbula
Meredith Charbula
Assistant Attorney General